# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

David Edward Jackson III
    Defendant,

v.

State of Indiana
    Plaintiff.

Federal Habeas Corpus No. 2:24-cv-00010
Petition For: 45G02-1803-F4-000011
Petition For: 45G02-1803-F4-000009
Petition For: 45G02-1803-F3-000011

---

## Habeas Corpus – Exhibit Coversheet and References

| Exhibit | Title or Description of Document |
|---------|----------------------------------|
| A | Affidavit Alyssa Broshar: |
| B | NWI Times - All-female Lake County SVU team brings justice to rape victims - June 12, 2019 |
| C | NWI Times - Fighting for the victims - Nadia Wardrip - June 3, 2018 |
| D | NWI Times - When Victims Don't Cooperate, Solving Sex, Violence Crimes Challenging, Prosecutor Says - January 12, 2019 |
| E | The Crusader - Is Hobart Police Department guilty of Racial Profiling - October 12, 2022 |
| F | NWI Times - Hobart Cop Under Investigation for Racial Remarks on Facebook Police Chief Says - June 10, 2020 |
| G | NWI Times - Lake Prosecutor Seeks Federal Funds to Boost Special Victims Unit - March 17, 2019 |
| H | Chicago Tribune - Advocate to Aid in Hobart Domestic Violence Calls – Congressional Grant - July 10, 2017 |
| I | Official Hobart PD Facebook Post – March 14, 2018 |
| J | Arrest Information Count - Sex Crimes - Lake County - 2009-2023 |
| K | Facebook - Nadia Wardrip Receives Outstanding Service Award (ICESA) - April 9, 2018 |
| L | Plea Agreement |
| M | Course of Events and Proceedings NOTE: Includes transcript excerpts and more. |
| N | Federal Civil Complaint |

/S/ _[signature]_    Date: 8-5-2024
Signature: David Edward Jackson III
Plaintiffs, pro-se
507 Oak St. FRNT
Valparaiso IN, 46383
(219) 781-2799
Dated: August 5, 2024

## Exhibit A - Affidavit Alyssa Broshar

This affidavit clearly establishes that Mr. Jackson suffers from mental disability and trauma related to his treatment by government officials and details the struggles he suffers when performing everyday tasks.

*"David reported being diagnosed with Attention-deficit/hyperactivity disorder, inattentive type before beginning therapy with this therapist. This diagnosis was confirmed by psychological evaluation in October 2020. The psychologist also confirmed this therapist's diagnosis of PTSD as well as including a diagnosis of Generalized anxiety disorder (GAD)."*

*"David's attention and memory has been impacted more severely since his release from prison based on this therapist's observations in session and verbal report in sessions by David. David has repeated stories or concerns in sessions and experiences fragmented thinking patterns, requiring the therapist to prompt David to return to the original conversation. When completing skills-based work, David at times needs to repeat the task multiple times or have this therapist repeat instructions to be able to fully understand and complete the task. David is aware of these difficulties, and becomes emotional when feeling incapable of completing tasks".*

*"On David's recent assessments completed March 2024 his score indicated "severe" symptoms. On the GAD-7 assessment, David received a score of 21, indicating severe anxiety symptoms. On the PHQ-9 assessment, David received a score of 24, indicating severe depressive symptoms. On both of these assessments, a score of 15 and above is indicative of severe symptomology.*

*Due to his ADHD diagnosis, along with the severity of his PTSD symptoms and sleep disturbances, his attention has been significantly disrupted. This has led to difficulty in completing daily tasks."*

## Exhibit B - NWI Times - All-female Lake County SVU team brings justice to rape victims - June 12, 2019

This article implies that the policy to turn over cases within 72 hours would be perceived as only pertaining to those that involve rape kits. This is not true. It is all sex offence and domestic violence cases as confirmed in the deposition of Detective Brazil and addressed in other news articles.

Page 3:
*"Since forming, the SVU handles all reports of crimes involving sex offenses or intimate partner violence before charges are filed until the final resolution. The process removes discretion from police on whether the case has sufficient evidence for prosecution, creating department-wide consistency."*

*"We wanted to make sure that each and every one of these victims had an opportunity to have their case looked at," Wardrip said. "Prior to this unit, prosecutors would change — the files could change hands. You have every prosecutor trying every type of case. But now, every case is handled by one of us. And that's how we can get that uniformity."*

## Exhibit C - NWI Times - Fighting for the victims - Nadia Wardrip - June 3, 2018

This article addresses again the violation of separation of powers, equal protections, checks and balances and prosecutorial overreaching.

Page 2:
*"From here on out, we have removed the discretion from police," Wardrip said. "Previously, a detective could choose to bring the case to the prosecutor or not. We have removed that.*

*"Going forward, within 72 hours of the detectives concluding their key witness interviews and gathering crucial evidence, they have to bring us the case. One of the four of us will decide whether charges are appropriate or not."*

*"The office has filed an average of six felony cases a month in Lake Criminal Court since 2015. Wardrip said those numbers likely will rise now. "Because we've learned a lot of these detectives have not been bringing us cases that should have been presented to us," she said."*

## Exhibit D - NWI Times - When Victims Don't Cooperate, Solving Sex, Violence Crimes Challenging, Prosecutor Says - January 12, 2019

This article clearly states that the Prosecutors only see two options when they receive a case after it has been forcibly transferred by policy to the Prosecutors Office. Plea Negotiation or Trial. Nowhere does it state they will dismiss cases lacking credible evidence.

Page 2:
*"Our goal is to keep everyone safe – the victims and society as a whole. If the suspect is willing to get help, we try to get him help," Afshar said. "We either have a pre-trial agreement (admitting guilt) or we go to trial."*

## Exhibit E - The Crusader - Is Hobart Police Department guilty of Racial Profiling – October 12, 2022

This article shines a light on the Racial Bias and Prejudice that infests Hobart Police Department. This one of several instances in the media and one of two that is presented here.

On October 12, 2022, as reported by the Crusader Newspaper Group:
*"On or about the 8th of August 2022, the Gary NAACP Branch was contacted and requested to file a complaint against the Hobart, Indiana, Police Department. As the Legal Redress Investigator, I, Robert L. Buggs, received the call and provided the family with the forms necessary to begin an investigation."*

*"Gould stated he was arguing with his girlfriend on the side of his house located in the 300 block of N. Cavender Street, Hobart,*

*Indiana. It must be noted that only two Black families live in this all-white neighborhood."*

*"Gould said he saw a red laser on his stomach and began to run as Nelson fired at him. Gould stated he was yelling for help, so he ran into his home and called the police, stating he had been shot at by his neighbor. The police dispatcher told him the police were outside waiting to talk to him."*

*"He stated that when he exited his house, the police advised him to put his hands up and slowly back up to them. He followed their orders and was immediately handcuffed and subsequently taken to jail. Thomas stated when she arrived home there were five police cars present. She also stated she observed eight police evidence cones on the street by spent shell casings."*

*"Thomas was not allowed to talk to her son who was in the squad car. A Hobart police officer asked her to sign a document giving them permission to search her house. When she refused, she was denied entry into her home because it was a "crime scene." The officer told her he was going to get a judge to issue a search warrant."*

*"The police obtained the search warrant at approximately 2 a.m. and never presented it to Ms. Thomas before searching her home. After about two hours of searching, the officers found nothing and upon exiting the house told Ms. Thomas they left the warrant on her kitchen table."*

*"A Black man running for his life while being shot at by a white man... was charged with attempted murder. Why?"*

*"Additionally, the probable cause document had three different accounts by police of their response to the calls and two different dates for the same incident."*

*"Thomas also stated when they moved in five years ago, she suspected Nelson broke into her house, defecated on her beds,*

*busted holes in her walls, spray painted her walls with "go home niggas" and other expletives."*

*"I spoke with the Prosecutor about upgrading the charge against Nelson. The first court date for the Criminal Recklessness charge is October 7."*

*"Hobart police did not pursue the attempted murder charge against Gould. They released him the next day."*

*"The Hobart Police continue to respond when Thomas calls about the intimidation, but they refuse to make a report."*

*"The Hobart Police Chief refuses to meet with me as the NAACP Legal Redress Investigator after repeated requests, as does the Internal Affairs Department."*

## Exhibit F - NWI Times - Hobart Cop Under Investigation for Racial Remarks on Facebook Police Chief Says - June 10, 2020

Again, prejudice was made public and the response by Hobart PD was dismissive especially from Police Chief Zorimier.

Page 2:

*"We were made aware of the situation. It is under investigation to figure out what rule violations were committed, and we do intend for there to be discipline and some kind of mandatory training," Zormier said.*

*In a Facebook comment directed to Ryan Stutesman late last week — in response to the statement "Black lives matter," — Luke stated:*

*"While other races don't talk about crimes against each other, they also don't protest, riot and loot and pretend like other races are the main reason their people are dying. You know what response times are like for GSWs (gunshot wounds) and homicide sand shots-fired calls in the black community? They're terrible, and why would they get any better? Yes, the police have a duty to protect their*

6

*communities, but if they get there in a timely fashion, they're going to be wrong no matter what action they take. If they wait until the dust settles, nobody cares who died. So go ahead and continue believing cops are killing black people daily without just cause. Just a heads up, by doing so you aren't helping black lives."*

*Page 3:*

*"I think the time we are in right now, it's really crucial to make sure that police are doing their job and keeping communities safe no matter if they're black or white," Stutesman said.*

*Stutesman added they felt it was important people from their hometown saw Luke's comment, as it was the opinion of an officer serving the Hobart community.*

## Exhibit G - NWI Times - Lake Prosecutor Seeks Federal Funds to Boost Special Victims Unit - March 17, 2019

Again, it states that they are only interested in two options, a good plea deal or trial. Nothing is mentioned about dismissing unsubstantiated complaints. It states that the money will also be used to supplement the pay of Deputy Prosecutors which gives them motive to prosecutor as many as they can to help secure the grant when it comes up for renewal and is supported by the salary history provided of Nadia Wardrip.

*Page 1:*

*The Lake County Prosecutor's Office is seeking federal funds for its newly minted Special Victims Unit as part of a broader effort to prioritize sex crimes and domestic violence cases.*

*County prosecutors intend to ask for a $140,000 grant from the Justice Department's Office of Violence Against Women, which manages 19 separate grant programs under a 1994 federal domestic violence law.*

*The funds come from OVW's STOP grant, a formula-based program used to help local jurisdictions develop strategies for prosecuting crimes against women and provide better assistance to victims.*

7

Page 2:

*"If the full grant request is approved, the county will kick in $35,000 in matching funds, bringing total program funding to $175,000 for the year, according to figures provided to The Times.*

*The STOP grant could give the Special Victims Unit some needed financial support. Lake County Prosecutor Bernard Carter created the unit last year in response to public outcry over the discovery of 5,000 untested rape kits across Indiana, including238 in Lake County that dated back to the 1990s.*

*"[We] will now be better prepared to go to trial and obtain a guilty verdict or a good plea agreement and more jail time," Carter said at the time."*

*"Under the proposed STOP grant budget, about $155,000 would be set aside for wages and employee benefits in the Special Victims Unit. The money would cover the full-time advocate's entire salary plus benefits, along with supplemental pay for deputy prosecutors, whose caseload often requires up to 20 hours of additional work per week."*

## Exhibit H - Chicago Tribune - Advocate to Aid in Hobart Domestic Violence Calls – Congressional Grant - July 10, 2017

This shows that not only does Hobart PD recognize that a department of their size normally would not get the grant, but all three individuals were involved in Mr. Jacksons arrest and are also named as defendants in Mr. Jacksons civil case. This is improper motivation when all three must show a need for ensuring that more cases are reported and prosecuted to continue to receive the grant that pays their salaries.

Page 1:

*"The Hobart Police Department has taken its handling of domestic violence cases a step further, hiring a full-time victim's advocate."*

"Rachelle Ellis, a Hobart High School and Indiana University Northwest graduate who worked in the department's System to End Repeated Violence (SERV) program as an unpaid intern, was hired on a paid basis as of July 5, Police Chief Rick Zormier told the Hobart Board of Public Works and Safety."

"Most departments our size don't have a victims' advocate," Zormier said. "This puts us family us at the forefront as a premier agency in handling and following up on family violence cases," he said.

"No agency is too small to care or take notice of this nationwide problem," he said

Ellis said Wednesday she'll see about 50 victims in a year.

Zormier said the SERV program received a $90,000 grant through the Violence Against Women's Act enacted by Congress and made available to the State of Indiana through the Indiana Criminal Justice Institute.

Page 2:
"He said the grant will be used to pay for the salaries of Ellis and one detective, as well as training. The city must pay a matching amount of $30,000, Zormier said.

He said the grant would be renewed on a yearly basis."

"Ellis Ciszewski also worked to secure the latest grant with the aid of Capt. Garrett Ciszewski and Detective Robert Brazil."

"Zormier said the SERV program has received grant money for the past three years."

## Exhibit I - Hobart Police Department - March 14, 2018

This is the Facebook post that was placed on the Official Hobart Police Department Facebook page by Capt. Garrett Ciszewski. Not only does it address issues not yet charged but also indicates crimes and a 47-year-old accomplice and speculative motives based on no actual

evidence to defame Mr. Jackson, taint the jury pool and to entice others with a grudge against Mr. Jackson to step forward to claim he assaulted them two. This would result in two others stepping forward. These two would have a motive. One was an ex-employee fired from her job with Mr. Jackson for credit card fraud and theft and her girlfriend.

In the Deposition of Detective Brazil, it is made clear that the "tip" they received never mentioned Mr. Jackson in anyway though the Facebook post would state otherwise. This would be then shared all over social media as well as used in a NW Indiana Times news post.

## Exhibit J - Arrest Information Count - Sex Crimes - Lake County - 2009-2023

This information is provided by the Management Performance Hub on the In.Gov website. The information provided is for Indiana Arrest Information. It clearly shows under the category of Sex Crimes that the rate between 2009 and 2023 has dropped dramatically. The Lake County Prosecutors Office claims that 1/3 of all crimes in Lake County are violent / sex crime related. However, Indiana State records contradict this claim. Arrest Information Count - Arrested Individuals:

Lake County - 2009-2023 - All: 95,528 (100%)
Lake County - 2009-2023 - Sex Offense: 1,366 (1.42%)

## Exhibit K - Facebook - Nadia Wardrip Receives Outstanding Service Award (ICESA) - April 9, 2018

Defendant Nadia Wardrip's actions are seen as encouraged by Indiana Coalition to End Sex Abuse and the local government.

## Exhibit L - Plea Agreement

David Jackson's plea agreement which was agreed too under illegal coercion and influence while deprived of medications, human contact, lack of medical and psychiatric care while in "Protective Custody" Solitary Confinement and under suicide watch.

## Exhibit M - Course of Events and Proceedings

This Is a full recounting of everything that has happened over the past few years starting from Mr. Jacksons arrest up until this moment.

## Exhibit N – Federal Civil Complaint

Attached is a copy of the latest Federal Civil Complaint that is being filed the same day as this action. Its for relevancy and can help establish arguments, motivations or provide context when used along side the Course of Events and Proceedings.

## VERIFICATION

"I verify under penalties of perjury that all information within this Exhibit is factual and accurate as to the best of my / our abilities."

/S/ _____ Date: 8-5-2024

Signature: David Edward Jackson III

Plaintiffs, pro-se
507 Oak St. FRNT
Valparaiso IN, 46383
(219) 781-2799
Dated: August 5, 2024

# Affidavit of Alyssa Broshar

State of Texas

County of Van Zandt

Alyssa Broshar, being duly sworn deposes and states as follows under penalty of perjury:

1. My name is Alyssa Broshar, I am presently 33 years old, and my current address of residence is 2167 Tecumseh Park Ln, West Lafayette, Indiana 47906.

2. The purpose of this Affidavit is to advocate for David Jackson as his mental health therapist.

3. My name is Alyssa Broshar, and I am the current therapist seeing David Jackson. I began seeing David for weekly to twice weekly individual counseling services on November 15, 2019. Since I began seeing David, he has been consistent in maintaining his counseling sessions and has been actively working on meeting treatment objectives. Sessions lapsed due to incarceration. Upon release, David contact this therapist to resume sessions. Due to financial constraints, sessions have been reduced to biweekly (every other week) although weekly to twice weekly sessions have continued to be the recommendation due to severity of symptoms.

   Based on my diagnostic interview, clinical observations, and assessments, I have diagnosed David with Post-traumatic stress disorder (PTSD). Common symptoms of PTSD are flashbacks of the traumatic event, increased arousal, avoidance, and frequent worry. David specifically has spoken about being fearful and having somatic symptoms such as muscle tension and cold sweats whenever he hears a door knock for example. He has described fearing leaving his home and has avoiding going out in public unless absolutely necessary. David has also mentioned sleep disturbances and panic attacks that were not present before his arrest. David previously disclosed past trauma that began as a child but reported no PTSD symptoms occurring until his initial arrest. These symptoms were present at the time of the initial assessment in 2019 and have continued with severe presentation to the current date.

   David reported being diagnosed with Attention-deficit/ hyperactivity disorder, inattentive type before beginning therapy with this therapist. This diagnosis was confirmed by psychological evaluation in October 2020. The psychologist also confirmed this therapist's diagnosis of PTSD as well as including a diagnosis of Generalized anxiety disorder (GAD).

   David's attention and memory has been impacted more severely since his release from prison based on this therapist's observations in session and verbal report in sessions by David. David has repeated stories or concerns in sessions and experiences fragmented

thinking patterns, requiring the therapist to prompt David to return to the original conversation. When completing skills-based work, David at times needs to repeat the task multiple times or have this therapist repeat instructions to be able to fully understand and complete the task. David is aware of these difficulties, and becomes emotional when feeling incapable of completing tasks.

David has complained about feeling overmedicated in the past by his psychiatrist. David has described and provided information to this therapist on his medications, and at times has been prescribed 8 different psychotropic medications at a time. David has reported his medication have not been stable and continue to fluctuate. This therapist has provided referrals to David to seek alternative care. David followed through on seeking a different psychiatrist; however, was unable to continue care due to financial constraints. David continues to report advocating for himself and taking all medications as prescribed.

Before David's incarceration, he was in the process of completing disability paperwork due to the severity of symptoms impacting daily life. The paperwork was put on hold due to incarceration. David is currently working on finalizing the paperwork. This therapist initiated discussions on filing disability paperwork due to observations on how PTSD and ADHD symptoms were impacting daily functioning.

On David's recent assessments completed March 2024 his score indicated "severe" symptoms. On the GAD-7 assessment, David received a score of 21, indicating severe anxiety symptoms. On the PHQ-9 assessment, David received a score of 24, indicating severe depressive symptoms. On both of these assessments, a score of 15 and above is indicative of severe symptomology.

Based on my years in working with David, I have seen consistent motivation in reaching personal and clinical goals. Due to his ADHD diagnosis, along with the severity of his PTSD symptoms and sleep disturbances, his attention has been significantly disrupted. This has led to difficulty in completing daily tasks. In our sessions, we have worked on improving organization, improving sleep hygiene, reframing negative and fear-based thought patterns, and teaching and practicing coping skills and grounding techniques to reduce hypervigilance. However, since it would be out of my scope of practice, I have not been able to provide relevant feedback on any legal aspects contributing to his stress. Being able to have a court-appointed attorney to assist with legal challenges in making sure paperwork is filed appropriately would aid greatly in reducing stress for David.

I hereby swear or affirm that the information above is true accurate and complete to the best of my knowledge, and that no relevant information has been omitted.

Dated:

03/12/2024

Signature of Individual:

Notarized online using audio-video communication



Notary Public

*Bonnie Esparza*

Title And Rank

Notary Public, State of Texas

Date Of Commission
Expiry

07/18/2026

USDC IN/ND case 2:24-cv-00010-PPS-AZ    document 15-1    filed 08/05/24    page 15 of 234

https://www.nwitimes.com/news/local/crime-and-courts/all-female-lake-county-svu-team-brings-justice-to-rape-victims/article_620c915f-c818-545f-ba88-1ef15b820ec5.html

URGENT

# All-female Lake County SVU team brings justice to rape victims

Olivia Heersink
Jun 12, 2019



Infinity Baulos, left, talks about a case with fellow Deputy Prosecutors Maryam Afshar, center, and Jessica Arnold at the Lake County prosecutor's office in Crown Point. Nadia Wardrip, not pictured, is the fourth woman who makes up the Special Victims Unit within the prosecutor's office. The unit marks one year in operation this month.

Ty Vinson, The Times

Olivia Heersink

CROWN POINT — As she approached her front door on the night of March 20, 1984, a woman felt a gun pressed into the back of her head.

She and another woman who had been with her then were forced inside the home in the 2000 block of East 39th Avenue by three unknown men, according to court records.

Upon entering the Hobart residence, the group of men found a third female, raping each at gunpoint. No suspects were charged at the time.

For three decades, the evidence — the women's rape kits — sat, gathering dust until May 1, 2018, when they were forwarded to the state crime lab for review, records state.

On Jan. 18, 2019, DNA from one of the unearthed kits returned the name of **Joel Williams Jr.**, a convicted felon, tying him to the 35-year-old crime.

## People are also reading...

1   **Raising Cane's to open first NWI location Thursday**

2   **'Grace' the baby bobcat escapes from Washington Park Zoo**

3   **NWI Business Ins and Outs: Family Pizza & BBQ, King of Budz, Harbor Freight Tools, Brothers BBQ and Seoul Food, Crazy Snacks, Schillings, Dunkin' and Culver's opening; Enzo's for sale**

4   **Chesterton resident defrauded of $35,000 in Apple hack scam, police said**

Williams' arrest is one of many made during the past year following a commitment by the prosecutor's office to test all non-anonymous rape kits backlogged in Lake County.

In 2017, a statewide audit revealed nearly 5,000 untested kits across Indiana, with 238 of those in Lake County.



Joel Williams Jr.
Provided by the Lake County Sheriff's Department

## Untested rape kits in Indiana



0    20    40    60    80    100    120    140    160    180    200    220    240    260    280    300    320    340    360    380    400    420    440    460

Source: Indiana State Police report provided to Indiana General Assembly on Nov. 27, 2017.



"It's a nationwide problem with hundreds of thousands of kits across the country untested," Deputy Prosecutor Nadia Wardrip said. "We knew that before the report came out."

Wardrip said the audit served as an opportunity to revamp how crimes involving sex offenses or intimate partner violence are prosecuted by the county, leading to the creation of the **Special Victims Unit**.

The all-female, four-member team is composed of Wardrip and fellow Deputy Prosecutors Maryam Afshar, Infinity Baulos and Jessica Arnold, with each representing one of the four felony courtrooms.

### Improving prosecution

USDC IN/ND case 2:24-cv-00010-PPS-AZ    document 15-1    filed 08/05/24    page 17 of 234

Since forming, the SVU handles all reports of crimes involving sex offenses or intimate partner violence before charges are filed until the final resolution. The process removes discretion from police on whether the case has sufficient evidence for prosecution, creating department-wide consistency.

If a rape kit is done, police must collect it from the medical facility within 72 hours and then forward it to Indiana State Police within 30 days of pickup. Once finished, the information is presented to the SVU, whose members handle the case from that point and decide if charges are appropriate.

"We wanted to make sure that each and every one of these victims had an opportunity to have their case looked at," Wardrip said. "Prior to this unit, prosecutors would change — the files could change hands. You have every prosecutor trying every type of case. But now, every case is handled by one of us. And that's how we can get that uniformity."

In the past year, they have sent all backlogged kits performed on or after Jan. 1, 2008, to the state crime lab, Wardrip said. Nearly all of them have been tested, with some of the completed kits already being prosecuted by members of the SVU.

Recent cases — each involving a victim reporting that she/he was raped by a stranger — have ended in arrests after the associated kit returned a DNA match with a person in the FBI's Combined DNA Index System (CODIS), a nationwide database of DNA profiles that includes samples taken from all people arrested in Indiana on felony offenses.

Just before Williams, 53, of Gary, was taken into custody in March, police arrested 27-year-old **Christopher R. Bias**, of Hammond and East Chicago, on Feb. 25 after DNA tied him to a rape that occurred in August 2018, according to court records.

The alleged victim told police her car had broken down at a gas station in Munster. When she began to walk home, Bias approached under the guise of offering help and later sexually assaulted her, records state.

She told police he had put his hand over her mouth and threatened to kill her if she screamed.

Bias is facing four felonies and a misdemeanor, including strangulation and battery by bodily waste, stemming from the August incident.

Before Williams or Bias were arrested, police nabbed **Willie L. Dixon**, of Gary, charging the 51-year-old with rape, kidnapping and four other felonies related to a crime that occurred in January 2018, records state.



Christopher Ray Bias
Provided

Dixon admitted in a plea agreement he dragged a woman into an abandoned Gary home, where he stabbed and sexually assaulted her. He pleaded guilty to rape May 10 in exchange for the other charges being dropped. His sentencing is scheduled for June 25.

"These three cases are all really terrible crimes that would've quite honestly never been solved," Baulos said. "We wouldn't have even known they existed (without testing the specific rape kit)."

With these and other backlogged cases involving CODIS hits, Afshar said they've had victims come forward, saying, "Wow, I can't believe you found this person. I never thought you would find them."

## Legislative changes

The unit's one-year anniversary also coincides directly with the implementation of a new state law aiming to better help rape victims.



Willie Lee Dixon
Provided by the Lake County Sheriff's Department

📄 Lake County prosecutor takes on sex crimes with a new zeal and an all-female trial attorney team

The law allows victims and prosecutors to track rape kits through the Indiana Criminal Justice Institute database, assigning each kit a specific number.

Individuals then will be able to see the date the kit was received, processed, examined and finalized.

The program, which is expected to be fully operational July 1, also provides reimbursement to those providing the medical exams and additional forensic services to protect victims' identities.

"This important new law will bring peace of mind to victims of rape who choose to have their kits tested," state Rep. Carolyn Jackson, D-Hammond, said in a news release May 30. "It is my hope that this new law will prove to help rape victims successfully move through the recovery process, while also protecting their identity."

Lake County Prosecutor Bernard Carter said he believes the law will improve accountability statewide and empower victims — a sentiment Wardrip echoed.

"It's not just out there somewhere; (victims) can get on their computer and see exactly what is going on with their kit," Wardrip said.

## Looking ahead

In the coming years, the group hopes to expand the unit to include additional prosecutors, social workers and victim advocates to improve their response to these types of cases.

"(Victims) need places to live. They need counseling. They need people to watch their kids, so they can come to court. It's life-altering. They need a lot of services that we can't provide them at that point," Baulos said. "The more people we can get involved, the more people we can help."

"We're realizing, in doing things differently, it requires a village to really prosecute these awful crimes," Wardrip added.

Baulos said they also want to continue educating all levels of law enforcement — including themselves — and making progress on their promise to test the backlogged rape kits.

USDC IN/ND case 2:24-cv-00010-PPS-AZ    document 15-1    filed 08/05/24    page 19 of 234

Originally, Batllos said they planned to only send kits performed in the past decade to the state's crime lab. But now, they plan to send older kits — some dating back to the early 1990s — due to the progress made within their first year.

"It's nonstop, it's very busy," Wardrip said. "But it's been very successful."

### Recent arrests booked into Lake County Jail

**Rape kit process**

If a rape kit is done, police must collect it from the medical facility within 72 hours and then forward it to Indiana State Police within 30 days of pickup. Once finished, the information is presented to Lake County's Special Victims Unit, whose members handle the case from that point and decide if charges are appropriate.

**By Olivia Heersink**
**Morning Cops/Breaking News Reporter**

Source: https://www.nwitimes.com/news/local/crime-courts/lake-county-prosecutor-takes-on-sex-crimes-with-a-new-zeal-and-an-all-female/article_362cebdf-9040-56f4-b73a-9f08bb5535e4.html

# Fighting for the victims

## Lake County prosecutor takes on sex crimes with a new zeal and an all-female trial attorney team

**Bill Dolan**    Jun 3, 2018 Updated Jun 11, 2019    6 min to read



Lake County Prosecutor Bernard Carter poses with deputy prosecutors of the Special Victims Unit, from left, Infinity Baulos, Nadia Wardrip, Samantha Wuletich and Maryam Afshar.

John J. Watkins, The Times

Bill Dolan

CROWN POINT — Four women have been given the job of bringing Lake County's sexual offenders to justice.

Lake County Deputy Prosecutors Maryam Afshar, Infinity Baulos, Nadia Wardrip and Samantha Wuletich have been called in to attend to law enforcement's prior neglect of past rapes and ensure future investigations are more compassionate and zealous.

"From here on out, we have removed the discretion from police," Wardrip said. "Previously, a detective could choose to bring the case to the prosecutor or not. We have removed that.

"Going forward, within 72 hours of the detectives concluding their key witness interviews and gathering crucial evidence, they have to bring us the case. One of the four of us will decide whether charges are appropriate or not."

The office has filed an average of six felony cases a month in Lake Criminal Court since 2015. Wardrip said those numbers likely will rise now. "Because we've learned a lot of these detectives have not been bringing us cases that should have been presented to us," she said.

One such case was a complaint by a woman who said she was sexually assaulted by three men with whom she had been drinking alcohol in a Merrillville apartment. The victim went to a hospital, underwent a medical examination, the evidence was put in a rape kit, which was put aside and gathered dust, untested, for three and a half years.

Several weeks ago, Wardrip and Merrillville Detective Allison Ellis found the kit as part of a survey of neglected rape cases. Wardrip filed rape charges last month against the three men, who now are facing trial.

Wardrip said it was the first case filed by the Lake County prosecutor's office Special Victims Unit. Prosecutor Bernard Carter said he formed the unit in response to criticism following the discovery of about 5,000 untested rape kits across the state, including 238 in Lake County, 16 in Porter County and 20 in LaPorte County. Some of Lake County's untested cases date back to the 1990s.

Crown Point attorney Walter Alvarez, whose law firm represents one of the defendants in the Merrillville case, said, "Our client was innocent four years ago and he is innocent today. The entire matter was voluntary and consensual. Though the #MeToo sentiments are now a valid reality of life, we are confident that our client will receive a fair and just resolution."

## Making survivors' cases matter

The Joyful Heart Foundation, an advocate for sexual assault victims, states on its End the Backlog website that across the U.S. hundreds of thousands of untested rape kits exist that have never been submitted to a forensic police laboratory for DNA identification of the perpetrator.

The foundation and other victim advocates argue for the belated processing of the kits to let survivors know their cases still matter and to put a perpetrator's DNA in a database for use in future investigations of serial rapists.

Michelle Kuiper, a sexual assault survivor, said she has been working with Joyful Heart and state authoritie. Her assailant, she said, was identified 17 years after her rape through DNA collected from her rape kit, the kits of other victims, improvements in forensic technology and good police work.

Kuiper said she lobbied state Sen. Mike Crider, R-Greenfield, for legislation to audit Indiana's inventory of untested rape kits.

## Seeking cooperation

Crider reached out to Dave Powell, executive director of the Indiana Prosecuting Attorneys Council, for county prosecutors' help in getting cooperation from all police departments with the audit, which was completed last fall.

Powell said about half of the nearly 5,000 untested kits should have been destroyed after the victims, who have a right of refusal under state law, declined to press further with their complaint. In some cases, the perpetrator was too young for prosecution or investigations were concluded from evidence other than the kits.

"About half of that number we couldn't account for and we needed to look into (it)," Powell said.

"Critics complain that prosecutors have lost control, but prosecutors are not the boss of cops. We are a team, and ultimately we are responsible for the cases they bring to us."

Carter said he could not leave his office prey to arbitrary choices by detectives, so he formed the Special Victims Unit.

"Bernie and his team have been asking police why they haven't brought in cases," Powell said. "Do we have a training problem with that department? Do we have a lazy officer who doesn't care? Do we have a bias against these victims? Do we just have incompetence? I think he has made dramatic improvement."

Carter said his all-female prosecutor team "will now be better prepared to go to trial and obtain a guilty verdict or a good plea agreement and more jail time."

No one is publicly blaming individual police officers for sitting on past rape complaints.

"I never go in pointing fingers. Law enforcement were trained differently at that time to determine within 10 minutes whether someone was lying," Kuiper said. "Crime victims are expected to recount the details perfectly as possible like, 'How long were you held?' You can't always remember those things. They may say things out of order or say something wrong because they are telling you in trauma."

"Sexual assault victims memories don't function in a way as someone who didn't go through such a traumatic event," Wardrip added. "The ability to hold memory literally shuts down because your body is just trying to survive. It may not retain what color the perpetrator's shoes were. It takes at least two sleep cycles to recall these types of details in an appropriate order. But we expect victims to do that right away, as soon as they report to the hospital. We are asking them to do the impossible.

"To the lay person it looks like the person isn't telling the truth because they cannot recall what seems to us like obvious details. The perpetrators are usually cool, calm and collected and have their stories in order because nothing traumatic happened to them."

## Dispelling sexual assaults myths

Wardrip said it will be the mission of their new team to educate not only law enforcement, but the public at large.

"There are a lot of myths surrounding sexual assault cases. The victim wanted it, but felt bad the next day about having a one-night stand or the victim had it coming because she was intoxicated or the victim is a bitter ex-girlfriend wanting revenge on her ex-boyfriend," Wardrip said. "If the victim had a bad first experience with the responder, they will be very hesitant to move forward with cooperating with law enforcement. We need to teach law enforcement how to handle these cases differently. We will be retraining law enforcement and the special considerations they need to take into account.

"Given my experience of working in shelters and advocacy centers, I've seen first-hand what these victims have to endure and the deplorable treatment they are given by those who are supposed to help them."

There is more to reopening a long dormant rape case than filing court papers, Wardrip said.

"The approach we will use in some of the older backlog cases is making sure we have a victim-friendly detective and a victim advocate who will initially do the approach to these victims. We cannot just barge into their life. We have to evaluate the victim's current mind state," she said.

The victim in the Merrillville case "was on the one hand very happy that we were doing something about it and that she was not forgotten, but at the same time there is that hurt and confusion about why this is happening three and a half years later," Wardrip said.

"We are dealing with human beings who have gone through likely the most traumatic event of their lives. There is more involved than a decision on what kind of a plea should we get or should we go to trial. We need to validate them, tell them we are so sorry this wasn't looked at more carefully from the start. That means something to these victims."

## Searching for fairness

Carter said his prosecutorial team will have to faces juries with the same skeptical attitude about sexual assault complaints, but he said he is confident they can find fair-minded jurors.

"We are hopeful with this #MeToo movement and all the publicity from the cases of Bill Cosby and Harvey Weinstein will positively affect the way we prosecute these cases," Wardrip said.

Powell said while county prosecutors like Carter have taken their own measures to ensure all rape cases are properly investigated, they want an electronic system that tracks every new rape kit from the time the victim's medical exam is finished.

"We are trying to take the human error out of it with a system that victims, if they want to know, can track their own kit. Prosecutors will know about these kits out in the field so they can reach out and ask why they haven't brought in," he said.

Powell said his office has met with an information technology vendor to brainstorm a simple, cost-effective tracking system. "They have done some preliminary work. It can be done. I hope by the end of summer to have something concrete," he said.

"Then we will sit down with sexual assault nurse examiners, victims' groups, prosecutors and law enforcement, answer their questions and get consensus. Everything is being driven toward the upcoming legislative session. We will rely on Sen. Crider to pass legislation to make it real."

"Once we know what the needs are and put a dollar figure on that, I will file a bill this next legislative session asking for funding to pay for that tracking system," Crider said.

Wardrip said while the team can't guarantee every case will end in a conviction, "we can guarantee that every victim will be treated with the dignity and respect that they deserve and each case will be worked to the fullest extent possible."

https://www.nwitimes.com/news/local/when-victims-dont-cooperate-solving-sex-violence-crimes-challenging-prosecutor-says/article_d74695e0-9d28-53a6-8347-2aa299eaa863.html

URGENT

# When victims don't cooperate, solving sex, violence crimes challenging, prosecutor says

Lu Ann Franklin Times Correspondent
Jan 12, 2019



Lake County Prosecutor Bernard Carter
Bill Dolan

Lu Ann Franklin Times Correspondent

SCHERERVILLE — One-third of the criminal cases filed by the Lake County prosecutor involve sex crimes and domestic violence.

Investigating these crimes and helping victims, including women and children, is the focus of the Special Victims Unit, introduced last spring.

Lake County Prosecutor Bernard A. Carter and four female deputy prosecutors provided insight into the SVU's work during Friday's monthly meeting of the Lake County Advancement Committee at Teibel's Restaurant.

Carter said he set up the SVU to focus on four crimes – domestic violence, sex crimes, including rape and child molestation, child pornography and human trafficking.

The main problem facing prosecutors is "the lack of victim cooperation," said Deputy Prosecutor Nadia Wardrip. "The perpetrator is known to the victim – father, stepfather, mom's boyfriend. The victims have been manipulated for years and years."

**People are also reading...**

USDC IN/ND case 2:24-cv-00010-RPS-AZ    document 15-1    filed 08/05/24    page 25 of 234

1   **Cops: Driver with drugs, booze in his system charged with killing elderly man getting his mail**

2   **U.S. Steel opens new $150 million pellet production facility**

3   **Driver more than 3 times legal limit did not recall hitting other vehicle, Portage police say**

4   **Valpo-area mom had cocaine around her son, charges say**

---

Prosecutors fulfill the role of counselor to determine what the woman needs for support, what the children need and what needs to be done to prevent the crime from happening again, Wardrip said. "We can't throw everyone in jail."

The SVU goals include training police and detectives to know how to handle the situation, she said. "We see a lot of victim-blaming."

Training for nurses who handle sexual assault patients and community education comprise other goals for 2019.

Deputy Prosecutor Jessica Arnold said domestic violence includes physical, sexual and psychological abuse. After an assault, there is usually "a honeymoon phase" but the tensions build again, she said.

"A victim will leave (the abuser) seven times," Arnold said.

Domestic violence is also a "serious problem for business," accounting for $1.8 billion in losses due to employees missing work or being unable to continue working," she said.

Employers should look for tell-tale signs of domestic violence including bruising, black eyes, hearing loss and wearing long sleeves during the summer months, Arnold noted.

Sexual assault occurs every 98 seconds, said Deputy Prosecutor Infinity Baulos.

"One in nine girls and one in 53 boys are raped by an adult," Baulos said. "We hear about false rape claims. Less than 5 percent are false, and 63 percent of rapes are not reported to police."

Sexual assault of a minor is child molestation and "93 percent of child molestation victims know the person. One in 10 children is molested before their teens and 20 percent of those before they are 8 years old," she said.

Child pornography also abuses children and has increased 200 percent in the last 10 years, Baulos said. "The United States is the second highest ranked in the world behind The Netherlands in child pornography."

Human trafficking is a $105 billion industry and 83 percent are American citizens, she said, with sporting events and festivals the primary places where human trafficking takes place. Teens and runaways are primary targets.

Methods of prosecuting sex crimes have changed recently to promote thorough investigation and obtaining tangible evidence, said Deputy Prosecutor Maryam Afshar.

"Our goal is to keep everyone safe – the victims and society as a whole. If the suspect is willing to get help, we try to get him help," Afshar said. "We either have a pre-trial agreement (admitting guilt) or we go to trial."


# THE CRUSADER
### NEWSPAPER GROUP

Q Search...

# Is Hobart Police Department guilty of racial profiling?

Crusader Staff    October 12, 2022    9:26 am

naacp

**By Robert L. Buggs, Sr.**

On or about the 8th of August 2022, the Gary NAACP Branch was contacted and requested to file a complaint against the Hobart, Indiana, Police Department. As the Legal Redress Investigator, I, Robert L. Buggs, received the call and provided the family with the forms necessary to begin an investigation.

I met with the mother of the victim, Belinda Thomas, who stated her son, Michael Myyeah Gould, had been shot at eight times by a white male neighbor, Joseph Nelson. I interviewed Michael Gould by phone.

Gould stated he was arguing with his girlfriend on the side of his house located in the 300 block of N. Cavender Street, Hobart, Indiana. It must be noted that only two Black families live in this all-white neighborhood. Gould stated that this white male, Joseph Nelson, left his garage located at 300 N. Guyer St., Hobart, Indiana, and approached Gould and asked him who was he talking to. An argument ensued and Nelson allegedly pulled a gun on Gould from the street.

Gould said he saw a red laser on his stomach and began to run as Nelson fired at him. Gould stated he was yelling for help, so he ran into his home and called the police, stating he had been shot at by his neighbor. The police dispatcher told him the police were outside waiting to talk to him.

He stated that when he exited his house, the police advised him to put his hands up and slowly back up to them. He followed their orders and was immediately handcuffed and subsequently taken to jail. Thomas stated when she arrived home there were five police cars present. She also stated she observed eight police evidence cones on the street by spent shell casings.

...Thomas was not allowed to talk to her son who was in the squad car. A Hobart police officer asked her to sign a document giving them permission to search her house. When she refused, she was denied entry into her home because it was a "crime scene." The officer told her he was going to get a judge to issue a search warrant.

USDC IN/ND case 2:24-cv-00010-PPS-AZ    document 15-1    filed 08/05/24    page 27 of 234

The police obtained the search warrant at approximately 2 a.m. and never presented it to Ms. Thomas before searching her home. After about two hours of searching, the officers found nothing and upon exiting the house told Ms. Thomas they left the warrant on her kitchen table.

As a result, her family including her 6-, 8- and 10-year-old grandchildren had to sit on the ground from approximately 10 p.m. that night until 4:45 a.m. the next morning.

During the night they were not allowed to enter their home to use the bathroom. A neighbor said she provided blankets for warmth and a couple of chairs.

Meanwhile, Nelson, the shooter, was free to roam around at will.

After the white police officers returned to interview the neighbors they were told by the white neighbors that Gould was observed running and calling for help as Nelson was shooting at him. It was at this time that Nelson was arrested, taken to jail, and charged with criminal recklessness.

Joseph Nelson was allowed to bond out for $190.

I began the investigation by contacting the Hobart Police Department which refused to provide me with a copy of the probable cause and information documents. I then asked to meet with the Police Chief and was informed he was not going to meet with me.

The front desk clerk then contacted the detective on the case. The front desk clerk said, "I talked to the detective in internal affairs and he told me to tell you that they are not going to give you a copy of the information you requested. And, if you don't like it, file a complaint." The police department clerk gave me a complaint packet.

I promptly filed a complaint and a Freedom of Information Act request.

Several days later, I received a request from Thomas to come to their house to assist them in speaking with the police. The police had been nonresponsive (refusing to make a police report) to their complaints against Nelson who had been driving past their home shouting harassing remarks and making intimidating gestures at the family. Of course, Nelson did not drive by at that time.

This time when the office met with the family I gave him my card and advised the Hobart officer that the NAACP was gathering information to give to the FBI for a possible hate crime investigation.

Later that day, I received a phone call informing me the requested documents will be provided immediately. Included was the Hobart City Jail Arrest Record indicating Gould, who was unarmed, was charged with attempted murder.

A Black man running for his life while being shot at by a white man... was charged with attempted murder. Why?

Additionally, the probable cause document had three different accounts by police of their response to the calls and two

As if that were not enough, a Hobart police officer told Thomas and her son not to go into their backyard or walk to the store because "Nelson was still upset and to stay inside their home for a couple of days so he could cool off."

Thomas also stated when they moved in five years ago, she suspected Nelson broke into her house, defecated on her beds, busted holes in her walls, spray painted her walls with "go home niggas" and other expletives.

The homeowner's estimate and repair costs exceeded $30,000.

I spoke with the Prosecutor about upgrading the charge against Nelson. The first court date for the Criminal Recklessness charge is October 7.

Hobart police did not pursue the attempted murder charge against Gould. They released him the next day.

Nelson continues to drive by Thomas' house laughing and shouting "I got you motherfuckers."

The Hobart Police continue to respond when Thomas calls about the intimidation, but they refuse to make a report.

The Hobart Police Chief refuses to meet with me as the NAACP Legal Redress Investigator after repeated requests, as does the Internal Affairs Department.

What Say You?

*Robert L. Buggs Sr. is the Legal Redress Investigator for the Gary Branch NAACP.*

## Recent News



### VONtv Premieres CBS 2 Chicago Dorothy Tucker's Special Report 'Investigating Injustice: The Shocking Truth about Black Women and Crime in Chicago'

by **Patrick Forrest** — 🕒 May 29, 2024    0 ↪



### DePaul Targets Eight BIPOC and Jewish-Led Student Organizations for Disciplinary Action After Encampment

by **Crusader Staff** — 🕒 May 28, 2024    0 ↪



## Tips for checking in with your teen

by **Patrick Forrest** — 🕒 May 28, 2024    0 ↪



## Blackhawks and Rockford IceHogs agree to ECHL affiliation extension

by **Joseph Phillips** — 🕒 May 28, 2024    0 ↪

⟨ ⟩





The Crusader Newspaper Group consists of two weekly newspapers in Illinois and Indiana featuring news, commentary, and lifestyle reporting geared toward the African American community.

**Follow Us**

**Browse by Category**

Business

Entertainment

News

National

Sports
Gary Business

Gary Community

Gary Education

Gary Local News

Gary Sports

Opinion

Podcast

Education

Classifieds

Lifestyle

**Newsletter**

Subscribe to our mailing list to receives daily updates direct to your inbox!

Email

Subscribe

© 2022 The Crusader News Group | Empowered by

https://www.nwitimes.com/news/hobart-cop-under-investigation-for-racial-remarks-on-facebook-police-chief-
says/article_0960d278-5f96-5d70-916a-2eade72816bb.html

URGENT

# Hobart cop under investigation for racial remarks on Facebook, police chief says

**Mary Freda**

Jun 10, 2020



Times Staff

Mary Freda

**H**OBART — A Hobart cop is under internal investigation for inflammatory social media comments regarding race, including police response times to black neighborhoods, the police chief confirmed.

Hobart Cpl. Matt Luke, a patrolman and 18-year veteran of the department, returned to work Wednesday after using accrued paid time off while the department reviewed the situation, Police Chief Rick Zormier told The Times on Wednesday.

"We were made aware of the situation. It is under investigation to figure out what rule violations were committed, and we do intend for there to be discipline and some kind of mandatory training," Zormier said.



A Facebook comment from Hobart Cpl. Matt Luke.
Provided

In a Facebook comment directed to Ryan Stutesman late last week — in response to the statement "Black lives matter," — Luke stated:

"While other races don't talk about crimes against each other, they also don't protest, riot and loot and pretend like other races are the main reason their people are dying. You know what response times are like for GSWs (gunshot wounds) and homicides and shots-fired calls in the black community? They're terrible, and why would they get any better? Yes, the police have a duty to protect their communities, but if they get there in a timely fashion, they're going to be wrong no matter what action they take. If they wait until the dust settles, nobody cares who died. So go ahead and continue believing cops are killing black people daily without just cause. Just a heads up, by doing so you aren't helping black lives."

## People are also reading...

1   **2 children dead after vehicle disregarded stop sign, county police say**

USDC IN/ND case 2:24-cv-00010-PPS-AZ   document 15-1   filed 08/05/24   page 33 of 234

Stutesman, who lives in Chicago but grew up in Hobart, engaged with Luke after seeing his comment under a mutual friend's post, which explained the difference between saying, "Black lives matter," and "All lives matter."

"I think the time we are in right now, it's really crucial to make sure that police are doing their job and keeping communities safe no matter if they're black or white," Stutesman said.

Stutesman added they felt it was important people from their hometown saw Luke's comment, as it was the opinion of an officer serving the Hobart community.

A probe into Luke's comment was set to continue Wednesday, Zormier said.

Zormier said Luke hasn't had any disciplinary action in his file for the past seven years, during which Zormier has been chief.

"He's never even had a written complaint or official complaint filed against him," Zormier said, adding Luke has a "stellar police record."

Zormier said the social media post is not reflective of how the department feels.

"Hobart is diverse. We have people of color that live in every neighborhood of this city. We don't have a particular neighborhood that I would say classifies as a minority neighborhood," Zormier said. "When he was making (the) comment, according to his version, (he was) making the comment these things happen (but) not in our community."

Zormier said location or race never play into response times by his police department.





See a day in the life of Dyer Police Officer Matthew Voss as he patrols on a snowy February day. Video shot by Kale Wilk and produced by Nat Cardona. Interview by Anna Ortiz.

Kale Wilk

"His comments were poorly written. It wasn't something that should have ever been said, even if he was referring to other communities that maybe do have segregated neighborhoods or what have you," Zormier said. "He's not been a police officer anywhere else. (He) doesn't have a right or an experience to feed off of to make a comment of that nature.

"Had he worked somewhere that those things occurred ... then maybe he can try to explain why those things happen ... but he doesn't have any experience in that department. I certainly don't have experience in that department."

Zormier said police response times are reviewed annually and officer evaluations are conducted semi-annually, usually in July and November.

According to Zormier, Luke's response times are "up there with everybody else's."

The Times has requested a copy of Luke's response times.

## Gallery: Recent arrests booked into Lake County Jail

**By Mary Freda**

**South Lake County Reporter**

USDC IN/ND case 2:24-cv-00010-PPS-AZ   document 15-1   filed 08/05/24   page 35 of
234

[URGENT]

# Lake prosecutor seeks federal funds to boost Special Victims Unit

**Will Racke , 219-933-4089**
Mar 17, 2019



Lake County Prosecutor Bernard Carter
Bill Dolan

Will Racke , 219-933-4089

C ROWN POINT — The Lake County Prosecutor's Office is seeking federal funds for its newly minted Special Victims Unit as part of a broader effort to prioritize sex crimes and domestic violence cases.

County prosecutors intend to ask for a $140,000 grant from the Justice Department's Office of Violence Against Women, which manages 19 separate grant programs under a 1994 federal domestic violence law.

The funds come from OVW's STOP grant, a formula-based program used to help local jurisdictions develop strategies for prosecuting crimes against women and provide better assistance to victims.

In a unanimous vote Tuesday, the Lake County Council gave the prosecutor's office permission to move forward with its grant application. The county must apply to the Indiana Criminal Justice Institute, which receives the federal funds and decides how much, if any, of the grant request will be awarded.

**People are also reading...**

1   **Michigan City considering lakefront entertainment complex at NIPSCO site, looking at ideas like hotels and Ferris wheel**

USDC IN/ND case 2:24-cv-00010-PPS-AZ   document 15-1   filed 08/05/24   page 36 of 234

2   Report: Drunken driver leads chase, says officers are lucky she didn't use gun

3   **Chesterton resident defrauded of $35,000 in Apple hack scam, police said**

4   **Federal grand jury indicts Cedar Lake woman for theft of PTO funds**

---

If the full grant request is approved, the county will kick in $35,000 in matching funds, bringing total program funding to $175,000 for the year, according to figures provided to The Times.

The STOP grant could give the Special Victims Unit some needed financial support. Lake County Prosecutor Bernard Carter created the unit last year in response to public outcry over the discovery of 5,000 untested rape kits across Indiana, including 238 in Lake County that dated back to the 1990s.

"[We] will now be better prepared to go to trial and obtain a guilty verdict or a good plea agreement and more jail time," Carter said at the time.

The unit, initially formed as an all-female team of four deputy prosecutors, has a mandate to remove discretion from police about when to pursue sexual or domestic violence cases. Its attorneys also have specialized experience working with survivors of rape and domestic violence, which can make victims feel more comfortable working with the prosecutor's office.

But simply assigning knowledgeable staff is not enough to make it effective, county prosecutors say. The team needs STOP grant funding to pay for all the extra hours, additional duties and outside training initiatives its attorneys must perform in their new roles, according to deputy prosecutor Bob Neumaier.

"[The STOP grant] will include acquiring specialized training for the unit's deputy prosecutors, who will in turn pass on that knowledge to local law enforcement and other victim services groups," Neumaier wrote in his request to the county council. "The program will also seek to enlarge our victim services and assistance to those who have suffered sexual and/or domestic violence by designating a full-time victim/witness advocate exclusively to the unit."

One of the biggest impacts a successful STOP grant application would have is to allow the Special Victims Unit to switch its part-time victim advocate to a full-time position. The current advocate does not have enough time to manage her caseload with the unit along with other duties in the Victim Witness Division, according to Infinity Baulos, one of the unit's four deputy prosecutors.

Under the proposed STOP grant budget, about $155,000 would be set aside for wages and employee benefits in the Special Victims Unit. The money would cover the full-time advocate's entire salary plus benefits, along with supplemental pay for deputy prosecutors, whose caseload often requires up to 20 hours of additional work per week.

"The extra money will go toward community outreach and training," Baulos told The Times, adding that deputy prosecutors are responsible for seeking out their own training opportunities from organizations such as the Police Chiefs of America and The Indiana Prosecuting Attorneys Council.

The county's STOP grant application is due April 5. Once the Criminal Justice Institute receives an application, it typically takes 30 to 60 days to decide whether to approve the grant and how much of it to award, Neumaier said.

County lawmakers must create the budget line items that will allow the Special Victims Unit to begin spending the money. Assuming the grant is approved, the unit expects the money to go toward operations in the period between July 1 and June 30, 2020, according to Neumaier.

USDC IN/ND case 2:24-cv-00010-PPS-AZ   document 15-1   filed 08/05/24   page 37 of 234

The county council appears poised to move quickly to authorize the spending if the STOP grant is approved. On top of the council's unanimous vote, Councilwoman Christine Cid, D-East Chicago, was outspoken in her support of the grant application during Tuesday's council meeting.

"I've always been an advocate in the fight against domestic violence," Cid told The Times on Wednesday. "I know too many women who have suffered domestic violence — it's close to my heart."

NEWS

# Advocate to aid in Hobart domestic violence calls



By KAREN CAFFARINI

PUBLISHED: July 10, 2017 at 1:00 p.m. | UPDATED: June 3, 2018 at 1:29 p.m.

The Hobart Police Department has taken its handling of domestic violence cases a step further, hiring a full-time victim's advocate.

Rachelle Ellis, a Hobart High School and Indiana University Northwest graduate who worked in the department's System to End Repeated Violence (SERV) program as an unpaid intern, was hired on a paid basis as of July 5, Police Chief Rick Zormier told the Hobart Board of Public Works and Safety.

"Most departments our size don't have a victims' advocate," Zormier said. "This puts us at the forefront as a premier agency in handling and following up on family violence cases," he said.

"No agency is too small to care or take notice of this nationwide problem," he said

Ellis said Wednesday she'll see about 50 victims in a year.

Zormier said the SERV program received a $90,000 grant through the Violence Against Women's Act enacted by Congress and made available to the State of Indiana through the Indiana Criminal Justice Institute.

He said the grant will be used to pay for the salaries of Ellis and one detective, as well as training. The city must pay a matching amount of $30,000, Zormier said.

He said the grant would be renewed on a yearly basis.

He said while an intern, Ellis helped organize the office and record-keeping for the SERV program as well as provided intensive follow-up to victims of domestic violence. He said she will network with local women's shelters, substance abuse clinics and the schools, because "911doesn't always get us into the homes. Sometimes it's a teacher or counselor," Zormier said.

Ellis also worked to secure the latest grant with the aid of Capt. Garrett Ciszewski and Detective Robert Brazil.

Mayor Brian Snedecor said the follow-up that Ellis will be doing is key to the program.

"Often, officers have to stabilize this call then go on to another call. This allows the follow-up," Snedecor said.

Zormier said the SERV program has received grant money for the past three years.

*Karen Caffarini is a freelance reporter for the Post-Tribune.*

## TRENDING NATIONALLY

1. Connecticut state trooper killed by hit-and-run driver

2. 'A huge kiss and make up.' Disney World, Florida leaders plot major expansion

3. Trump caught on tape using n-word: ex-Apprentice producer

4. Median home price surpasses $2 million in these two Bay Area counties

5. TikTokers post viral video of themselves breaking into amusement park

 Messages 📶 📶 ⛺ 2:15 PM 📶 ⛺ ✽ 🔋

‹ 🛡 **Hobart Police Department**
28 mins · ⊙ ···

Owner of Games Inn charged with Child Molesting/Sexual Misconduct

On March 8, 2018, a 14 year old juvenile victim and her parents came to the Hobart Police Department, the juvenile victim told investigators that for the last year, she and her parents have been going to Games Inn, located at 301 Center Street. She explained that her family had become close with the owner, who she identified as David Jackson and his family. She explained that while she was at Games Inn, David took her and her family downstairs, so he could show them his 3D printer and how it worked. She stated after he was done showing how it worked, everyone went back upstairs and she stayed in the basement with David and he subsequently kissed her and hugged her. She explained that David has done this for the past year and kissing and touching had become more frequent and intimate. The juvenile explained that this started when she was 13 years old and continued after she turned 14.

Investigators also spoke to the juvenile's mother, who explained that her daughter had been acting out and hadn't been her self for the past year. She told investigators that their was an incident at Games Inn when David and her daughter went to the kitchen together and they were gone for an unusual amount of time, she said she went to the kitchen to check on them and the two of them were standing in the kitchen. She said she asked her daughter if anything was going on with her and David, which at the time she denied anything was happening.

The Hobart Police Department had also received an anonymous tip from "We Tip" crime line, which is a independent third party crime tip line and not affiliated with Law Enforcement. The tip specifically named David Jackson and another male, approximately 47 years of age, and it alleged that David and this other male were engaging in sexual misconduct with minors and sexual assault inside of Game Inn in the upstairs apartment. The tip didn't specify any victim(s) in particular or when the assaults occurred.

The Hobart Police Department is committed to ensuring that situations involving abuse to juveniles are thoroughly investigated, we have a Social Worker, who is assigned to the Detective Bureau and who can assist us with interviews and offer resources to victims. It is important that if anyone else who has patronized the Game Inn and had any inappropriate contact with Mr. Jackson or the other 47 year old male should report it to the Hobart Police Department.

The allegations made are disheartening to the community as a whole, due to Mr. Jackson owning a business, which specifically caters to juveniles. The allegations can be interpreted as such that Mr. Jackson opened his business purely to satisfy is own personal desires at the expense of innocent children.

Mr. Jackson (pictured below) in currently in custody and has been charged with one count of child molesting and one count of sexual misconduct with a minor.

A link to the Mayo Clinic, which explains the signs that your child is being abused, physically, sexually, and or emotionally. It is imperative that if anyone thinks that a juvenile is being abused in any way that it is reported to the police, parent, teacher or any person, who can assist the juvenile.

https://www.mayoclinic.org/diseases-conditions/child-abuse/symptoms-causes/syc-20370864



    ≡





**Lake County Prosecutor's Office**
April 9, 2018 · 🌐

The Lake County Prosecutor, Bernard A. Carter, would like to congratulate Nadia Wardrip for receiving the Outstanding Service Award from the Indiana Coalition to End Sexual Assault (ICESA). ICESA has received dozens of nominations from across the state for people who have shown leadership in their individual disciplines when it comes to providing compassionate, evidence-based, trauma-informed service to victims and survivors of sexual assault. We are proud to hear that one of our own has been recognized for this award. Nadia has been a deputy prosecuting attorney with our office for the last 5 years. During her time with us she has gone above and beyond for both the state of Indiana and the victims of violent crime. It is an honor to have her on our staff and we look forward to many more years of working alongside of such an inspirational individual.

👍 9

| Like | Comment | Share |

 Write a comment...

Firefox    https://the.lake.in.portal.org

Filed: 2/13/2022 9:38 AM
Clerk
Lake County, Indiana

| | | |
|---|---|---|
| STATE OF INDIANA | ) | SUPERIOR COURT OF LAKE COUNTY |
| | ) SS: | CRIMINAL DIVISION |
| COUNTY OF LAKE | ) | CROWN POINT, INDIANA |

| | | |
|---|---|---|
| STATE OF INDIANA | ) | |
| | ) | CAUSE NUMBER. 45G02-1803-F3-000011 |
| vs. | ) | CAUSE NUMBER. 45G02-1803-F4-000009 |
| | ) | CAUSE NUMBER. 45G02-1803-F4-000011 |
| DAVID EDWARD JACKSON III | ) | |
| TCN: 4500091994 | ) | |

## STIPULATED PLEA AND AGREEMENT

Comes now the State of Indiana, BERNARD A. CARTER, Prosecuting Attorney for the Thirty-first (31st) Judicial Circuit, by his Deputy Prosecuting Attorney, NADIA WARDRIP, and the Defendant, DAVID EDWARD JACKSON III, in person and by his attorney, RUSSELL BROWN, and stipulate and agree to the following:

1.      The Defendant, David Edward Jackson III, is currently charged under Cause # 45G02-1803-F3-000011, with Count I: Rape, a Level 3 Felony; Count II: Attempted Sexual Misconduct with a Minor, a Level 4 Felony; Count III: Sexual Misconduct with a Minor, a Level 5 Felony; Count IV: Sexual Misconduct with a Minor, a Level 6 Felony; is charged under Cause # 45G02-1803-F4-000009, with Count I: Child Molesting, a Level 4 Felony; Count II: Sexual Misconduct with a Minor, a Level 5 Felony; and is charged under Cause # 45G02-1803-F4-000011, with Count I: Sexual Misconduct with a Minor, a Level 4 Felony; Count II: Sexual Misconduct with a Minor, a Level 5 Felony; Count III: Sexual Misconduct with a Minor, a Level 6 Felony.

2.      That the Defendant has been informed by his attorney as to the nature and cause of every accusation against the Defendant, and that the attorney for the Defendant has consulted and advised the Defendant with regard to such matters and as to any possible defense which the Defendant might have in this cause.

3.      That the Defendant understands that he is entitled to have all of his rights which may be involved in this matter explained to him.

4.      That the Defendant understands that he has a right to plead "Not Guilty" to any offense charged against him, and that pursuant to a plea of "Not Guilty", the Constitution of the United States and the Constitution of the State of Indiana guarantee him the following rights:

A. The right to a speedy and public trial by an impartial jury in the county in which each offense is alleged to have been committed;

B. The right to be heard by himself and counsel;

C. The right to demand the nature and cause of the accusation against him and to have a copy thereof;

D. The right to confront and cross-examine all witnesses against him at time of trial;

E. The right to use the power and process of the Court to compel the production of any evidence including attendance of any witnesses in his favor at trial;

DEFENDANT'S
EXHIBIT
E

Firefox   https://indiana.inpcms.org/

F. The right to require the State to prove his guilt beyond a reasonable doubt at a trial at which the Defendant may not be compelled to testify against himself;

G. The right to the assistance of counsel at every stage of the proceedings, including upon an appeal if need be;

H. The right not to testify without prejudice; and

I. That in the event that he should be found guilty of the charge now pending, he has the right to appeal that conviction on such charge to the Indiana Supreme Court.

5.   The Defendant further understands that if he enters a plea of "guilty", he thereby waives his right to a trial by jury, to confront and cross-examine the witnesses, the right to require the State to prove his guilt beyond a reasonable doubt, and the right not to testify without prejudice.

6.   That notwithstanding the above, the Defendant has, with the assistance of counsel, entered into an agreement with the State of Indiana, the terms of which are as follows:

A. The State agrees file an Amended Information adding Count IV: Sexual Misconduct with a Minor, a Level 6 Felony in Cause # 45G02-1803-F3-000011,

B. The Defendant agrees to plead guilty to Count IV: Sexual Misconduct with a Minor, a Level 6 Felony in Cause # 45G02-1803-F3-000011;

C. The Parties agree that the Defendant will be sentenced to two and a half (2.5) years in the Lake County Jail/Department of Correction, with 534 days to be executed and the remainder suspended and served on sex offender probation;

D. The Defendant understands that a Level 6 Felony carries a possible sentence of six (6) months to two and a half (2.5) years in jail/prison; that the advisory sentence is one (1) year;

E. The Defendant understands that if credit time is granted for a Level 6 Felony it is one (1) day credit for every one (1) day served;

F. The State agrees file an Amended Information adding Count III: Sexual Misconduct with a Minor, a Level 6 Felony in Cause # 45G02-1803-F4-000011;

G. The Defendant agrees to plead guilty to Count III: Sexual Misconduct with a Minor, a Level 6 Felony in Cause # 45G02-1803-F4-000011;

H. The Parties agree that the Defendant will be sentenced to two and a half (2.5) years in the Lake County Jail/Department of Correction, with 534 days to be executed and the remainder suspended and served on sex offender probation;

I. The Defendant understands that a Level 6 Felony carries a possible sentence of six (6) months to two and a half (2.5) years in jail/prison; that the advisory sentence is one (1) year;

J. The Defendant understands that if credit time is granted for a Level 6 Felony it is one (1) day credit for every one (1) day served;

K. The Defendant agrees to plead guilty to Count II: Sexual Misconduct with a Minor, a Level 5 Felony in Cause # 45G02-1803-F4-000009;

L. The Parties agree that the Defendant will be sentenced to three (3) years in the Department of Correction, with 305 days to be executed and the remainder to be suspended and served on sex offender probation;

M. The Defendant understands that a Level 5 Felony carries a possible sentence of one to six (1-6) years in jail/prison; that the advisory sentence is three (3) years;

N. The Defendant understands that if credit time is granted for a Level 5 Felony it is one (1) day credit for every three (3) days served;

O. The Parties agree that said sentences in Cause # 45G02-1803-F3-000011; Cause # 45G02-1803-F4-000009; and Cause # 45G02-1803-F4-000011 shall be served concurrently,

P. The Defendant agrees and understands that as a result of the conviction in Cause # 45G02-1803-F4-000009, he is required to register as a sex offender for ten (10) years as required by law;

Q. The Defendant agrees he has been fully advised of the registration requirements imposed on him as a result of this conviction;

R. The Parties agree that the Defendant's probation sentence shall be transferred to Porter County, Indiana;

S. The Parties agree that the Defendant's visitation with his children shall be subject to Porter County Probation's discretion;

T. The Defendant agrees he has been fully advised of the rules and requirements of sex offender probation;

U. The Defendant agrees and understands he will be required to participate in Project Pro through Porter County PACT;

V. The Defendant agrees to continue to abide by the No Contact Orders with the victims in Cause # 45G02-1803-F3-000011; Cause # 45G02-1803-F4-000009; and Cause # 45G02-1803-F4-000011 during the duration of his sentence;

W. The victims have been notified of the terms contained herein; and

X. The Defendant understands that if probation is granted as part of the Defendant's sentence and the Defendant is later found to have violated the conditions of probation, then the Court may impose sanctions under I.C. 35-38-2-3; including, among other things, an additional term of imprisonment of all or part of a suspended sentence so long as the total sentence served is not less than the statutory minimum prescribed by statute for the class of felony for which the Defendant was placed on probation;

Y. The parties agree that this Stipulated Plea and Agreement shall not be considered an admission of any allegations of ineffective assistance of counsel or prosecutorial misconduct within the Petition for Post-Conviction Relief;

Z. At the time of sentencing, the State of Indiana agrees to dismiss Count I: Rape, a Level 3 Felony; Count II: Attempted Sexual Misconduct with a Minor, a Level 4 Felony; Count III: Sexual Misconduct with a Minor, a Level 5 Felony under Cause # 45G02-1803-F3-000011; Count I: Child Molesting, a Level 4 Felony under Cause # 45G02-1803-

Firefox                                                          https://indiana.inpcms.org

F4-000009; Count I: Sexual Misconduct with a Minor, a Level 4 Felony; and Count II: Sexual Misconduct with a Minor, a Level 5 Felony under Cause # 45G02-1803-F4-000011;

AA. Attached hereto and incorporated herein as Exhibit 'A' is the Stipulated Factual Basis.

7.      That the Defendant affirms that he has entered into this Plea Agreement voluntarily and of his own accord, and that no promises have been made to him other than those contained herein.

8.      The Parties agree that the plea agreement will be taken under advisement until the sentencing date at which time the Court will either accept or reject the plea agreement.

9.      That if the Court does not see fit to accept the terms as herein set forth, the Court is respectfully requested to set this matter for trial at its earliest convenience.

10.     If the criminal history of the Defendant substantially deviates from representations made by the Defendant or counsel for the Defendant with regard to any such criminal history, the State of Indiana reserves the right to withdraw any agreement contained herein at any time prior to the Court's imposition of a sentence in this cause.

11.     The Defendant understands that if he is not a United States citizen, a conviction may affect his immigration status.

12.     The Defendant also understands that by pleading guilty he will not have the right to directly appeal the conviction(s) to the Indiana Court of Appeals or the Indiana Supreme Court but may appeal the conviction(s) directly to the trial court by filing a Petition for Post-Conviction Relief (PCR). The Defendant understands that the PCR petition is a standard form which can be obtained from the court's office or found in any library in any institution within the department of correction or in the Indiana Rules of Court book at any public library. The Defendant further understands that if he is going to file a PCR petition, he must file it at the earliest possible opportunity following the imposition of sentence. The Defendant understands that if he delays in filing a PCR petition, and the State becomes unable to prosecute the case because witnesses and/or evidence is unavailable to them, the PCR petition may be denied even if good grounds for appealing the guilty plea exists.

_____
DAVID EDWARD JACKSON III
DEFENDANT


_____
RUSSELL BROWN
COUNSEL FOR DEFENDANT

STATE OF INDIANA

_____
NADIA WARDRIP
Deputy Prosecuting Attorney
Indiana Attorney No. 30996-64
Lake County Prosecutor's Office
2293 North Main Street
Crown Point, Indiana 46307
Telephone: (219) 755-3720
Fax: (219) 755-3642

STATE OF INDIANA ) 
) SS: 
COUNTY OF LAKE )

STATE OF INDIANA )
)
V. )
)
DAVID EDWARD JACKSON III )

SUPERIOR COURT OF LAKE COUNTY
CRIMINAL DIVISION
CROWN POINT, INDIANA

CAUSE NUMBER. 45G02-1803-F3-000011
CAUSE NUMBER. 45G02-1803-F4-000009
CAUSE NUMBER. 45G02-1803-F4-000011

## STIPULATED FACTUAL BASIS

Come now the State of Indiana, by Deputy Prosecuting Attorney Nadia Wardrip, and David Edward Jackson III, in person and by his attorney, Russell Brown, and stipulate and agree to the following:

1. That David Edward Jackson III, DOB - 9/19/1980, SSN - XXX-XX-1787, is the Defendant in Cause Numbers 45G02-1803-F3-000011, 45G02-1803-F4-000009, and 45G02-1803-F4-000011.

2. That Victim One is the victim in Cause # 45G02-1803-F3-000011 and born on September 19, 2000.

3. That Victim One is the victim in Cause # 45G02-1803-F4-000009 and born on August 30, 2003.

4. That Victim One is the victim in Cause #45G02-1803-F4-000011 and born on January 13, 2000.

5. **As it relates to Cause # 45G02-1803-F3-000011:**

6. That on numerous occasions between the dates of September 19, 2014 and September 18, 2016, David Edward Jackson III and Victim One were together at Games Inn, located at 301 Center Street, Hobart, Lake County, Indiana.

7. That between said dates, Victim One was between fourteen (14) and sixteen (16) years of age and David Edward Jackson III was over eighteen (18) years of age.

8. That between said dates, David Edward Jackson III was aware of Victim One's age.

9. That on numerous occasions between said dates and at said location, David Edward Jackson III kissed Victim One on her lips and rubbed her arms and vaginal area, while commenting how she found her attractive, to satisfy his own sexual desires.

10. That between September 19, 2014 and September 18, 2016, in the County of Lake, State of Indiana, David Edward Jackson III, being at least 18 years of age, did perform or submit to fondling or touching with Victim One, a child at least fourteen (14) years of age but less than sixteen (16) years of age, with the intent to arouse or satisfy the sexual desires of the child or defendant contrary to I.C. 35-42-4-9(b) and against the peace and dignity of the State of Indiana.

11. **As it relates to Cause # 45G02-1803-F4-000009:**

12. That on numerous occasions between the dates of August 30, 2017 and February 28, 2018, David Edward Jackson III and Victim One were together at Games Inn, located at 301 Center Street, Hobart, Lake County, Indiana.

13. That between said dates, Victim One was fourteen (14) years of age and David Edward Jackson III was over twenty-one (21) years of age.

14. That between said dates, David Edward Jackson III was aware of Victim One's age.

15. That on numerous occasions between said dates and at said location, David Edward Jackson III grabbed Victim One's hand and placed it on the front of his pants, forced her to touch his penis, touched Victim One on her vaginal area outside of her clothing, and pushed her against the wall, kissing her and fondling her breasts while telling her, "I want you so bad" to satisfy his own sexual desires.

16. That between August 30, 2017 and February 28, 2018, in the County of Lake, State of Indiana, David Edward Jackson III, being at least 21 years of age, did perform or submit to fondling or touching with Victim One, a child at least fourteen (14) years of age but less than sixteen (16) years of age, with the intent to arouse or satisfy the sexual desires of Victim One or of David Edward Jackson III contrary to I.C. 35-42-4-9(b)(1) and against the peace and dignity of the State of Indiana.

17. **As it relates to Cause # 45G02-1803-F4-000011:**

18. That on numerous occasions between the dates of July 1, 2014 and January 12, 2016, David Edward Jackson III and Victim One were together at a game shop on Main Street in Hobart, Lake County, Indiana, and together at another store, Games Inn, located at 301 Center Street, Hobart, Lake County, Indiana.

19. That between said dates, Victim One was between fourteen (14) and sixteen (16) years of age and David Edward Jackson III was over eighteen (18) years of age.

20. That between said dates, David Edward Jackson III was aware of Victim One's age.

21. That on numerous occasions between said dates and at said locations, David Edward Jackson III kissed Victim One, fondled her breasts, buttocks, and vaginal area, to satisfy his own sexual desires.

22. That between July 1, 2014 and January 12, 2016, in the County of Lake, State of Indiana, David Edward Jackson III, being at least 18 years of age, did perform or submit to fondling or touching with Victim One, a child at least fourteen (14) years of age but less than sixteen (16) years of age, with the intent to arouse or satisfy the sexual desires of the child or defendant contrary to I.C. 35-42-4-9(b) and against the peace and dignity of the State of Indiana.

23. That all of these events occurred in Lake County, Indiana.

_____
DAVID EDWARD JACKSON III
DEFENDANT

_____
RUSSELL BROWN
COUNSEL FOR DEFENDANT

BERNARD A. CARTER
PROSECUTING ATTORNEY

_____
NADIA WARDRIP
DEPUTY PROSECUTING ATTORNEY
Indiana Attorney No. 30996-64
2293 North Main Street
Crown Point, Indiana 46307
Telephone- (219) 755-3720

EXHIBIT "A"

# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF INDIANA, HAMMOND DIVISION

David Edward Jackson III; Nickole Anna Jackson; Stoic Azalia Jackson; Promise Joy Jackson; Et al.
    Plaintiffs,

v.

State of Indiana; Et al.
    Defendants.

**DEFENDANTS FULLY LISTED IN CIVIL COMPLAINT**

**Civil Action No. 2:20-CV-00045**
**Civil Action No. 2:24-CV-00009**

Federal Habeas Corpus case no.
2:24-cv-00010

State Trial Court case no.
45G02-1803-F4-000011
45G02-1803-F4-000009
45G02-1803-F3-000011

Post Conviction Relief(s) case no.
45G02-2106-PC-000014
45G02-2204-PC-000010

Indiana State Appeal case no.
23A-PC-00583
24A-CR-00244

Indiana State Family Civil case no.
45D03-1506-DR-897

---

## CIVIL COMPLAINT - EXHIBIT A - COURSE OF EVENTS AND PRECEEDINGS

/S/ _____ Date: 8/5/24
    Signature: David Edward Jackson III

/S/ _____ Date: 8/5/24
    Parent Signature for minor child:
    Stoic Azalia Jackson

/S/ _____ Date: 8/5/24
    Signature: Nickole Anna Jackson

/S/ _____ Date: 8/5/24
    Parent Signature for minor child:
    Promise Joy Jackson

Plaintiffs, pro-se
507 Oak St. FRNT
Valparaiso IN, 46383
(219) 781-2799
Dated: August 5, 2024

1

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................ 2

COURSE OF EVENTS AND PRECEEDINGS ........................................................................... 4

    The Arrest(s) ........................................................................................................................ 4

    The Coverup & Defamation ................................................................................................. 9

    Arrested Again ................................................................................................................... 11

    Back in Jail ........................................................................................................................ 13

    Out on Bond ...................................................................................................................... 14

    Wrap Around Services ...................................................................................................... 15

    The Deposition of Brazil ................................................................................................... 16

    False Services ................................................................................................................... 18

    The Prosecutorial Switcheroo .......................................................................................... 19

    The Missing Brady Discovery ........................................................................................... 21

    Prosecutorial Interference ................................................................................................ 24

    Rule 4(C) Dismissal ......................................................................................................... 26

    The Reporter ..................................................................................................................... 27

    Rule 4(C) Interlocutory Appeal ........................................................................................ 28

    Bad Counsel ..................................................................................................................... 30

    Withdrawal Requests, Sentencing & Conviction .............................................................. 30

    Probation Officer Harassment and Fraud ........................................................................ 39

    Ignored Requests, Rights and Protections ...................................................................... 43

    PCR, Probation and Therapy Don't Mix .......................................................................... 47

    INSOMMS ......................................................................................................................... 58

    Illegal Monitoring Software ............................................................................................... 63

    More Probationary Fraud .................................................................................................. 89

    Jailed! - Enter the Biased Magistrate .............................................................................. 93

    Hostility, Ignorance and Biased Assumption .................................................................. 127

    Solitary Confinement and Mental Decline ...................................................................... 132

    Post Conviction "Relief" .................................................................................................. 138

    Conspiracy, Violations and Pseudo "Science" ............................................................... 139

    Criminal Fraud & Entrapment ........................................................................................ 145

Family Court Interference .................................................................................................. 148

Emergency Motions and Notice to the Court .................................................................... 155

Removed from Therapy ..................................................................................................... 156

Jailed Yet Again & Bond Denial ........................................................................................ 157

Hearsay Reigns Supreme with Sullivan - PTR Granted ................................................... 159

Denial of 2nd PCR .............................................................................................................. 160

PCR APPEAL .................................................................................................................... 162

Prison ............................................................................................................................... 162

Parole ............................................................................................................................... 164

Filed Notices and PCR 3 ................................................................................................... 165

Indirect Criminal Contempt - Round 1 .............................................................................. 165

The FBI, DOJ, Police, State Police, Disciplinary Boards, Etc. .......................................... 174

The Reporters Spouse ...................................................................................................... 179

Sentence Served – Home Sweet Home? ......................................................................... 179

Notices .............................................................................................................................. 181

Court Reporter Failing to Report & Court Interference ..................................................... 182

Indirect Criminal Contempt - Round 2 .............................................................................. 183

**VERIFICATION** ............................................................................................................ 186

# COURSE OF EVENTS AND PRECEEDINGS

## The Arrest(s)

1. On March 15, 2018, the officers of the Hobart Police Department (the "Police") stormed into the Jackson's home and detained Mrs. Jackson without a warrant for her arrest and without probable cause.

2. When the Police stormed her home, Mrs. Jackson was peacefully resting in bed with her infant daughter.

3. For no good reason, the Police destroyed portions of the home.

4. For no good reason the Police intentionally instilled fear into Mrs. Jackson and her infant child by storming into her private space screaming with loaded guns drawn.

5. The Police failed to advise Mrs. Jackson of her rights upon being arrested.

6. The Police forcefully prevented Mrs. Jackson from contacting anyone by telephone.

7. Unbeknownst to Mrs. Jackson, the Police arrived to arrest Plaintiff David Jackson, her husband; Mrs. Jackson told the Police of his whereabouts before knowing this fact.

8. The Police manipulated Mrs. Jackson into providing information about her husband when the Police arrested her in her home without advising her of the consequence or purpose for their asking.

9. Mrs. Jackson never consented to have the police enter her home, seize her, stop her from using her telephone, unreasonably search her home when they knew Mr. Jackson was not around, or seize her personal belongings. Conversion, Level 6 Felony (Official misconduct. Ind. Code Ann. § 35-44.1-1-1.)

10. The Police detained Mrs. Jackson and prevented her from leaving her home or contacting anyone without suspicion or probable cause of her having committed a crime. Confinement, Level 6 Felony (Official misconduct. Ind. Code Ann. § 35-44.1-1-1.)

11. When the Police detained Mrs. Jackson, the Police failed to advise her of her rights to obtain a lawyer and remain silent. Level 6 Felony (Official misconduct. Ind. Code Ann. § 35-44.1-1-1.)

4

12. Without authority from Mrs. Jackson and without a warrant against her the Police violated her rights under the US Constitution.

13. The Police used excessive force in arresting Mr. Jackson despite his willingness to go with them peacefully.

14. The Police failed to advise Mrs. Jackson that they were there to arrest her husband and thus prevented her from phoning her husband so he could freely turn himself in with the assistance of an attorney.

15. Upon leaving Mrs. Jackson's home, the Police intentionally inflicted emotional distress on her by laughingly making light of the devastation the Police wreaked upon her home.

16. On March 15, 2018, the Police forcefully arrested Mr. Jackson at his place of employment despite the opportunity to carry out an arrest peacefully.

17. At the arrest, the press was present, and the Police happily gave them a photo opportunity of Mr. Jackson in handcuffs. By this act, the Police cast Mr. Jackson in a False Light as he was arrested on a forty-eight-hour hold; no investigation had been done and was seeking to defame Mr. Jackson. Copies of the news articles and social media posts have been collected to support this claim. This is also further supported by a later deposition of Detective Brazil.

18. Depositions from Brazil and Newspaper Articles have been collected to further establish the miss-information both in the charging documents and the lack of any investigation or evidence.

19. In Coffin v. United States, 156 U.S. 432 (1895), the United States Supreme Court established the need for the presumption of innocence with the prosecution proving their guilt. Other cases and courts interpreting the 5th and 6th Amendments in favor of defendants this way. "Innocent until proven guilty" evolved from the United States Constitution to become just as important as other rights.

20. The Police intentionally inflicted emotional distress on Mr. Jackson by begging Mr. Jackson to resist and goading him on for several minutes despite Mr. Jackson cooperating fully with their wishes.

21.    The Police failed to carry out their responsibility for keeping the peace and enforcing the law, not instigating fights, through illegal police coercion, that would make an accused look guilty or to allow the officers a "legal" reason to physically assault the suspect.

22.    Due to the forceful arrest, Mr. Jackson may not return to work as a union millwright employee and lose his pension and annuity investitures.

23.    On March 15, 2018, and possibly before that time, the Police used department resources to publicly and maliciously publish a lie that Mr. and Mrs. Jackson opened a board game business in Hobart to attract children and have sex with the children.

24.    Using department resources, the Police told news reporters about their impending arrest of Mr. Jackson creating a circumstance whereby the Police acted toward Mr. Jackson as if he were guilty until proven innocent; in reckless disregard for their acts causing, inter alia, a wrongful arrest. In fact, Mr. Jackson was initially arrested on a forty-eight-hour hold, which was based on a false affidavit for probable cause, and at the time of the arrest, a warrant was not even in the system, however the Police deliberately alerted the press who were awaiting Mr. Jackson's arrest at his place of business. The police, by their own action, were more interested in the publicity than in the actual innocence or guilt of Mr. Jackson. This was done prior to being officially charged and was bringing Jackson in on a forty-eight-hour hold.

25.    News articles and other evidence have been gathered to support this claim.

26.    During Mr. Jacksons initial arrest, Hobart Police Detective Robert Brazil was made aware that Mr. Jackson suffered from "PTSD" and had been sexually assaulted in his youth by his grandfather while on the way to the Lake County Jail before being rerouted to HPD after Mr. Jackson agreed to work with the Detective.

27.    Still, no Defendant took any steps to accommodate Mr. Jackon's condition.

28.    Instead, Defendants encourage, enabled and authorized Defendant Brazil to psychologically coerce a disabled Mr. Jackson through hours of intensive interrogation causing a PTSD episode which led to Mr. Jackson to demand an attorney and prevent further cooperation with the Defendants.

29.    During Mr. Jackson's interrogation it came to light that there was reasonable belief that Complaining Witness 1, a "Caucasian female", was using perpetrator substitution following a

year of repeated relentless interrogation and badgering by her mother when noticing changes in her daughter's behavior.

30.    Detective Brazil and others interrogated Mr. Jackson and instead accused Mr. Jackson of lying about the cousin, a "Caucasian male", even though Mr. Jackson implored them to confirm with his wife who was also aware of the fact because the minor confided in Mr. Jackson, who told his wife the day she told him where they discussed the situation.

31.    Upon being advised that he was being arrested for sexual misconduct with a minor, Mr. Jackson offered to cooperate with the Police and advise them of the truth that he knew - namely that the minor girl was molested by her own cousin and not Mr. Jackson. This fact the HPD corroborated by a statement from Mrs. Jackson later that day and then verified the following day as truthful during a follow-up deposition with the complaining witness.

32.    During the interrogation of Mr. Jackson detectives Brazil and others took away Mr. Jackson's water stating that "water is a privilege, not a right".

33.    In the interrogation of Jackson, who is a person of color, the Detectives used a derogatory reference or improper remark when the Detective used the racial slang word "spade". "Spade" is an "offensive term[] used to demean" Black Americans and other persons of color. *See* Wolfgang Mieder, *Call a Spade a Spade: From Classical Phrase to Racial Slur: A Case Study* (new ed. 2002); Okianer Christian Dark, *Racial Insults: Keep Thy Tongue From Evil*, 24 Suffolk U.L.Rev. 559, 567 n.47 (1990). In *People v. Hrobowski*, 575 N.E.2d 1306, 730 (1991), the court commented "we do not ever condone the use of any derogatory references or improper remarks" when it was addressing the use of the phrase "call a spade a spade", the same phrase is used by the detective. The Fourth Circuit has held that the "use of the n-word or a similar racial slur . . . can engender a hostile work environment," *see Chapman v. Oakland Living Ctr.*, 48 F.4th 222, 235 (2022), but that is only when the person who uses the slur is a supervisor or someone who the plaintiff reasonably believes has "power" over the plaintiff. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 279 (4th Cir. 2015) (en banc).

34.    During Mr. Jacksons interrogation, the Police intentionally inflicted emotional distress on Mr. Jackson by making him discuss and relive abuses he suffered as a child and even

implied repeatedly that Mr. Jackson wanted to be in his own abuser's shoes by seeing through his eyes.

35.    At that time, Mr. Jackson asked for a lawyer because of their wrongful treatment.

36.    On March 15, 2018, following the Interrogation of Mr. Jackson, the Police used department resources to fabricate lies and direct the Hobart Building Department to wrongfully shutting down the Plaintiffs' Building, preventing the business from continuing to provide income, and forcing the Jackson family to be homeless for a time.

37.    On March 15, the Police, through Captain Garrett Ciszewski, according to Detective Brazil during his later deposition, used department resources to publicly and maliciously publish a lie that Mr. and Mrs. Jackson opened a board game business in Hobart to attract, prey on and have sex with children. This happened at the same time as Mr. Jacksons interrogation and prior to being officially charged.

38.    A copy of the notice is recorded in the news articles' pictures.

39.    While escorting Mr. Jackson to a holding cell, the Police maliciously referred to Mr. Jackson using racial epithets and attempted to cause Mr. Jackson to fight with the Police.

40.    Mr. Jackson was refused phone calls and access to his personal belongings to retrieve any information or phone numbers that he needed to contact his family; The Police actually returned Mr. Jacksons belongings to Mrs. Jackson without proper documentation.

41.    While in their custody, the Police refused Mr. Jackson food despite his asking to eat and with the intent to harm his health the Police delivered Mr. Jackson to Lake County Jail after meals were served.

42.    The Hobart police officers subjected Mr. Jackson to cruel and unusual punishment when they detained him with no food or water, bathroom use, basic amenities, and subjected him to a jail where he was denied medical attention.

43.    The Hobart police officers discriminated against Mr. Jackson and treated him more harshly and unequally under the laws because he is a Puerto Rican man married to a white woman. Notably, the police using racial slurs are part of the video recordings that are in the custody and control of the Hobart police.

8

44.    While in Lake County Jail custody Mr. Jackson was not provided with a sleeping area, blanket, toilet paper or anything at all and was forced to sleep on bare concrete for two days before finally being issued a blanket.

## The Coverup & Defamation

45.    Defendant Brazil called Complaining Witness 1 back in the following day after already transferring custody of Mr. Jackson over to Lake County Jail to be processed, after speaking with Mrs. Jackson who confirmed Mr. Jacksons statements and following the transfer of the case over to Lake County Prosecutors for prosecution.

46.    During this follow up questioning, the Police, Detective Brazil, and other unknown agents of the Police, including Victim Advocate Rochelle Ellis, concealed evidence tending to prove Mr. Jackson's innocence and would do so for fourteen months after his arrest, which are malicious criminal acts of Official Misconduct and denying Mr. Jackson his Constitutional right to due process.

47.    Had the Police performed an investigation they would have discovered, inter alia, that the complaining witnesses were carrying out perpetrator substitution by naming Mr. Jackson as their perpetrator. A fact that Detective Brazil himself stated on video when performing the follow up interview with the complaining witness in the related case.

48.    Despite, being informed from multiple sources that Mr. Jackson was not the perpetrator of the alleged crime and informing the Police of the true perpetrator whose identity and involvement were confirmed by the complaining witness in that case, the Police refused to investigate this information or prosecute the true perpetrator.

49.    The Police discovered evidence further corroborating Mr. Jacksons statement but concealed the same, which are malicious criminal acts of Official Misconduct and denying Mr. Jackson his Constitutional right to due process. A level 6 Felony per count. (Indiana Code Title 35. Criminal Law and Procedure § 35-44.1-1-1)

50.    This would also result in acts of selective prosecution not only based on race as established by the comments made both on and off camera by HPD officers but also by the fact

9

that no prosecution / investigation, deliberate concealment of the actual perpetrator both by the complaining witness, HPD and later the Prosecutors Office.

51. This too is verified by video recordings provided by HPD and the later deposition of Detective Brazil.

52. Importantly, the Police publicly announced that the department investigated this case thoroughly all the while knowing that Detective Brazil and others failed to do an investigation into the claims alleged by the minor.

53. This was later found to be false during the deposition of Detective Brazil showing that his statements to the public was one of many knowingly falsified statements used to falsely prosecute and damage Mr. Jackson and would cause further harm to all plaintiffs.

54. All statements here are supported and verified by video recordings provided by HPD, official social media, news articles as well as Detective Brazil's deposition transcripts.

55. This defamation was done on the Official Hobart PD Facebook page. Hobart Police Department would post on their official Facebook page a misconstrued, libel statement not only alleging crimes that were not charged, nor stated anywhere in the affidavits or charging documents but also allegations of targeting multiple victims and asked for others to come forward.

56. This post was removed two days later after the case had already been transferred to Lake County Prosecutors and official charges had been filed. The reason for taking down the post was due to Hobart PD verified that the Complaining Witness admitted to lying to them and verified most of Mr. Jacksons statements.

57. The HPD defamed the plaintiffs when they allowed officers to post lies about Mr. Jackson and about the business in which all the plaintiffs held interest on the department's official Facebook page without performing a reasonable investigation. The police made an unprivileged false statement of fact about Mr. Jackson and about the business in which all plaintiffs shared interest, which caused the plaintiff's material and emotional harm and was an act of both negligence and with malicious intent, which includes but is not limited to, inciting the local populace against the plaintiffs and their business's.

58. Though the post was taken down, it had already been used in news reports including local and area newspapers and news stations. It was also copied by social media news outlets and private citizens and reposted outside of Hobart PD's control.

59. Plaintiffs have secured a copy of the original post for evidence prior to it being taken down.

60. Hobart PD failed to perform an investigation into the allegations against Mr. Jackson and assumed guilt, which denied the defendant the right to freedom. We claim that Hobart PD is/was prejudiced to Mr. Jackson both racially, due to financial gain and then later to protect themselves from lawsuits when it was discovered they had made serious mistakes with the case.

61. Bail was set at $75,000 after Mr. Jackson was charged even though Mr. Jackson had no criminal history nor had any indications of being a flight risk. Later, bail would be reduced to $2000 cash.

62. Plaintiffs would secure money to cover Mr. Jacksons bond and Mr. Jackson was released on $2,000 bond shortly after.

## Arrested Again

63. It is believed that due to complaining witnesses 1's allegations, and the lies published by the Police in the media, specifically the official HPD Facebook Page, two other people made allegations of sex crimes against Mr. Jackson for vindictive purposes related to prior termination of employment at the Plaintiffs' business.

64. The post was used to also try and obtain more charges against Mr. Jackson, which it did and yet again the police failed to investigate easily disproved unlawful claims against Mr. Jackson (Brandenburg v. Ohio, 395 U.S. 444 - 1969)

65. Mr. Jackson vehemently denies all charges against him and is waging a vigorous defense.

66. HPD would secure arrests warrants and again fail to perform any investigation into the new claims made.

67. Had HPD done investigations they would have discovered not only conflicts in the statements and timelines made by the 2 new complaining witnesses but also motive.

68. Not only was there clear evidence on the fakebook pages that contradicted the complaining witnesses' statements that were public but also the two new statements contradicted each other as well.

69. Copies of the Facebook Statements by Complaining Witness 2 and 3 have been recorded and preserved.

70. On March 23, 2018, Mr. Jackson was at his commercial property packing up his belongings due to being forcefully evicted from his own property where all the Plaintiffs held residence on the second floor and operated their two businesses prior to the initial arrest.

71. This forceful eviction was done by the City of Hobart at the prompting and deliberate interference with the HPD and the Hobart Building Department. This would be enforced by the HPD as well.

72. All the Plaintiffs would sacrifice and suffer stress, loss of Mr. Jacksons income and loss of income from the plaintiffs' businesses that were forced to close due to the revocation of their business license by the City of Hobart due to interference done by HPD resulting in the forced evacuation of their residence and enforced by HPD.

73. Mr. Jackson noticed HPD walking down the street with guns drawn and in force and told the two witnesses that he believed he was about to be arrested. Mr. Jackson unlocked and opened the door letting in the officers.

74. Mr. Jackson would be arrested a second time. There was no questioning or interrogation done. While in custody Mr. Jackson again was denied accommodation and necessities including food, toiletries and all other required services.

75. At the second arrest, officers again berated Mr. Jackson with weapons drawn and pointed at Mr. Jackson in front of witnesses, Bill Perry and Matt Gilbert, who were also berated by the officers, was paraded down a public street in handcuffs to the police station in view of his neighbors and local businesses to further humiliate Mr. Jackson.

76. Had HPD done an investigation or questions Mr. Jackson he would have provided evidence contrary to his accusers for the Police to investigate. Specifically:

a.  The accusers claimed Mr. Jackson abused them in the basement of the 301 Center Street property at a time when the Jacksons did not own or have access at all to the property;

b.  One accuser was recently fired by Mr. Jackson for committing credit card fraud;

c.  An accuser claimed that Mr. Jackson raped her on 12-31-2017, which was just five days after Mr. Jackson had a gallbladder removed and two days after he was released from the hospital due to complications;

d.  The accusers were intimately involved with each other.

77.  While in their custody, the Police refused Mr. Jackson food despite his asking to eat and with the intent to harm his health the Police delivered Mr. Jackson to Lake County Jail after meals were served.

78.  The Police used enforcement techniques that were intended to incite anger and violence in a person to justify treating Mr. Jackson very severely, as if he were a violent criminal, which he was not.

## Back in Jail

79.  While again in Lake County Jail custody Mr. Jackson was not provided with a sleeping area, blanket, toilet paper or anything at all and was forced to sleep on bare concrete for two days before finally being issued a blanket.

80.  The Lake County Prosecutors office would fail to address the inconsistencies that were clearly apparent with the complaining witnesses' testimonies.

81.  Lake County Prosecutors would request that the court set an additional $15,000 Cash Bond for Mr. Jackson. It would take months to find a way to secure this funding.

82.  During Mr. Jackson's time in Lake County Jail, he was viciously assaulted, ignored by the guards, denied medical care, and placed in solitary confinement without a mattress for a time. Also, during his time in jail, he continued to complain to the jail personnel that he needed medical assistance because of severe pain. Defendants, knowing of the complaints, continuously ignored Mr. Jackson.

83.    On April 19, 2018, Lake County Prosecutors filed a States Answer to Discovery Order stating that all discovery had been turned over. A Discovery Deadline was previously set by Judge Clarence Murrey for March 19, 2019.

84.    This deadline was for "all" discovery as no exceptions were noted. This would include disclosure of all exculpatory evidence prior to trial, consistent with Brady v. Maryland, 373 U.S. 83 (1963).

85.    On May 7, 2018, due to Mr. Jackson being placed in solitary confinement under the guise of "Protective Custody", Mrs. Jackson was able to share their experience with a friend who would lend money to pay for the bond.

86.    The Jacksons would spend the next 5 years paying the bond off while also selling what possessions remained to them to cover debt accrued by the loss of their business. This would include selling their property and home for less than its worth as well.

## Out on Bond

87.    Upon release, the Lake County Prosecutor would request the court to order that Mr. Jackson enroll in "Wrap Around Services" while on bond and at Mr. Jacksons expense along with GPS monitoring.

88.    This service was an intrusion into Mr. Jacksons personal life and failure to participate would have resulted in the revocation of his bond. This service was not explained in any way to Mr. Jackson, his lawyer or his family.

89.    Despite the circumstances, Mr. Jackson did find work through the Millwright union of which Mr. Jackson was a member. However, it only lasted a week due to being harassed and then laid off when the charges against Mr. Jackson became known to the others. Mr. Jackson lost insurance for himself and his family, his pension, his annuity, and other union benefits.

90.    Mr. Jackson had requested during one of the hearings from Judge Murray, that he be able to travel anywhere in the contiguous United States to ensure that he may be able to secure work again as a Millwright which would be granted by Judge Clarence Murrey orally at that time.

91.	Mr. Jackson was unable to find work as a millwright in the area following this and requested that the GPS be removed as it limited work, he could do as a millwright and was a safety concern / hazard on the job. Mr. Jackson would also request that he be allowed to travel beyond the States borders as the condition would prevent him from traveling to possible jobs that would not be aware of his pending charges out of other millwright halls. This was granted and Mr. Jackson was able to travel anywhere within the 48 contiguous states.

92.	Mr. and Mrs. Jackson along with S. Jackson and P. Jackson would suffer serious emotional and medical setbacks caused by the actions of the State and all its actors to this point, which would lead them all into individual private rehabilitation services.

93.	Shortly after entering therapeutic services, Mr. Jackson was diagnosed as "Medically Frail" by the State of Indiana through FSSA and diagnosed with multiple mental health disorders directly related to these events. Similar diagnosis, conditions or related episodes would also be suffered by the other plaintiffs as well.

94.	Mr. Jackson was unable to find work as a millwright however as word spread fast amongst the halls as to the state of his legal charges and as his mental conditions continued to deteriorate and some of the medications making it unsafe to operate machinery making him a liability.

## Wrap Around Services

95.	The service was performed by Cleotis White, MSW, LCAC, who is the CEO of Lakeside Behavioral Solutions. Mr. White acted as a counselor for Addiction disorders and assessments for patient mental health and treating cognitive, psychological, behavioral and emotional disorders.

96.	Mr. Jackson spoke to Mr. White prior to appearing for the first session, asked if his wife could accompany him. Mr. Jacksons attorney at the time stated that Mr. Jackson should request that his conversation be recorded as Mr. Jackson was out on bond and not convicted of anything.

97.     Mr. White would not agree to the recording but did permit Mrs. Jackson to accompany Mr. Jackson during his visits.

98.     During the sessions, Mr. White would question Mr. Jackson about the arrests and what led up to them. Mr. Jackson stated that he was out on bond and did not want to talk about the legal aspects of his case.

99.     Mr. White would state that Jackson would have to participate in the service as ordered by the court or risk having his bond revoked but did not push further during that session.

## The Deposition of Brazil

100.    On September 13, 2018, a deposition was done of Detective Brazil. The transcripts clearly show and bring to light that:

   a.  Page 10 Line 22 - Page 13 Line 5: Detective Brazil admits that his probable cause affidavits are knowingly falsified. This falsification included both the dates and the statement of events themselves.

   b.  Page 14 Line 7 - Page 15 Line 9: Detective Brazil admits to having no physical evidence, rape kits, social media, or anything other than the knowingly falsified probable cause affidavits.

   c.  Page 16 Line 9 - Page 17 Line 3: On the day that HPD arrested and detained Mrs. Jackson and consequential arrest of Mr. Jackson, Detective Brazil states that his officers went in first through the front door while he was out back. This was recorded and proved to be a lie. This further supports Mrs. Jacksons statement of events directly relating to her claims. The Times of Northwest Indiana provided both firsthand testimonies contradicting this statement as well as provided corroborating pictures showing Brazil's statement to be false. This evidence has been procured along with TV News who also provided evidence.

   d.  Page 22 Line 17 - Page 23 - Line 13: Detective Brazil states that he turned over the witness interviews and records the past Tuesday (September 11, 2018). Tavitas

states he has gone through the discovery and stated that certain videos and statements were not included.

e. Page 26 Line 16 to Page 27 Line 11: Tavitas asks about the HPD Facebook Post stating "Mr. Jackson's business specifically caters to juveniles" and "The allegations can be interpreted as such that Mr. Jackson opened his business purely to satisfy his own personal desires at the expense of innocent children" and how it ended up in The Times newspaper and identifying the officer who wrote it.

f. Page 32 Line 7 - Line 25: Detective Brazil admits that he called the First Complaining Witness back in for a second statement the following day of Mr. Jacksons initial arrest. After questioning Brazil admitted that it was recorded. Stated that it was also turned over to the prosecutor's office the previous Tuesday.

g. Page 33 Line 13 - Page 35 Line 25: Detective Brazil asked Carol (Complaining Witness 1) if she had been abused previously. The complaining witness denied it. She denied talking to Jackson about how he was also victimized as a child as well. Detective Brazil stated after he started walking her back to her family following the second interview, she grabbed his arm admitted she lied. Detective Brazil admits that he felt that the witness was not being open with him. The witness would admit that what Jackson had said about the witness and her cousin was true and further corroborated Jacksons statement.

h. Page 36 Line 5 - Page 38 Line 8 and Page 39 Line 19 - Pag 40 Line 8: Detective Brazil admits that complaining witness 2 and 3 came together on the same day at the same time to make statements contradicting the police reports and probable cause affidavits. Brazil stated that they came together on September 15th or 16th 2018 following the HPD Facebook post.

i. Page 42 Line 14 - Page 44: Detective Brazil admits that he did not check Mr. and Mrs. Jacksons camera system, did not check the banks cameras, did not interview employees, did not investigate the area that the complaints allegedly took place in and did no interviews with anyone other than the complaining witnesses and that no investigation was done.

17

j.    Page 45 Line 17 - 46 Line 9: Tavitas ends the deposition and again requesting a copy of the exculpatory Brady Material evidence and Detective Brazil stating that he will get them to Tavitas.

101.    The deposition clearly shows that the charging documents were knowingly falsified to protect the alternative suspect and to paint Mr. Jackson in a further false light to further prejudice Mr. Jackson and convince the court that probable cause was met.

102.    Brazil used falsified records, in a conspiracy as defined by I.C. § 35-32-2-4, providing false or inaccurate reporting of case or proceedings, I.C. § 34-47-3-4.

103.    Mr. and Mrs. Jackson filed a Notice of Tort with the State of Indiana and the police department and other required state offices.

104.    The Lake County Prosecutor's Office immediately offered a plea agreement for the first time and unrequested following Detective Brazil's deposition. This Plea Agreement stated that the State offered that all three cases be resolved under a global resolution, and each would have a single charge of "Unlawful Confinement" Level 6 Felony each and considered a Non-Registerable Offence. 1.5 years Prison Term suspended to be served on probation and ran concurrently. After 2 years the charges would be reduced to a misdemeanor and then after 5 years from conviction the state would not object to sealing the record and expunging the convictions.

## False Services

105.    Later, while participating in the mandatory Wrap Around Services, during multiple other sessions Mr. White would start to ask questions about Mr. Jacksons previous marriage and if he had other children. Mr. White would then begin to ask religious-based questions and would preach and even tried on several occasions to initiate prayer sessions with Mr. Jackson.

106.    Almost all sessions involved trying to obtain information about Mr. Jackson's sexual habits or interests.

107.    On or before October 24, 2018, during the session that would ultimately end up being the last session, Mr. White made several comments about Mr. Jackson and Mrs. Jacksons

previous divorces and made disparaging comments about how both should have worked harder to maintain their previous marriages and should consider reconciliation with their respective ex's.

108. On October 24, 2018, Lakeside Behavioral Solutions would notify the court of Non-Compliance.

109. After that session Mr. and Mrs. Jackson contacted Mr. Jacksons attorney to complain about all that had happened to that point. It was clear that Mr. White was trying to gather information for the State for use in prosecution as well as acted improperly in his position outside of the scope of the claimed services to act as a tool for the State for its own purposes and not that of any true service to Mr. Jackson.

110. This resulted in the termination of Mr. Jacksons participation in the "service".

111. During the 5 months of participation, at no point did Mr. White perform any evaluation, treatments, referrals or offer any services outside of what was mentioned above other than having Mr. Jackson take a drug screening.

112. It is Mr. Jacksons claim that not only was the State intending to obtain coerced information through the guise of some counseling services but also to establish some claim toward sexual deviant behavior diagnosis to be used at trial or to secure leverage for plea negotiations. This was done at a time when Mr. Jackson had no convictions or criminal history and was out on bond pending trial.

113. On the Indiana website it states that the Wrap Around Services is a voluntary program. This program for this purpose was to address Sexually Harmful Behavior Recovery and Moral Reconation Therapy. Moral reconation therapy (MRT) is a cognitive-behavioral therapy (CBT) that helps people develop moral reasoning skills and make conscious decisions. It was developed in the 1980s by Dr. Gregory Little to treat criminal behavior, addictions, etc.

114. The bond condition requiring mandatory Wrap Around Services was dropped following an agreement between Mr. Jackson and the State.

## The Prosecutorial Switcheroo

115.    On November 2, 2018, this plea agreement was confirmed in court, on the record, by the lead prosecutor on the case Deputy Prosecutor Aleksandra Desancic Dimitrijevic. The transcripts states on Page 4 Line 17 - Page 23 - Line 13:

> THE COURT: Parties wish to go on the record as to the plea offers
>
> and the status of it.
>
> MS. DIMITRIJEVIC: Judge, we're still in negotiations on a plea. Um, I
>
> believe that the terms that we discussed so far are to non-registrable
>
> offense.
>
> THE COURT: All right.

116.    The Defense was still waiting for the Lake County Prosecutors to deliver the promised Exculpatory Brady Discovery to be turned over that was requested during Detective Brazil's Deposition and was not a part of the previously turned over discovery.

117.    On January 10, 2019, the CCS clearly shows that Defense Attorney Adam Tavitas is removed from representation and Attorney John Cantrell appears and orally enters his appearance on behalf of the Defense.

118.    On January 24, 2019, Final Pre-Trial Conference was held, and the State informed the Court that they will be filing a joinder of the three cases the following week. Transcript Page 12 Line19 to 23.

119.    On January 24, 2019, Final Pre-Trial Conference was rescheduled for January 31, 2019. CCS stated the reason was "Other". The defense was still awaiting Exculpatory Brady Material Evidence to be turned over by Lake County Prosecutor while the Prosecutor pushed to either set a trial date or sign an agreement in absence of the awaited discovery.

120.    On February 4, 2019, the scheduled Trial that was set for this date was canceled while awaiting Discovery and Plea Negotiations.

121.    On February 17, 2019, the State filed an appearance of Nadia Wardrip on behalf of the State of Indiana. Defense immediately objected to the appointment due to a perceived conflict of interest as Nadia Wardrip is married to a Hobart Indiana Police Officer who had financial interest in that organization. The Defendants had already filed Notice of Tort previously against Hobart PD.

122. On February 19, 2019, the hearing that day was continued based on the resolution of the conflict of interest and was addressed on the record during the next hearing. This time was not accountable towards the Defense regarding Rule 4(C).

123. On March 19, 2019, during the hearing Nadia Wardrip informs the court about the possible conflict of interest and that the delay was due to the resolution of that. This was also the Discovery Deadline set by the Court. No extension was requested by the Prosecution. This time was not accountable towards the Defense regarding Rule 4(C). Page 9 Line 10 to Line 15:

> MS. WARDRIP: Your Honor, I would have no objection to that. I do
> have a meeting with our Chief Deputy, Ms. McConnell, this afternoon
> regarding the potential reassignment of these cases. So that is, that
> is the reason for the delay.
> THE COURT: All right.

## The Missing Brady Discovery

124. On April 23, 2019, the hearing was set as an omnibus hearing. The Prosecutors Officer had determined that there was not an issue with the Conflict of Interest. The delay was caused by waiting on the Lake County Prosecutors to turn over the exculpatory Brady Material Evidence. This is evident on the transcripts of that date. This time was not accountable towards the Defense regarding Rule 4(C) due to awaiting Exculpatory Brady Discovery beyond discovery deadline. Transcript Page 11 Line 11 to 19:

> MR. CANTRELL: Yes, your Honor. I do have a meeting with the State
> a little bit later this week, and the State has a meeting with the
> detective next week. So I'm asking for, maybe, about five weeks. I
> think that will put us in a good position if we need to set trial dates or
> not.
> THE COURT: State?
> MS. WARDRIP: Five weeks is fine, your Honor.

125.    On June 7, 2019, 80 days past the discovery deadline, or 438 days following charges being filed, the State released this evidence after the one-year deadline for Rule 4(C) had expired. The next hearing date would be June 19, 2019, which was three days later.

a. **When Defense is Awaiting Discovery:** In Indiana, when the defense is awaiting discovery, the time is typically attributed to the State or the prosecutor. If the delay in providing discovery is due to the prosecutor's actions or negligence, then the time delay caused by the lack of discovery would be attributed to the State. The defendant should not be penalized for delays caused by the State's failure to provide necessary discovery materials in a timely manner. This aligns with the principle that the State has an affirmative duty to bring a defendant to trial within the specified time frame, and delays caused by the State's actions should not be charged against the defendant.

b. **When Prosecutor Has a Possible Conflict of Interest:** In cases where the prosecutor has a possible conflict of interest, any resulting delays in the trial process should generally be attributed to the State. If the conflict of interest on the part of the prosecutor leads to delays in the proceedings or impacts the timely progression of the case, it would be unfair to attribute these delays to the defendant. The State's duty to bring a defendant to trial within the specified time frame includes ensuring that the prosecution is conducted without any conflicts of interest that could impede the progress of the case.

c. ROBERT DUANE HUFFMAN v. STATE OF INDIANA, 502 N.E.2d 906 (Ind., 1987): This Opinion discusses the right to a speedy trial under the Sixth Amendment and Indiana's Constitution, emphasizing the importance of Criminal Rule 4 in ensuring a defendant's speedy trial rights are upheld.

d. Delmar CALDWELL v. STATE of Indiana, 922 N.E.2d 1286 (Ind.Ct.App. 2010): This Opinion highlights that the duty to bring a defendant to trial within one-year rests with the State, and any delay due to the defendant's motion or action extends the one-year period. It also states that delays not attributable to the defendant should not be charged against them.

e. STEVEN D. COOK v. STATE OF INDIANA, 810 N.E.2d 1064 (Ind., 2004): This Opinion discusses the issue of charging a defendant under Indiana Criminal Rule 4(C) with delays resulting from their actions before a trial date is set. It emphasizes that the State has an affirmative duty to bring a defendant to trial within one year and allows for extensions of time for various reasons.

f. CURTIS v. STATE, 948 N.E.2d 1143 (Supreme Court of Indiana., 2011): This Opinion addresses Indiana Criminal Rule 4(C) and the requirement that a defendant cannot be held to answer a criminal charge for more than one year unless the delay is caused by the defendant, emergency, or court congestion.

126. In the scenario where the Prosecutor fails to turn over exculpatory discovery evidence, exceeds the Discovery Deadline set by the court, and has not asked for an extension, the time would generally be attributed to the Prosecutor. This is because the Prosecutor has the obligation to provide discovery to the defense in a timely manner, as required by the rules of criminal procedure and case law. Failure to meet this obligation can result in delays that are chargeable to the Prosecutor as they have the responsibility to provide timely and relevant discovery to the defense.

a. United States v. Reid, 2011 WL 5075661 (Oct 26, 2011): Establishes the threshold requirements for seeking production of evidence under Rule 17(c), emphasizing the importance of timely and relevant discovery in criminal cases.

b. U.S. v. HASSEBROCK, 663 F.3d 906 (Nov 22, 2011): Discusses the validity of written waivers of Speedy Trial Act rights and the consequences of continuances requested by the defendant.

c. STATE v. BLACK, 947 N.E.2d 503 (Ind.Ct.App. May 10, 2011): Highlights the importance of timely discovery and how delays caused by the State's failure to comply with discovery requests can be chargeable to the State. Excerpt:

> Our appellate courts have noted that the "objective of pretrial
> discovery is to promote justice and to prevent surprise by
> allowing the defense adequate time to prepare for its case."
> Biggs v. State, 546 N.E.2d 1271, 1275 (Ind.Ct.App. 1989)

23

*(citing Campbell v. State, 500 N.E.2d 174, 182 (Ind. 1986)).*

*"To put the defendants in a position whereby they must either go to trial unprepared due to the State's failure to respond to discovery requests or be prepared to waive their rights to a speedy trial, is to put the defendants in an untenable situation." Marshall v. State, 759 N.E.2d 665, 670 (Ind.Ct.App. 2001); Biggs, 546 N.E.2d at 1275. In Marshall, we held that, where "the State failed to comply with a discovery request," the delay in bringing a defendant to trial should be charged to the State and not to the defendant. 759 N.E.2d at 669. Here, in an effort to hold the State accountable for the late production of the laboratory results, and consistent with the above reasoning, the trial court granted Black's request for a continuance and charged the delay to the State. Appellant's App. at 68. As such, Black was not charged with any of the trial delays.*

127. The Defense is required to have Exculpatory Discovery Evidence prior to accepting a plea agreement.

128. Mr. Jackson was not happy with his Attorney John Cantrel due to his failure of performance and unsatisfied as Cantrell had failed repeatedly to file motions over the previous months at Mr. Jacksons request regarding securing the exculpatory brady material evidence through court action and make them aware of the delay. This includes the failure of Mr. Cantrell to perform timely depositions and file challenge to the charging documents showing that the charging documents were in fact falsified and establish a lack of probable cause.

## Prosecutorial Interference

129. Mr. Jackson had also previously informed Mr. Cantrell that Mr. Jackson was offered a paid job for one week to escort a family friend to Louisiana for a week while she did a study of the

effect of rising sea levels and hurricanes on New Orleans regarding architectural evolution required to address these issues. This was done due to Mr. Jacksons experience and for the safety concerns at that time. Mr. Cantrell failed to consider the date when he rescheduled the next hearing with the court.

130.    On September 20, 2019, the CCS states there was a continuance but not as to why or who was responsible.

131.    On Oct. 22, 2019, Jackson and his charge flew out to Louisiana and planned to stay there until Oct. 25, 2019.

132.    While in Louisiana, Mr. Jackson posted pictures of some of the architectural sites and FEMA tags that were placed on some of the buildings during Hurricane Katrina on his personal Facebook.

133.    Mr. Jackson has brothers and sisters who live in the area as well and planned on visiting them on the final day there after his work was completed.

134.    Mr. Cantrell had misinformed Mr. Jackson about some of the claims and rights Mr. Jackson had asserted regarding admissibility of the Brady Material Evidence. Mr. Cantrell also stated that it could only be brought up at Trial. Mr. Cantrell also informed

135.    At this time Mr. Cantrell had for months failed to return Mr. Jacksons calls, texts and emails. All of this had been documented.

136.    On October 18, 2019, the CCS states there was a continuance on Defenses motion and reset for October 25, 2019. In that motion, Mr. Cantrell informed the court that Mr. Jackson may be replacing Mr. Cantrell with a different attorney.

137.    Wardrip replied to the continuance with an objection. Wardrip in her motion did not state that Mr. Jackson did not have authority but stated that she was not aware of Mr. Jackson having permission to leave. Wardrip also stated that Mr. Jackson is a believed flight risk with no basis stated for that claim. The Court denied the continuance. The evidence Wardrip used was screen shots of Mr. Jacksons Facebook which stated clearly shows that Mr. Jackson was there for Architectural purposes and stated that he would only be gone for a week and was looking to bring something back for his wife and child. It also shows who Mr. Jackson was with and why. This was

done to clearly harass Mr. Jackson and stalk his Facebook and to further hinder his ability to support his family.

138.   Mr. Jackson was informed by Mr. Cantrell that he had to exchange his ticket for an earlier flight so that he could return home in time to arrive at court for the hearing. Mr. Jackson did so.

139.   On October 25, 2019, Mr. Jackson and his attorney appeared in court and had previously made amends based on promises by Cantrell to resolve and address Mr. Jacksons past concerns. The court also asked Mr. Jackson the reason for his trip and Mr. Jackson informed the court that it was a business trip as well as the fact that the court had previously granted travel in the contiguous 48 states. Judge Murrey stated that he did not recall but stated that moving forward prior requests would need to be made.  Continuance was made according to CCS on Defense motion.

## Rule 4(C) Dismissal

140.   On November 8, 2019, Mr. Jackson filed a Motion to Dismiss. In this motion the court is made aware of the video evidence regarding the interview of the first complaining witness and how it was taken on September 7th, 2018. It also states how Detective Brazil made it known during his deposition that it existed 174 days after charges were filed or 5 months 21 days.

141.   It also informed the court that the Detective only turned over the second video to be received by the Defense on June 7th, 2019. The motion stated that Detective Brazil stated that he was aware the Video held exculpatory evidence during a second deposition on August 30th, 2019, 531 days after charges were filed against Defendant or 1 year, 5 months, 13 days. That failure to turn over the information, violated Brady V. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the Speedy Trial Clause Of the Sixth Amendment to the United States Constitution, Criminal Rule 4(C), and the right t0 Due Process Clause of the 14th Amendment t0 the United States Constitution.

142.   That the Defendant continued his trial because the second Video tape statement was not presented until after the trial setting. In accordance with Rule 4 this delay should be

attributed to the State, because the Hobart Police Department did not turn over exculpatory evidence to the Defendant in a timely manner. Delay from a defendant's motion for continuance will not be attributed to the defendant (and will count against the Rule 4(C) period) if the reason necessitating the continuance was the State's failure to provide timely discovery. That the delay must fall on the State Of Indiana, because the trial date Of January 4th, 2019, was continued awaiting additional discovery. This trial date was 293 days after charges were filed against Defendant or 9 months, 18 days.

143. That the Defendant had to wait to get the Video footage to determine if a Brady Violation had taken place, because the Video had to be watched to see if there was any exculpatory evidence in it.

144. The State filed an objection, and the hearing was set for December 13, 2019.

145. On December 13, 2019, Nadia replied to the Motion to Dismiss.

146. On December 13, 2019, Judge Murrey denied Mr. Jacksons motion to Dismiss. Omnibus Hearing Rescheduled for January 31, 2020. Runs 4(c) Clock.

147. On January 8, 2020, Mr. Jackson hired Attorney Michael A. Campbell as co-counsel to handle the Interlocutory Appeal. Mr. Campbell filed motion to Certify Order Denying Motion to Dismiss for Interlocutory Appeal. The Motion was granted that same day. Unknown to Mr. Cantrell, Mr. Jackson started to look for a new trial attorney as issues Mr. Jackson had before were not resolved. Hearing Scheduled for February 14, 2020.

148. On January 31, 2020, Omnibus Hearing continued Defendants motion.

149. On February 3, 202, David and Nickole Jackson filed their initial complaint on February 3, 2020, under cause: 2:20-cv-00045

150. On February 14, 2020, Omnibus Commenced and Concluded. Stay is in place due to Interlocutory appeal.

## The Reporter

151. On February 17, 2020, Mr. Jackson would email Sara Alice Reese to her official email address (sarah.reese@nwi.com) stating he would like to talk to her about her story and offer

her his side of the story and provide information about the civil action being taken against the State regarding the illegal behavior that occurred against Mr. Jackson and his family. Mr. Jackson would provide attachments which were supporting evidence and documents.

152.    Mr. Jackson had stated that he noticed her as he dropped his daughter off at pre-school in the morning down the street from his house and seen Mrs. Reese entering a house, he presumed was hers and realized she was one of his neighbors.

153.    Mrs. Reese would then reply stating that her story was based on court records and statements made in open court. She then stated she did not want Mr. Jackson to approach her at her residence or property to discuss the case.

154.    This was not true. Mrs. Reese was the reporter that was waiting with the Hobart Police Department when they broke into Mr. and Mrs. Jacksons business and then later when they arrested Mr. Jackson at his place of work out at the Cargill factory in Hammond prior to any charges being brought.

155.    Mr. Jackson would then reply stating he never would and pointed out that he contacted her through official channels and that he did not go out of his way to track her down and pointed out that he and Mrs. Jackson have only interacted with her in court one time and was courteous to here when they did.

156.    Mrs. Reese would then have her editor contact Mr. Jacksons attorney about Mr. Jackson threatening her and also would make a police report to the Valparaiso Police Department that led to police showing up at Mr. Jacksons house stating he did nothing wrong but to just avoid Mrs. Reese.

## Rule 4(C) Interlocutory Appeal

157.    The Court of Appeals accepted the interlocutory appeal and was addressed under cause 20A-CR-00616.

158.    On December 10, 2020, the Court of Appeals would rule against Mr. Jackson. Mr. Campbell stated that he would not be interested taking this appeal to the Indiana Supreme Court as at this time Mr. Jackson had replaced his trial attorney Mr. Cantrell. Mr., Campbell is a close

friend of Mr. Cantrell. Mr. Jackson felt that the deficiencies in performance by Mr. Cantrell were made apparent by the Appeals Court in their final order. Mr. Jackson claims that there were errors in the calculations of the Appeals Court as well. The Appeals court found that the State had 46 days left to bring Mr. Jackson to trial. The final order was certified on February 4, 2021, and with that date the 4(c) Clock resumes.

159. The Court, who was made aware of the contested validity of the evidence via the Interlocutory Appeal should have held a Franks Hearing. The Defense attorney should have requested a Franks Hearing as well. Franks v. Delaware, 438 U.S. 154 (1978): The U.S. Supreme Court held that a defendant is entitled to a hearing (a "Franks hearing") if they can make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included in the affidavit supporting the warrant, and that the false statement was necessary to the finding of probable cause. For the falsified information to warrant dismissal, it must be material to the finding of probable cause. If the remaining truthful information in the affidavit is sufficient to establish probable cause, the case may not be dismissed.

160. Indiana Rules of Criminal Procedure: Indiana courts require that charging documents be based on truthful and accurate information. If it is proven that the documents contain knowingly falsified information, the court may take appropriate action, which can include dismissal of the charges.

161. State v. Hicks, 525 N.E.2d 316 (Ind. 1988): The Indiana Supreme Court has held that if a defendant can show that false information was knowingly included in the affidavit and that it was material to the finding of probable cause, the charges may be dismissed.

162. United States v. Pace, 898 F.2d 1218 (7th Cir. 1990): The court emphasized that the remedy for falsified information in charging documents should be proportionate to the harm caused. While suppression of evidence is a common remedy, dismissal of charges is reserved for cases where the falsification undermines the entire basis for the prosecution.

163. The calculations were incorrect, and Mr. Jackson has asserted his 4(C) rights, and the calculations need to be addressed anew.

## Bad Counsel

164.    On January 20, 2021, Appearance filed for Joseph G. Bauer and Paul M. Namie for the defense. Replacing John Cantrell.

165.    On February 10, 2021, Wardrip filed a motion to set the hearing which was granted for February 18, 2021. Runs 4(c) Clock leaving 31 days to get to trial by Ct. of Appeals calculation.

166.    On February 18, 2021, on Defendants motion cause is reset to February 24, 2021

167.    On February 24, 2021, the Defense Attorney filed the Plea Agreement. The Attorneys also informed Mr. Jackson that he did not have to be there for the hearing which was addressed in the hearing. This was found to be in error and presence was excused.

168.    On February 24, 2021, the court held a Change of Plea hearing. Sentencing was scheduled for March 26, 2021.

169.    Mr. Jackson did not want to take a plea and it was based on miss information provided by Mr. Namie and Mr. Bauer during the coming Post Conviction Relief. Mr. Jackson had been arguing with his attorneys who misinformed him and who were refusing to make filings because they stated that it would upset the Prosecutors for whom they had to work with and would be detrimental to their business interests.

170.    On March 3, 2021, Defense filed a Motion to Withdraw Appearance. In that motion it was clear that Mr. Jackson did not agree with the Defense Council, which would be proven correct during the coming Post Conviction Relief Hearing.

## Withdrawal Requests, Sentencing & Conviction

171.    On March 5, 2021 Mr. Jackson filed a Pro Se Pleading which was denied due to being still represented by Counsel. This filing was a request to withdraw the guilty plea. Mr. Jackson had requested that his attorney file it repeatedly but the attorney at the time for nearly a month ignored all calls, texts and emails. Mr. Jackson did not hear from his attorney until a day prior to sentencing and still the attorney failed to file the withdrawal of guilty plea. This would be proven during the coming post-conviction relief hearings.

172. On March 24, 2021, a Presentence Investigation Report was done by Lake County Probation Department, which was ordered February 26, 2021, and performed by Danaysy Diaz. This was filed as CONFIDENTIAL Pursuant to IC 35-38-1-13. In that report it clearly shows that Mr. Jackson scored LOW in every category regarding threat assessment

173. On March 26, 2021, Defense Attorney Paul Namie requested that his firm be removed from Mr. Jacksons case at Mr. Jacksons request. This was following Mr. Jackson filing a complaint with the disciplinary board regarding Namie's firms' representation and behavior as well as complaints against the Lake County Prosecutors office as well as against others. This involved the issues with Discovery Violations, Ethical Violations, and other questionable behavior. Transcript Page 14 Line 7 to Line 18:

*Judge, my client has filed some very disciplinary complaints against*

*myself, Nadia Wardrip, Judge Dimitrijevic, and previous attorneys in*

*this matter.*

*They are set to have a meeting on those issues, I think, April 9th. He's*

*is asking that I motion to have a stay of these proceedings for 60 days*

*to allow them to conduct an investigation and to, you know, I guess,*

*flush out what it was.*

*The nature of the allegations, in large part, against the State, are that*

*they withheld exculpatory evidence.*

174. The Court was made aware of Mr. Jacksons wishes via the Pro Se filing and though the court refused to file the motion due to Mr. Jackson being represented, Mr. Jackson had asserted his rights and informed the court in a timely manner that prior to the date of sentencing that he had wished to withdraw the plea agreement and his valid reasons why. The failure of the court to acknowledge Mr. Jackson's wishes is a violation of his right to a Trial By Jury and that his agreement was made via coercion.

175. In the context of the United States legal system, particularly under the 7th Circuit and the United States Supreme Court, there are several cases that address the issue of a defendant filing pro se motions even when represented by counsel. One notable case is Faretta v.

31

California, 422 U.S. 806 (1975), where the Supreme Court held that a defendant has a constitutional right to represent themselves in state criminal trials.

176.    However, the specific issue of whether pro se filings by a represented defendant can secure their rights, even if not accepted, is more nuanced. The 7th Circuit has addressed similar issues in various cases. One such case is United States v. Patterson, 576 F.3d 431 (7th Cir. 2009), where the court discussed the limitations and implications of pro se filings by represented defendants.

177.    In Patterson, the court noted that while a defendant has the right to self-representation, once they choose to be represented by counsel, their attorney is generally expected to handle all filings and court communications. However, the court also acknowledged that pro se filings could be considered under certain circumstances to ensure the defendant's rights are protected.

178.    The Deputy Prosecutor would claim that Mr. Jackson was manipulating the court and trying to delay the proceedings. The Court would deny the removal of the Defense Attorney and denied the continuance and moved on to sentencing and denying Mr. Jackson his right to a Trial by Jury and Due Process of Law.

179.    If the defendant can demonstrate a "fair and just reason" for withdrawal of a plea agreement, they may do so after the court accepts the plea but before sentencing. Mr. Jacksons attorney failed to represent Mr. Jacksons interests and did not present his "fair and just reason" for the court along with his wish to withdrawal from the plea agreement.

180.    Later during the Post Conviction Relief Hearing it would become evident that Mr. Jacksons concerns were valid as Paul Namie's firm had coerced Mr. Jackson through false information to accept a plea agreement he did not want to accept, and that Mr. Jackson wanted to fight his charges unless Mr. Jackson paid an additional $15,000 and would not do so without payment made first. This is verified in an email sent from Mr. Jackson to Joseph Bauer and Paul Namie on March 8, 2021, citation:

> *We are going to be filing with the ABA a complaint about prosecutor misconduct as well as issues with past attorneys. We understand you don't want to be involved in this, though we made it clear during*

*our intake interview/paperwork that we were hoping for your help on this. We were informed by the ABA that the investigation will take at minimum several weeks. Is there a way to stay the acceptance of my plea and the sentencing hearing until the ABA finishes their investigation? I have found references in the past that the judge must work with the ABA during the investigation. Can you share what policies you know of or any other information that could deal with the investigation of council during pre-trial hearings? I can't possibly be the only person in history to have this kind of thing happen and be aware of the misconduct before the conclusion of the trial.*

*I can't afford $15,000 to go to trial, which is what your firm requires. We told you we lacked the funding you require prior to your motion to withdrawal, yet you didn't mention it in the motion. Since they didn't completely accept your withdrawal so I can get a public defender, how can I get my constitutional right to effective counsel during the entire legal process? Since you haven't been dismissed as our council, what are your legal obligations to us so we know what we can expect, based on our lack of ability to pay so much more ($15,000) to go to trial? If you could respond to this via email so there's no opportunity for us to misunderstand your words, we would appreciate it.*

181.    On March 16, 2021, Mr. Jackson sent another email to Mr. Bauer and Mr. Namie in which there would be no reply. The email stated:

*We also have still not heard back from you from the email we sent 8 days ago in which we were concerned about our rights to counsel during this time or about the strength of our case going to trial or how we could possibly go to trial without being able to pay for council and*

33

*possibly withdrawing our plea as we disagree with your understanding and timeline requirements?*

*We finished the application submissions for the Indiana Supreme Court Disciplinary Board. We are overnighting them tomorrow with signature confirmation. We are sending you a copy of them so that you are aware that it is done and what is in the contents of them. We are also including USBs for each one that have copies of emails, text messages, etc to support each application.*

*Also now that we have filed these applications with the higher court we wanted to ask what options we have in regards to asking for a stay to be placed on the criminal cases while the investigation application is processing/investigated. What other options do we have? We look forward to your response.*

182. On March 25, 2021, Mr. Jackson sent another email to Mr. Bauer and Mr. Namie in which there would be no reply but did initiate a phone call. The email stated:

*You never replied to us to the email sent to you March 8th or any of the emails or texts reminding you that we had questions about our legal representation and about our options to go to trial and withdraw our plea deal. That was nearly 3 weeks ago. Tomorrow is my sentencing.*

*We have also requested that you put in a motion to Stay Proceedings while the Disciplinary Board finishes its investigation into the misconduct reports that are also key to my constitutional rights. You never replied. Under Indiana Judicial Rule RULE 2.16: Cooperation with Disciplinary Authorities, the Judge would accept the stay of proceedings.*

*I ask that you please submit the motion to stay proceedings. I have the letters from the board along with the case ID numbers. I spoke with them and they stated they have a meeting April 9th to go over*

*the investigation... Please file the motion this morning so that it has time to do what it needs to do. Feel free to call the disciplinary board yourself to confirm. I can provide you with any info I have if needed. They stated the communication with me directly is limited while the investigation is going on.*

*It has been a horrible week. I was admitted to the hospital due to chest pains, headaches, left arm going numb. I have to schedule a stress test now. My cousin was found dead this morning and my Father in Law has bleeding in his eye so severe that they can not see past the blood to find the problem.*

183. Mr. Namie would call and state that he would make a request to withdraw the Guilty Plea at sentencing. Mr. Jackson stated that the filing as he understood it had to happen prior to the date of sentencing. The failure of the counsel would be to Mr. Jacksons detriment as shown the following day in court.

184. During that same hearing it was addressed that Mr. Jackson on the Presentence Investigation Report had scored the lowest possible score regarding the possibility of re-offence on the Indiana Risk Assessment Tool (IRAS). However, the score was overwritten and determined that he is to be considered the highest threat level of re-offence based solely on the charges he is pleading guilty too. Transcript Page 21 Line 4 to 15:

> *THE COURT: Ms. Diaz, can you clarify if I'm wrong. It is based solely on the nature of the offenses. Am I correct, ma'am?*
>
> *MS. DIAZ: It is, your Honor. The reason why Mr. Jackson was put at a higher risk is because it's his first offense.*
>
> *THE COURT: Right.*
>
> *MS. DIAZ: It's a department policy where, even if he's low, we have to override it so that it is high.*
>
> *THE COURT: Right. Thank you very much, ma'am.*

185.    Such automatic categorization violates constitutional rights. Legal challenges related to risk assessment tools often focus on fairness, due process, and individualized considerations.

186.    In Malenchik v. State 928 N.E.2d 564 (Ind., 2010), the Indiana Supreme Court held that risk assessments like the Indiana Risk Assessment Score are not aggravating or mitigating circumstances but can be used to tailor a penal program for each defendant. It emphasizes the use of evidence-based offender assessment tools in sentencing decisions.

187.    The Court provided the framework necessary to assist trial courts in appropriately using the results of risk and need assessment instruments:

> It is clear that neither LSI-R nor the SASSI are intended nor recommended to substitute for the judicial function of determining the length of sentence appropriate for each offender. But such evidence-based assessment instruments can be significant sources of valuable information for judicial consideration in deciding whether to suspend all or part of a sentence, how to design a probation program for the offender, whether to assign an offender to alternative treatment facilities or programs, and other such corollary sentencing matters. Id. at 573.

188.    The Court stated that these instruments provide information based on extensive research and assist courts in crafting individualized sentencing schemes with a maximum potential for reformation consistent with Article I, Section 18 of the Indiana Constitution, which emphasizes the foundational importance of reformation as a goal of our penal code. The Court held that the assessment results are not intended to serve as aggravating or mitigating circumstances nor determine the gross length of a sentence but can be used in formulating the manner in which a sentence is to be served. By using instruments such as the IRAS and IYAS, the sentencing judge has the ability to formulate and enforce an acceptable individualized case plan, which can assist in the offender's rehabilitation.

189.    Under Indiana and Federal Law, when a defendant scores the lowest threat level on the Indiana Risk Assessment Tool but is perceived at a higher risk due to being a first-time offender

and the nature of the offense, it may raise concerns regarding fairness, due process, and individualized considerations in sentencing. While risk assessment tools can be useful in informing sentencing decisions, they should not be the sole determinant of a defendant's risk level or sentencing outcome. The principles of fairness, due process, and individualized considerations should guide the sentencing process to ensure a just and equitable outcome for all defendants. Here's why:

    a. Fairness: Treating a defendant as higher risk based solely on the nature of the offense and being a first-time offender may not align with the principles of fairness and equal treatment under the law. It could lead to disproportionate sentencing outcomes.

    b. Due Process: Due process requires that individuals have a fair and impartial legal process. Using a risk assessment tool to determine a defendant's risk level should be done in a manner that respects the individual circumstances of the case and the defendant. Relying solely on a risk assessment score without considering other relevant factors may raise due process concerns.

    c. Individualized Considerations: The sentencing process should take into account the unique circumstances of each case and defendant. While risk assessment tools can provide valuable information, they should not be the sole basis for determining sentencing outcomes. Individualized considerations, such as the defendant's background, the nature of the offense, and mitigating factors, should also be weighed in the sentencing decision.

190. Judge Natalie Bokota sentenced Jackson on his original plea agreement. During the sentencing, Judge Bokota asked about any special conditions of probation and the Prosecutor did not have any. Transcript Page 28 Line 19 to Page 29 Line 11:

> *THE COURT: In each of these Counts, each of cases, the sentence is by the terms of the plea. Three years in the Department of Correction. Suspended to be served on probation. The plea does have some specific terms concerning the fact that you must register as a sex offender for ten years, sir. There are No Contact Orders that*

*will be maintained throughout the term of probation. And you already know what that means, Mr. Jackson. No direct or indirect contact of any kind. Were there any other special terms of probation, Mr. Randall? I don't believe that there were?*

*MR. RANDALL: Not that were --*

*THE COURT: Reduced to writing?*

*MR. RANDALL: -- not reduced to writing.*

*I assume probation will take the helm at this point.*

*THE COURT: All right.*

Transcript Page 29 Line 24 to Page 30 Line 11:

*THE COURT: The Court having entered judgment and imposing the sentence, now advises you, Mr. Jackson, that you are to report to probation. I don't believe we still have a probation officer in the courtroom, but if we do -- Ms. Diaz, should he report to you today, ma'am?*

*MS. DIAZ: Yes, your Honor. After court, we'll go over the rules of probation.*

*THE COURT: Very good. Excellent. All right. So you'll speak with her today. You already have been advised of how you would go about appealing by filing a Petition for Post-conviction Relief.*

191.    Mr. Jackson would meet with Officer Diaz who had Mr. Jackson sign the terms of Probation and that agreement of the terms was filed with the court that same day.

192.    Judge Natalie Bokota sentenced Jackson on his original plea agreement. Bokota ordered Jackson to meet with Probation Officer Diaz to go over / sign the conditions of probation. These conditions of probation are on record and only two pages. Only 1 Additional Condition was listed. A No Contact Order.

## Probation Officer Harassment and Fraud

193.    On March 29, 2021, three days later, Mr. Jackson would then meet with Jacob Otto for the first time the following. During that meeting Otto would have Jackson sign additional non-ordered conditions of probation. Otto would use a blank Special Condition Order Form and initial every condition, including ones that did not apply to Jackson by statute per I.C. § 35-38-2-2.4. Otto had predated the form and lacked the signature of the sentencing Judge. The place where a Judge's initial should be instead belonged to Otto.

194.    The threat of probation revocation was Obstruction of Justice as defined by I.C. § 35-44.1-2-2. Otto antedated the sheet to the date of Jackson's sentencing. This is an act of false / inaccurate reporting of case or proceeding per I.C. § 34-47-3-4.

195.    Mr. Jackson stated to Mr. Otto that these conditions were not the conditions that were ordered and contradicted not only what the court had stated but also what his attorney had stated. Mr. Otto's response was that if Mr. Jackson did not sign the conditions that he would file a petition to revoke, and Mr. Jackson would go to prison for non-compliance. This will be later addressed during the coming Post Conviction Relief hearings.

196.    These conditions are vacant from the record entirely until October 11, 2021, when Otto and the State would file a Petition to Revoke. Probation and the Prosecution knowingly used non-existent conditions of probation to arrest and revoke Jackson's probation and was supported by comments on the record by Magistrate Sullivan who agreed that all special conditions of sex offender probation apply at sentencing even when not ordered by the sentencing judge.

197.    During this time Jacob Otto would on the first day of meeting Mr. Jackson tell Mr. Jackson that he was not allowed to masturbate, not allowed to talk to or visit his children, made Mr. Jackson sign the special conditions of adult probation even ones that would not apply to Mr. Jackson. Mr. Otto stated that if Mr. Jackson did not sign them then his probation would be revoked for non-compliance. Mr. Jackson would provide Mr. Otto with his psychiatric evaluation to add to his records. This included an addictions evaluation.

198.    The additional conditions Otto imposed on Jackson after his sentencing cannot be valid conditions of probation. This is further support by *Freije v. State*, 709 N.E.2d 323, 325 (Ind. 1999), noting "the 'special' or 'additional' conditions must be checked off by the judge."

> [i]t is true that Ind. Code§ 35-38-2-1(a) requires that when a court places a person on probation, the court "shall . . . specify in the record the conditions of probation." The intent of this statutory requirement is "to provide a defendant with prospective notice of the standard of conduct required of him or her while on probation and to prohibit the imposition of additional conditions after sentencing."

199.    *Bowles v. State*, Court of Appeals Case No. 06A05-1702-CR-411 (Ind. App. Oct. 4, 2017) (first citing *Ratliff v. State*, 546 N.E.2d 309, 311 (Ind. Ct. App. 1989) (noting that I.C. § 35-38-2-1(a) "imposes upon the sentencing court a duty to specify the conditions of probation in the record at the time it places a defendant on probation")); and then quoting *Atkins v. State*, 546 N.E.2d 863, 865 (Ind. Ct. App. 1989).

200.    The addition of non-court ordered special conditions of probation directly conflicted with the conditions of Jackson's plea agreement, I.C. § 35-35-3-3, and probation conditions I.C. § 35-38-2-2.4. Otto informed Jackson he could not see or talk to his children due to probation conditions, interfering with his marriage and parenting rights. U.S. Const.amend. XIV, § 1.6.3.4. Jackson protested as his attorney assured him, he was able to live at home and be around his children prior to accepting the plea. Otto informed Jackson he was not allowed to have sex with his wife or masturbate, denying Jackson and his wife their constitutional right to aspects of their marriage and right to reproduction. These acts also violate 18 U.S.C. § 242:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when this conduct explicitly or implicitly affects an individual's employment, unreasonably interferes with an individual's work performance, or creates an intimidating, hostile, or offensive work environment.
>
> Sexual harassment can occur in a variety of circumstances, including but not limited to the following:
> - The victim as well as the harasser may be a woman or a man. The victim does not have to be of the opposite sex.
> - The harasser can be the victim's supervisor, an agent of the employer, a supervisor in another area, a co-worker, or a non-employee.
> - The victim does not have to be the person harassed but could be anyone affected by the offensive conduct.

- Unlawful sexual harassment may occur without economic injury to or discharge of the victim.
- The harasser's conduct must be unwelcome.

201.    U.S. Equal Employment Opportunity Comm'n, *Sexual Harassment Discrimination*, https://www.eeoc.gov/laws/guidance/fact-sheet-sexual-harassment-discrimination (May 1, 2024) *See:* Title VII, 29 CFR § 1604.

202.    This unwelcome verbal sexually natured conduct unreasonably interfered with, and created a hostile, intimidating and offensive environment. Some of the sexual questions Otto asked would trigger Jackson's mental health conditions and affect Jackson for days or longer. Jackson would have episodes while either waiting for or during the sessions, Otto would ask Jackson when he would get over it. Again, the other Probation Officers around overheard these acts as well as Supervising Probation Officer Angela McFerrin showed a deliberate "Failure to Intervene". *See:* Title VII, 29 CFR § 1604

203.    Mr. Otto would then search Mr. Jacksons phone and when asked what his reasonable suspicion was, Otto stated that it is his right and if Mr. Jackson didn't let him then he would terminate his probation. Mr. Otto would then inform Mr. Jackson that he had to move out of his house immediately and was not allowed to return as his children lived there.

204.    As Mr. Jackson would go to leave Mr. Otto would then demand to search Mr. Jacksons car. Mr. Jackson again asked what the reasonable suspicion was I.C. § 35-40-4-7.3. Mr. Otto stated that he was going to search Mr. Jacksons car for child paraphernalia or if his children were with him. When Mr. Jackson and Mr. Otto approached the car, Mrs. Jackson asked what was going on as she was in the front passenger seat. Mr. Jackson informed Mrs. Jackson that Otto was searching for child items in the car. Mr. Otto would search for the car and leave.

205.    Mr. Otto would then every session search Mr. Jacksons phone every session and asked if Mr. Jackson had sexual encounters with his wife or if he had masturbated. Mr. Otto would then constantly inform Mr. Jackson that he is a sex offender and that he deserves it when ever Mr. Jackson would complain about how Mr. Otto would talk to him.

206.    Mr. Otto would then harass Mr. Jackson repeatedly and have Mr. Jackson verify his address by bringing mail or emailing him photocopies of letters with his address and name on it.

This would go on for months. This is verified with emails sent to Mr. Otto repeatedly at that time and his response.

207.    Mr. Otto would then tell Mr. Jackson that he had not done an addictions evaluation though Mr. Jackson provided Mr. Otto on the first day a copy of the one Mr. Jackson had just done. It was even done by one of the providers on Mr. Ottos list. Mr. Otto demanded a new one. The facility, Porter Stark, stated that they are good for a year and that the one Mr. Jackson had done is only a few months old. Mr. Otto would not accept it. Porter Stark would reach out to Mr. Otto to explain, and Mr. Otto would refuse to talk to them. Finally seeing the abuse, the facility decided to do a "Updated" evaluation which is not normal or done.

208.    Mr. Jackson, having regular panic attacks and serious side effects from his medications, would request to have his supervision transferred from Lake County to Porter County where he lived. Mr. Jackson lived a few blocks from the Probation Department there and could walk if needed to the facility. If he drove it would have minimal risk while under the influence of his medications compared to driving the extended distance to Lake County Probation.

209.    Mr. Otto would state that Mr. Jackson had to be in Sex Offender therapy even though it was not ordered by the Judge. Mr. Jackson contacted the first place and during the intake it asked Mr. Jackson on the form about his health conditions and Mr. Jackson put down his mental health conditions. The facility stated that they could not accommodate Mr. Jackson due to specifics regarding his medications, conditions and safety concerns as it would require Mr. Jackson to drive nearly an hour under medications that could cause issues with Mr. Jacksons history of Panic Attacks.

210.    Jacob Otto was informed by Mr. Jackson of his intent to file a Post Conviction Relief due to his lifetime registration requirements and the other special conditions which violated the plea agreement. Mr. Otto would tell Mr. Jackson that he is required to register for life no matter what the agreement says. Mr. Otto would then inform Mr. Jackson that he needs to enroll in another therapy service through Kevin Malloy.

211.    Mr. would reach out to the therapy service through Kevin Malloy, and he would deny Mr. Jackson as Mr. Jackson told the person that he was filing a Post Conviction Relief petition. The

therapist stated that Mr. Jackson could not join the sessions as he would be required to admit guilt at every session and that the program doesn't take people on appeal or post-conviction relief.

212. Mr. Jackson would tell Mr. Otto this who then would file a Petition to Revoke on Mr. Jackson for not being compliant. Mr. Otto would state that Mr. Jackson is trying to control his therapy sessions, that Mr. Jackson has not paid his dues or done an addiction evaluation.

213. Mr. Otto had previously told Mr. Jackson that his Bond had taken care of the fees in contradiction to the claim made in the PTR. This would later be shown that Mr. Jackson had in fact had his fees taken care of by his bond. And that in fact he had done an addictions evaluation, but Mr. Otto would state otherwise.

214. Mr. Jackson would be released on bond on the PTR. Mr. Otto would keep Mr. Jacksons visits bi-weekly instead of transitioning to the monthly. Mr. Otto would threaten Mr. Jackson for not being in therapy still. Mr. Jackson asked what he could do, and Mr. Otto stated that he could ask the last provider if he would take him in.

215. Mr. Otto stated that Mr. Jackson did not qualify for transfer, nor would it be granted if he was. Mr. Jackson requested a copy of the petition to transfer probation anyway, but Mr. Otto refused. This would violate Mr. Jacksons protected ADA rights and unnecessarily restrict his normally protected right to request transfer.

## Ignored Requests, Rights and Protections

216. On April 6th, 2021, Mr. Jackson would find the transfer application online, fill it out and send it to Mr. Otto via email. Mr. Jackson would also send a copy to Kristy Jones, L.C. Intrastate Contact. This email is available for submission as well.

217. The email sent to joneskl@lakecountyin.org and ottoja@lakecountyin.org states:

*According to the Rules for Probation Transfer which I have included here I am sending in my application for request of Transfer. According to the in.gov website I am sending a copy to both my Current Probation Officer for him to sign as well as a copy to Kristy Jones, the contact listed on in.gov for the Lake County Contact for Request of Transfer to be supplied too.*

*According to the Rules for Probation Transfer I qualify for transfer as:*

*1) I reside in Porter County which I have for the past 3 years. I do not work or go to school as I am disabled.*

*2) All of my Dues are Paid as shown by the Lake County Court Clerk as it was taken out of my bond before they released it to me.*

*As per Rule 1.B ( The intrastate transfer process can be initiated by either the sentencing court or by request of the offender.) I am initiating the transfer via this email. And as shown in the PDF attached, the court MUST review my application. If the Sentencing Court agrees that I qualify for transfer then as Rule 3.A states the receiving must accept my transfer as I am, and have been a resident of Porter County.*

*My support system is located in Porter County along with my wife and child. My therapist is located in the town in which I live. The Probation Office is 5 minutes or so from my house. Currently I drive over 45 minutes or longer to travel to Lake County for my Probation Appointments. My medication states that my driving should be limited as well so I am exposed to greater risk at driving more time over greater distances. It is an undue budron that can be resolved simply by transferring my Probation to the town in which I live and have lived, especially in case of any unforeseen transportation issues.*

*Please respond via e-mail if you have any questions or concerns or if you disagree with my right to apply for transfer. If I have to send my application elsewhere please let me know to whom I have to send it too instead.*

*Thank you for your time.*

*David Jackson*

44

218.    On April 7th, 2021, Mr. Jackson would email Jacob Otto twice, both of which were ignored, stating:

*I am diagnosed with Anxiety, PTSD and ADD. Because of this I take medications that alone doesn't work great together. The medications cause me to be constantly drowsy, sick to my stomach, unable to drive for long periods of time, and other psychological side effects and impairments.*

*My diagnosis for PTSD and ANXIETY is tied to Hobart Police, Lake County Police, etc. This has been well documented by each of my therapists, psychologists and doctors. My PTSD is so severe that I am unable to work. The state of Indiana declared me medically frail a few years ago.*

*I moved to Porter County 3 years ago to seek treatment and remove myself and my family from the elements mentioned above so that I can heal.*

*I spoke with the Therapist at Crown Counseling I told him my concern and informed him that I am willing to set an appointment as to not violate conditions of my probation but after he inquired as to my mental diagnosis and triggers he stated he is not going to set a appointment up until I speak to you as he is worried I will suffer from panic attacks and ptsd episodes either on the way to his office or in his office.*

*According to the Indiana website since I have and currently live in Porter County I have a right to apply for a transfer even if I was a mentally and physically healthy individual. Which on its own shows that it is a reasonable accommodation. My disability makes it a necessity. Not only is it dangerous for me to drive that long multiple times a week for nearly an hour each time each way compared to*

*staying in my safe area in which I live and only having to travel 5 minutes away.*

*It is a reasonable accommodation to a regular person who has the right to transfer it is even more so that I need it due to my disability.*

*I have a meeting with a layer tomorrow who also handles civil and disability law and will inquire as to this situation with him as well. I did state repeatedly to the therapist at Crown Counseling that I am more then willing to set an appointment as I fear violating my probation and he informed me that it would not be a violation as he is asking me to communicate with you my needs*

*I am sharing a copy of the federal statute that applies to state and local agencies including probation:*

*Law Enforcement Activities DOJ recently filed an amicus brief in City and County of San Francisco v. Sheehan, No. 13-1412 (United States Supreme Court), in which the Solicitor General ("SG") expressed the view of the United States Government with regard to the ADA's coverage to local law enforcement activities as follows: "[t]he statutory text [of the ADA] further demonstrates that law enforcement entities are subject to Title II's anti-discrimination mandate with respect to all of their operations, including arrests." Id. at 19 (emphasis added). The SG went on to explain: "[b]ecause law enforcement entities are subject to Title II, they must 'make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." Id. at 22 (citing 28 C.F.R. 35.130(b)(7); Title II Technical Assistance § II-3.6100, at 14).*

*Please reply to the email so that I know what I am required to do to stay in compliance while also hoping you respect my rights protected by the ADA.*

*I just found the Lake County Indiana ADA Coordinator. I am attaching*

*the PDF that was posted on the lake county website for your review.*

*I have already called and left a voicemail for the coordinator. I hope*

*to speak with him tomorrow as I do feel I am being discriminated*

*against and being denied reasonable accommodations that I qualify*

*for regardless of my disability but is needed because of it.*

219.   Mr. Jackson would reach out multiple times and leave voice mail messages to Delvert Cole, L.C. ADA Compliance Coordinator, who would never answer Mr. Jacksons calls or return them nor would he respond to any other communications made by Mr. Jackson. Mr. Cole failed in his duty and in so doing failed to prevent all that has happened since.

220.   Mr. Otto and Ms. Jones had a responsibility to process the application. Both failed to do so. If it had been most of what was to come could have been avoided. Mr. Jackson would follow up with both people. Ms. Jones would not return emails or calls while Mr. Otto would state that Mr. Jackson was denied but the process was never started.

## PCR, Probation and Therapy Don't Mix

221.   On April 13, 2021, Mr. Jackson would text Kevin Malloy at (574) 383-3323. Mr. Jackson would initiate a phone call, but the line was busy, and Mr. Jackson would receive a text from Mr. Malloy that initiated the text conversion. This is a copy of how those texts happened. They are part of the court record as well.

> *April 12, 2021*
>
> *Mr. Malloy: in group, I'll call you after*
>
> *Mr. Jackson: No problem. It's David Jackson to setup a session for*
>
> *probation mandated therapy.*
>
> *April 13, 2021*
>
> *Mr. Jackson: Please call when you are free*
>
> *April 14, 2021*
>
> *[Mr. Jackson called but line was busy]*
>
> *Mr. Malloy: in group, I'll call you after*

47

*Mr. Jackson: Mr Molloy. I would like to setup an appointment. I just left my PO. I will meet the requirements for treatment. When can we schedule the intake or first meeting?*

*April 16, 2021*

*Mr. Jackson: Hello, this is David. I just called and left you a voice mail. I would like to setup an appointment for therapy. I talked to Mr. Otto and he said for me to let him know if and when we can setup the appointment.*

*April 19, 2021*

*[Mr. Jackson called but line was busy]*

*Mr. Malloy: in group, I'll call you after*

*Mr. Jackson: Hello, this is David. I just called and left you a voice mail. I would like to setup an appointment for therapy. I talked to Mr. Otto and he said for me to let him know if and when we can setup the appointment.*

*April 20, 2021*

*Mr. Jackson: I have not heard back from you.*

*Mr. Malloy: David, I wanted to let you know that I am not willing to set up a appointment with you until your current court situation is completed. At that point, your probation officer is welcome to contact me.*

*Mr. Jackson: Which court situation so I am clear?*

*Mr. Jackson: ?*

*Mr. Malloy: Violation , and if you are PCR for guilt/innocence*

*Mr. Jackson: Why not?*

*[No further replies or answers to calls]*

222. On April 13, 2021, Mr. Jackson would email Jacob Otto and Kevin Malloy (k2pmolloy@aol.com) and Atty Brown stating:

*Hello Mr. Otto,*

*I spoke with Kevin Molloy today who is the therapist that you, Jacob Otto, stated was my last choice to choose from for therapy in regards to the probation requirement. He informed me that due to having a PCR in the works that he would have to hold off on even doing the intake as his program requires that I admit guilt. Mr. Molloy also does not take insurance payments which I informed him I am disabled and have medicaid so I would have to pay out of pocket.*

*I am surprised that you did not inform either locations that I am in the process of a PCR filing. Or informed either one of them about my disability status and accommodations. Though I am able to meet Mr. Molloy in Chesterton as it is not in Lake County and shorter then having to travel to Crown Point. I informed Mr. Molloy that I would like to set an appointment regardless so that I am in compliance with the requirements for Probation but he stated due to us actively working on the PCR that it would not be effective or appropriate at this time until that has gone through its course.*

*I have tagged my attorney Russell Brown Jr. and Mr Kevin Molloy in this email so that they get a copy of it as well. We have a meeting tomorrow for our scheduled P.O. Visit. I am concerned as I asked both providers to schedule me intakes or appointments so that I am considered in compliance but both have refused to do so due to the current circumstances or the PTSD or PCR.*

*I am asking you for your feedback and please reply here so that my legal counsel can be made aware of your requirements so that I stay in compliance. You have yet to respond to a single email I have sent you.*

*David Jackson*

223.    This was never replied to by either party nor was it acknowledged or refuted.

224.    On April 16, 2021, Mr. Jackson would email Jacob Otto and Kevin Malloy and Atty Brown stating:

> *Mr. Otto,*
>
> *I have a appointment set for Tuesday 4/20/21 at the BMV located in Valparaiso Indiana to update my address on my driver's license. I have already called ICU monitoring and let then know.*
>
> *I have also let them know about my appointment with you on Wednesday as well as court on Thursday.*
>
> *As you stated today you received confirmation that we did indeed already pay for our probation fees via out original bond. You stated we have new fees but that out new bond covered that and not to worry about it.*
>
> *You told me today that all I have not in compliance is being in a therapy program. I have called and texted Kevin Molloy about setting up an appointment and left voicemails. I am awaiting to hear back and have tagged him in this email.*
>
> *Hopefully Thursday I can get this monitor off and there will be less steps to jump through for these appointments etc.*
>
> *David Jackson*

225.    There was no reply or response from Mr. Malloy or Mr. Otto.

226.    On May 4, 2021, Mr. Jackson would group email Mr. Otto, Mr. Brown and Allyssa Broshar who was Mr. Jacksons personal therapist stating:

> *Mr Otto,*
>
> *I had talked to my Therapist Alyssa Broshar about having the addictions evaluation/therapy as you stated I needed. She has informed me that Jennifer Cimbala who also works at Aspire Therapy in Valparaiso meets the needs by the state as a state approved addictions specialist. Alyssa is setting up a time for the evaluation*

50

for Saturday and is awaiting confirmation. This meets the requirements you stated I needed.

I have 5 issues I wish to address for our meeting this Thursday. On that note...

ISSUE 1:

During our last visit I informed you that the SOMM Program is a Voluntary Program. One that needed to be Volunteered for during Phase 1 which takes place while incarcerated. This is followed by Phase 2 and then upon Parol or Court Order Phase 3. I am not on Parol nor was it Court Ordered for me to participate. The program requires that the participant sign a volunteer form to be enlisted in the program. This was not done nor was it a condition of the plea agreement nor a statutory condition of Sex Offendor Probation. In fact the correct updated form that confirms that as it states "as directed by the court". See Condition 11. I have attached the most recent revised version of the form that should have been used as it was modified due to recent law changes as well as state and federal court cases. There was no court order for therapy nor any stipulations to my plea agreement so I was falsely arrested for a violation I did not commit as it did not apply to me. Here are the State and Federal Case Law showing that the Therapy also violates my Constitutional rights:

According to the US Supreme court in Vitck vs Jones 100 S.Ct 125, 'While a conviction and sentence extinguish an individual's right to freedom from confinement for the term of the sentence, they do not authorize the state to classify him as mentally ill and subject him to involuntary psychiatric treatment without affording additional due process protections.

In Ohlinger vs Watson 652 F2d 775, it was brought out that people "have a constitutional right to such individual treatment as will give each of them a realistic opportunity to be cured or to improve his mental condition" and "rehabilitative rational is not only desirable, but it is constitutionally required" plus "adequate and effective treatment is constitutionally required" if inmates are being forced into treatment programs through coercion by threat of loss of their good time, or privileges afforded to other inmates than it is quite obvious that the prisons officials are attempting to change the thinking patterns through forced treatment in violation of these constitutional standards.

This issue was addressed by the United States Supreme Court in Stanley v. Georgia, 89 S. Ct. 1243, 1248 "Our whole constitutional heritage rebels at the thought of giving government power to control men's minds". It is interesting that behavior modification programs use the same principles as are used in brainwashing and mind control, something that the American people are adamantly against.

BLEEKE v. STATE

The upshot in this case is that the potential for revocation of parole forces Bleeke to give up his Fifth Amendment privilege or possibly return to prison. And although the five-year statute of limitation for perjury has expired, Bleeke is still subject to the possible use by law enforcement of any other incriminating statements.8 The SOMM program's requirements violate the Fifth Amendment.

https://caselaw.findlaw.com/in-court-of-appeals/1621453.html

ISSUE 2:

Per our conversation during our last meeting I am classified as a "Serious Sex Offendor" not a Violent Offendor nor a Offendor Against Minors. This removed all of my living restrictions except for the one

that states that I can not live within 1000 feet of a school or 1 mile from a complaining witness in the cases. But you informed me that I could not live at home due to my own children living there. Court cases and state law both state that since I was not convicted of an act against a family member that my children do not count to that restriction. So I requested to be returned to my home.

You also stated that Officer Sheets was the one that stated I could not live at home. This is not true as Officer Sheets actually made me sign a paper stating that I could live at my home unless I am classified as a Violent Offender or a Offender Against Minors and that if I do then I would have 30 days to move after being notified by Officer Sheets of the change. The only reason I moved out was because you told me I had too during our first meeting following you being assigned to my case.

Indiana Court of Appeals Case No.

15A01-1704-JT-901 (Ind. App. Oct. 31, 2017)

1) The Father was on Probation and did not take the SOMM therapy

2) Unlike me who is just classified as a serious sex offender he was classified as a offender against childeren

3) He had violated his probation for talking to his kid and the other was for trafficking stuff to a inmate but NOT due to not being in therapy

4) The court stated that regardless of all of that he had a constitutional right to parent his child and allowed him to live with his children as he did not offend against a family member and had constitutional rights to raise his children without the government interfering.

https://casetext.com/case/termination-the-parent-child-relationship-kp-v-ind-dept-of-child-servs

53

ISSUE 3:

You also told me that I am prohibited from having social media accounts/apps. This was not true. As the attached sheet shows I can have them I just can not use them to contact minors. There were several court cases on this as well recently both in federal and indiana state courts. I would like to reactivate my social media accounts. Please let me know if you have an issue with this. I will post the court case proving it is a constitutional right:

Packingham v. North Carolina

The court, in an 8-0 ruling, handed a victory to Lester Packingham, a registered sex offender due to a statutory rape conviction who had challenged the law as a violation of the U.S. Constitution's First Amendment guarantee of free speech.

https://www.supremecourt.gov/opinions/16pdf/15-1194_08l1.pdf

ISSUE 4:

You informed me that I was not allowed to Masterbate or enter into any form of sexual contact which includes my wife... I have not seen this restriction anyware. The ONLY thing that I see remotely close to this is the requirement is Condition 19 on this sheet that states I can not engage in any sexual relationship with anyone who has a child at home under the age of 16. Again this does not include my own wife and kids. So during our last meeting I requested a copy of any documentation that you had that stated otherwise.

ISSUE 5:

I want to go to the Gym and art museums (Not Children Museums or Youth Centers). You told me that I can only do it at home. I looked this up. There are many instances I came across where I saw offenders able to go to gyms etc. The only thing that shows anything close to this is Condition 26. This condition first off is NOT listed

54

*under the Statutory Conditions. And focuses only on facilities that are aimed specifically for children.*

*BLEEKE v. STATE*

*Bleeke contends that other certain additional parole conditions are impermissibly overbroad or vague. In Collins v. State, 911 N.E.2d 700, 713 (Ind.Ct.App.2009), trans. denied, we held that "[a] probationer has a due process right to conditions of supervised release that are sufficiently clear to inform him of what conduct will result in his being returned to prison." We see no reason that a parolee should be deprived of such a right. See Harris, 836 N.E.2d at 277 (holding that "a parolee . has a due process right to 'conditions of supervised release that are sufficiently clear to inform him of what conduct will result in his being returned to prison' ") (quoting Smith v. State, 779 N.E.2d 111, 118 (Ind.Ct.App.2002), trans. denied ).*

*https://caselaw.findlaw.com/in-court-of-appeals/1621453.html*

*CLOSING:*

*I would like to move home this weekend and get this ankle monitor off of my leg this Thursday if possible following our meeting if you think we can come to an agreement. If we have to wait on the monitor I understand but I do ask that I be allowed to return to my home. I informed you my daughter has been referred to start therapy due to me being removed from her life and the negative effect that the absence has had on her.*

*David Jackson*

227. Mr. Otto would not respond to or acknowledge any of my concerns or do his due diligence as part of the code of conduct or Probation Officers to assure that Probationers rights are not infringed upon. He would take no steps to address or evaluate any of Mr. Jacksons requests. Mrs. Broshar was attached as she was helping Mr. Jackson deal with serious issues that were

affecting his mental wellbeing and so that if Mr. Otto replied to any of the requests that she could help with.

228.    On May 7th, 2021, Mrs. Broshar would email Mr. Otto, Mr. Jackson and Mr. Brown with the following:

> Hello,
>
> I wanted to introduce myself. My name is Alyssa Broshar, and I am David's current therapist. I began working with David in november 2019. I am currently seeing him twice weekly for counseling services.
>
> David informed me that Mr. Otto would like to have him seen by a substance abuse counselor and evaluated so he does not have to complete the voluntary program, is that correct? We have a substance abuse counselor at Aspire Counseling Services (where I am contracted), and I have been in contact with my supervisor to set up a session for David to see her. I see David has informed you of this as well per his email above. Our substance abuse counselor works part-time, and we are working on fitting David into her schedule.
>
> David has let me know he is concerned if he cannot get into a session this weekend then he may be reprimanded at his upcoming appointment with Mr. Otto. I wanted to let you know David has been in contact and will be evaluated as soon as there is an opening. I wanted to reach out to inform you that David has actively worked on setting this session up and is now just waiting on an opening-he has done everything in his control of reaching out to set up an appointment. In the meantime, he does see me twice weekly and is consistent in attending sessions.
>
> If you have any concerns please feel free to contact me via email or cell phone at (219) 742-4972.
>
> Thank you,

*Alyssa Broshar, MAT, NCC, LMHCA*

229.    Mr. Otto would not respond to Mrs. Broshar's emails.

230.    On May 11, 2021, Mr. Jackson would email Mr. Otto, Mr. Brown and Mrs. Broshar two emails that stated:

> *I went ahead and had it setup at Porter Starke due to time constraints and availability. Here is the appointment information and confirmation letter is going out tomorrow.*
>
> *Drug / Alchoha / Sex Addiction Evaluation & Treatment Assessment*
>
> *May 28th 12:30*
>
> *Practitioner: Teresa Pavey LSW*
>
> *Porter Starke Valparaiso Indiana*
>
> *(219) 531-3500*
>
> *Confirmation is going into the mail tomorrow and will be mailed to:*
>
> *507 Oak St Front*
>
> *Valapraiso IN 46383*
>
> *Updated Medication List for ADD, PTSD and Anxiety:*
>
> *Adderall XR 25 MG - 1 Daily*
>
> *Amphet/Dextr 20 MG - 1 Daily (Or As Needed)*
>
> *Hydroxyzine HCL 25 MG - Twice Daily (Or As Needed)*
>
> *Sertraline 50 MG - 1 Daily*
>
> *Propranolol 10 MG - 2 Daily*
>
> *Clonidine 0.2 MG - Twice Daily*
>
> *Clonidine ER 0.1 MG  - Twice Daily*
>
> *Buspirone - 30 MG - 1 Daily*

231.    On May 25, 2021, Mr. Jackson would email Mr. Otto and Mr. Brown the following along with an attached appointment slip from Porter Stark:

*Here is a copy of the appointment slip that Porter Stark mailed to my house last week as proof of appointment for Addiction Counseling / Evaluation.*

*David Jackson*

232. On May 28, 2021, Mr. Jackson would email Mr. Otto and Mr. Brown stating:

*Mr. Otto,*

*I just did my addictions evaluation with Porter Starke. The informed me I had one done already when they did my psychological evaluation less then a year ago which you already had a copy of as I provided it to your office during my intake. They did it again however and said they will include it as an addendum to my pre-existing one. I was found as I was before to not have any addiction problems what so ever... She said that the report will be available later next week as it is Friday on a holiday weekend.*

*She stated however the original evaluation which you have already should suffice until you send in the request to get the new one.*

*If you need me to do anything else please feel free to let me know so that I can be assured to stay in compliance.*

*To refresh it was done at Porter Starke in Valparaiso.*

*David Jackson*

## INSOMMS

233. On July 29, 2021, Mr. Jackson spoke with Tracy Berry, Todd Casbon, and Brian Blitch who stated that Mr. Jackson would be exempt from participation in the program due to his active Post Conviction Relief. Mr. Jackson would email a copy of their contact information and mailed it to Mr. Otto that same day.

234. On July 29, 2021, Mr. Jackson had found proof that his claims as to why the Sex Offender Therapists would be valid. Mr. Jackson sent an email to Mr. Otto and Mr. Brown which stated:

> https://www.libertyhealthcare.com/wp-content/uploads/2015/08/ACA-08-2015-The-Indiana-DOCs-INSOMM-Program-Lessons-Learned-Compatibility-Mode.pdf
>
> The Fifth Amendment's Self-Incrimination Clause provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.
>
> Case showing that the only requirement for the exemption is that the defendant show proof that the defendant qualifies for the exemption. It also states that an evidence hearing will not be necessary if "The respondent could obviate the need for a hearing if he vacated the disciplinary
>
> proceedings at issue in this action and the corresponding sanctions."
>
> https://ecf.insd.uscourts.gov/cgi-bin/show_public_doc?12015cv1764-24
>
> JOHN BOCHNER v SUPERINTENDENT New Castle Correctional Facility
>
> Case No. 1:15-cv-001764-TWP-DKL
>
> I also spoke to two people today at INSOMM and they both stated that you just have to show proof that a PCR or Appeal is in the process or pending to qualify for the exemption.
>
> Brian Blitch
>
> INSOMM Program Director of Community Services
>
> 317 951 1984 x63

*Stated: You would just have to show that you are in process of a*

*PCR. If you show that you are in the process of a PCR then you are*

*considered temporarily exempt from the INSOMM Program.*

*During my Probation Meeting today I spoke with Mr Otto and he*

*asked that my attorney reach out to him about getting the monitor off*

*and about the adjustment to probation for exemptions. By doing so*

*we could have the Petition to Revoke withdrawn.*

*I hope to hear from both Russell Brown Jr. and Mr. Otto soon in*

*regards to this. I have also included a copy of the INSOMM Program*

*Intro Guide in PDF form that if you search for the word exemption*

*you will see that it is for people on appeal or post conviction relief. I*

*reminded Mr. Otto that I had informed him of my intent to file a PCR*

*from our first meeting as his notes reflect and I also provided him*

*with a copy of the filing for PCR when I had it. I should have been*

*considered and still am considered exempt from the INSOMM*

*program as I have met the requirements and provided proof of PCR*

*in a timely manner.*

*David Jackson*

235. The attachment on that email was from the Indiana INSOMM Program dated August 15, 2015, stating on Page 6:

*Exceptions – "Temporary Exemption from Treatment due to Ongoing*

*Appeal or Post Conviction Relief".*

236. The source came from Liberty Healthcare which is the program that is contracted by the State of Indiana who handles the certification, regulation, policies for all Sex Offender Treatment providers in Indiana.

237. This claim is also supported by case law. See: Clark v. Buss, No. 1:09-cv-00308-JMS-DML, 2010 WL 3927725, *1, *4 (S.D. Ind. 2010) (noting it was an uncontested fact that the INSOMM program allowed deferment of participation if convict could show he had a direct appeal or post-conviction relief action pending).

238. In a class-action habeas petition challenging the Indiana DOC's Sex Offender Management and Monitoring (INSOMM) program as being unconstitutional, the Court of Appeals for the Seventh Circuit held on April 25, 2019, that INSOMM's requirement that prisoners admit to crimes they had not been charged with violates their Fifth Amendment right against self-incrimination. See: *Lacy v. Butts*, 922 F.3d 371 (7th Cir. 2019). INSOMM doesn't allow confidentiality or immunity. Prisoners are made aware that whatever they admit to in the program can be used against them to file new charges. That applies to admissions discovered through testing, such as polygraphs. [See: PLN, July 2018, p.46; Nov. 2016, p.20]. The question before the Seventh Circuit was whether taking a prisoner's earned GCT constituted "compelled" speech under the Fifth Amendment intended to induce a confession that could incriminate the prisoner. The appellate court held it did. Pursuant to the Fifth Amendment, no person (including prisoners) shall be compelled to be a "witness against himself." In McKune v. Lile, 536 U.S. 24 (2002).

239. On July 30, 2021, Mr Jackson emailed Mr. Otto and Mr. Brown stating:

*Indiana Sex Offender Management and Monitoring (INSOMM) Program*

*According to Tracy Berry "INSOMM Program Director (317) 232-5719", when a offender doesnt want to take the Sex Offender Therapy then the offender is offered Sexual Violance Education Classes instead which the offender does not discuss their cases, their past or anything. She also stated that when an offender is going through a PCR or Appeal, due to the "Lacy Decision" (Lacy v. Butts, U.S.D.C. (S.D. Ind.), Case No. 1:13-cv-00811-RLY-DML) they grant temporary exemption to the offender while it is being litigated.*

*According to Brian Blitch "INSOMM Program Director of Community Services 317 951 1984 x63", You would just have to show that you are in process of a PCR. If you show that you are in the process of a PCR then you are considered temporarily exempt from the INSOMM Program.*

*"Lacy Decision"*

"The Ninth Circuit held that a district court's decision explicitly to condition a prisoner's supervised release on his successful completion of a treatment program similar to INSOMM violated the inmate's right to be free from compelled self-incrimination. Antelope, 395 F.3d at 1139.Just as in Antelope, Lacy's refusal to incriminate himself has rendered him categorically ineligible for the shorter term of confinement he otherwise would have received. The Fifth Amendment does not allow Indiana to impose such a penalty.

http://media.ca7.uscourts.gov/cgi-bin/rssExec.pl?Submit=Display&Path=Y2019/D04-25/C:17-3256:J:Wood:aut:T:fnOp:N:2331224:S:0

Case showing that the only requirement for the exemption is that the defendant show proof that the defendant qualifies for the exemption. It also states that an evidence hearing will not be necessary if "The respondent could obviate the need for a hearing if he vacated the disciplinary

proceedings at issue in this action and the corresponding sanctions."

https://ecf.insd.uscourts.gov/cgi-bin/show_public_doc?12015cv1764-24

JOHN BOCHNER v SUPERINTENDENT New Castle Correctional Facility

Case No. 1:15-cv-001764-TWP-DKL

240. On July 30, 2021, Mr. Jackson sent another email to Mr. Otto and Mr. Brown stating:

Due to the material and contact provided in the email entitled "Indiana Sex Offender Management and Monitoring (INSOMM) Program Alternatives to Therapy" which states that due to the Lacy Decision and the fact the I am in a PCR that Mr. Otto obviate his Petition To Revoke and vacate the disciplinary proceedings at issue

*as stated in (JOHN BOCHNER v SUPERINTENDENT New Castle Correctional Facility Case No. 1:15-cv-001764-TWP-DKL).*

*I provided repeated proof of both intent and finally filling a Post Conviction Relief Application as shown in our weekly meetings notes that I sign each time I come in. I qualified for the exemption both by INSOMM standards as well as the standards set forth in the Bochner case.*

*As stated in the Bochner case I request the "Obviation" as there is no need for e evidentiary hearing or to continue the process and is a waste of the courts resources and time as well as causing undue hardship to myself the defendant and the defendants family. And the removal of the ankle monitor.*

*I have tried calling you twice today to discuss this. I will try again. I have also at your request tried to reach out to my attorney Russel Brown Jr. since our meeting and have not had a return reply from the calls, text messages or emails I sent him but I am sure he will get back with me shortly and then to you. Feel free to reach out to me if you wish instead.*

*David Jackson*

*219 781 2799*

## Illegal Monitoring Software

241.    On August 16, 2021, Covenant Eyes emailed a copy of the chat between Mr. Jackson and Marcia M. who is a Member Care Agent for Covenant Eyes. This was sent to Mr. Jackson, Mr. Otto and Mr. Brown. It showed Mr. Jackson was working hard to set up and confirm the installation of the Covenant Eyes monitoring software but was having issues with the process that was resolved with the help of Covenant Eyes.

242.    The software states it is not permitted for use by Probation / Parole Departments as the software is technologically deficient to protect the rights of individuals when used in that manner and violates the terms of service. 36 CFR § 701.7. Certain Terms in License Agreements. On August 18, 2021, Due to Mr. Otto not wanting to accept Mr. Jacksons self-employment, Mr. Jackson sent an email to Mr. Otto and Mr. Brown confirming employment as Mr. Otto was threatening to revoke Probation for Mr. Jackson with non-compliance for lack of having a regular job and regular paycheck. Due to his disability, Mr. Jackson was self-employed as Mrs. Jackson was making enough to support them. Mr. Jackson established a part-time self-employed job prior to being placed on probation that worked around his mental health requirements. Mr. Jackson had repeatedly provided tax information and other documents, but Mr. Otto would consistently require every few weeks new proof of employment. The email had attachments including tax paperwork and pictures of delivery labels proving its legitimacy even though these were already provided. The e-mail stated:

> To Mr. Otto,
>
> You asked me for proof again of employment for my work at home job. I provided that already with the other probation officer and is reflected in the sessions log but I want to make sure I am complying to all of your requests regardless. I told you I could offer the tax filing I have for last year as I am self employed and do not received a regular paycheck or stub and you said that would be fine. Here you go. We just got the paperwork done today and was able to get a copy of them on PDF. It is my Form 1120-S, Schedule K-1 for MR SWEETS LLC for 2020.
>
> You also for a third time asked me to bring you proof that I live at my address which I have already done two previous times in a four month period and now again even though I am on House Arrest... with an ankle monitor, proving where I live. I told you I have spam mail that comes to my address here and you said that would be fine. I informed you in the past that due to the legal issues I have all the

> bills etc are in my Wifes name so she can make all the changes she
>
> needs too. It's 3 pictures of two pieces of spam mail I received this
>
> week.
>
> Is this sufficient?
>
> David Jackson
>
> 219 781 2799

243. Mr. Jackson was on GPS House arrest and was able to be always tracked as to his whereabouts. This was done simply to harass Mr. Jackson as the GPS would consistently confirm where Mr. Jackson was at all times and would show proof of where Mr. Jackson lives along with past submitted mailings.

244. On August 20, 2021, Mr. Jackson sent an email to Mr. Otto, Mrs. Broshar and Mr. Brown stating:

> Mr. Otto,
>
> My therapist Alyssa Broshar is interested in looking into the therapy
>
> program and the requirements to be a part of the accepted treatment
>
> list. I added her to this email per her request so that you can reply to
>
> the email about the program so that she can see what is needed to
>
> possibly be a part of that service.
>
> David Jackson
>
> 219 781 2799

245. On August 23, 2021, Mr. Jackson reached out to other therapists due to the local therapist refusing to take him because of the PCR and Mr. Ottos refusal to accept that determination. Mr. Jackson called and emailed back and forth between Phoenix Associates, Inc. The emails went as such:

> [From Phoenix Associates to Mr. Jackson - August 23, 2021]
>
> Hello
>
> The 1st attachment contains the paperwork that we need
>
> completed and returned.

The 2nd attachment contains a Release of Information so that we can speak to anyone that may need confirmation of your participation in therapy.

Trey Blanks

Office Manager

Phoenix Associates, Inc

CONFIDENTIALITY NOTICE: This email message and any accompanying attached document(s) may contain legally privileged, confidential information as defined by HIPAA, State and Federal Confidentiality rules (42 CFR part 2) and IC 16-39-2-5, belonging to the sender. The information is intended only for the use of the individual or entity listed above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, use or taking of any action by reliance on the contents of this emailed message or attached document(s) is STRICTLY PROHIBITED. If you received this email in error, please notify the sender immediately.

[From David Jackson to Phoenix Associates - August 25, 2021]
I am attaching a PDF of the forms you requested. Let me know if you have any issues or questions. Please confirm that you received them please.,

David Jackson

219 781 2799

[From David Jackson to Mr. Brown and Mr. Otto - August 25, 2021]
[FOWARDED ALL DOCUMENTS AS ATTACHMENTS]
For your records and proof that I am enrolled in a sex offender therapy program.

*[From Phoenix Associates to Mr. Jackson - August 26, 2021]*

*THANK YOU*

*Trey Blanks*

*Office Manager*

*Phoenix Associates, Inc*

246.    On August 23, 2021, Jacob Otto would respond to Mr. Jacksons email from his Proof of Address and Employment. The email chain happened as follows:

*[From Mr. Otto to Mr. Jackson - August 23, 2021]*

*The attachments were unable to be opened*

*[From Mr. Jackson to Mr. Otto - August 23, 2021]*

*They are jpegs. I'll bring them today then as I have to head there now*

*to drug test.*

*David*

*[From Mr. Otto to Mr. Jackson - August 23, 2021]*

*I will not be available to do a drug test until the afternoon due to*

*court. If you come in now you will most likely have to wait until I am*

*done with court unless someone else is willing to do the drug test for*

*me.*

*[From Mr. Jackson to Mr. Otto - August 26, 2021]*

*Resending with attachments. Please let me know if you can access*

*the PDF this time.*

*David*

*[From Mr. Otto to Mr. Jackson - August 26, 2021]*

*Got it thanks*

247.    On August 29, 2021, Mr. Jackson sent an email to Mr. Otto and Mr. Brown stating:

67

*Mr Otto,*

*You told me last week to send you the cases I was given that related to the special conditions for sex offenders. Here they are. Also NO Special conditions were assigned to me at sentencing or in the plea deal other than the NO CONTACT ORDER.*

*Other than that no special conditions were assigned. I was not convicted of offenses against my family so the Bleek and similar cases apply. Also my convictions were not related to the internet, computer, social media or any other services so restriction violates my freedom of speech as laid out below.*

*Also it states that my Probation can not be revoked based on not being in therapy. FIrst off I was never given the special condition that required it. Also both SOMM directors stated as such. There is NO automatic requirement to take it and even if the judge or the plea deal called for it there was a case that states that not participating in the somm therapy to protect my 5th amendment right is against the law and can not even be threatened by a probation officer. But again it was not a special condition I was given either way.*

*I am also classified as a "Serious Offender" which removes all of my living restrictions other than living 1 mile from a victim, living with someone under the age of 16, who is not blood related and not living near a school.*

*I also added the LATEST Indiana Adult Offender Supervision Sheet that has been updated since the Lacy Decision which reflects all that I have stated here and below.*

*David Jackson*

*PS: Below are both the state statutes as well as case law.*

*UNITED STATES v. HECKMAN*

*United States Court of Appeals, Third Circuit.*

*UNITED STATES of America v. Arthur William HECKMAN, Appellant.*

*No. 08-3844.*

*Decided: January 11, 2010*

*Though district courts have broad discretion in fashioning special conditions of supervised release, this discretion is not unfettered. "[S]uch conditions must be 'reasonably related to the factors set forth in [§ 3553(a) ]' and must 'involve[ ] no greater deprivation of liberty than is reasonably necessary' to deter future crime, protect the public, and rehabilitate the defendant." United States v. Thielemann, 575 F.3d 265, 272 (3d Cir.2009) (quoting 18 U.S.C. § 3583(d)(1)-(2)). Furthermore, "courts of appeals have consistently required district courts to set forth factual findings to justify special conditions." United States v. Voelker, 489 F.3d 139, 144 (3d Cir.2007) (internal quotations omitted). Nevertheless, we "may affirm [a special] condition if we can ascertain any viable basis for the restriction in the record before the District Court on our own." Id. (internal quotations omitted). In the end, only a "condition with no basis in the record, or with only the most tenuous basis, will inevitably violate § 3583(d)(2)'s command that such conditions involve no greater deprivation of liberty than is reasonably necessary." Id. (internal quotations omitted).*

*Furthermore, even when faced with a well-established sex offender, special conditions still must be tailored to the underlying conduct at issue in the given case, as well as any related actions in the defendant's criminal past.*

*Throughout, we remain sensitive to three factors that have guided our prior holdings in this area: (1) the length and (2) coverage of the imposed ban; and, (3) the defendant's underlying conduct.*

*http://iga.in.gov/legislative/laws/2021/ic/titles/035#35-38-2-2.4*

*IC 35-38-2-2.4 Conditions of probation for sex offenders*

*Sec. 2.4. As a condition of probation, the court may require a sex offender (as defined in IC 11-8-8-4.5) to:*

*(1) participate in a treatment program for sex offenders approved by the court; and*

*(2) avoid contact with any person who is less than sixteen (16) years of age unless the probationer:*

*(A) receives the court's approval; or*

*(B) successfully completes the treatment program referred to in subdivision (1).*

*As added by P.L.11-1994, SEC.15. Amended by P.L.238-2001, SEC.20; P.L.116-2002, SEC.22; P.L.140-2006, SEC.25 and P.L.173-2006, SEC.25; P.L.1-2010, SEC.142.*

*NOTE: IC 11-8-8-4.5 is REPEALED (Repealed by P.L.1-1993, SEC.238.) http://iga.in.gov/legislative/laws/2021/ic/titles/035#11-8-8-4.5*

*This condition was also not manditory but set as a possible contition set by the sentencing judge or by plea agreementas defined in the description with the words "MAY REQUIRE".*

*CASE LAW: United States v. Pruden, 398 F.3d 241 (3d Cir.2005)*

*"The defendant shall participate in a mental health treatment program at the discretion of the probation officer."13 Id. at 248. Even while striking down this condition, we conceded that "probation officers must be allowed some discretion in dealing with their*

charges," as "courts cannot be expected to map out every detail of a defendant's supervised release." Id. at 250.

The principle is that we must "balance[ ] the need for flexibility with the constitutional requirement that judges, not probation officers, set the terms of a sentence." Id. at 251. It works out practically as follows:

If [the defendant] is required to participate in a mental health intervention only if directed to do so by his probation officer, then this special condition constitutes an impermissible delegation of judicial authority to the probation officer.

Id. (quoting United States v. Peterson, 248 F.3d 79, 85 (2d Cir.2001)).

The mental health condition was "not recommended in the [Presentence Report] or requested by the government," id. at 245; there was no evidence of, and no findings for, the need for mental health treatment, id. at 249, 251 n. 5.

http://iga.in.gov/legislative/laws/2021/ic/titles/035#35-38-2-2.5

IC 35-38-2-2.5 Residency requirements for certain offenders

Sec. 2.5.

(a) As used in this section, "offender" means an individual convicted of a sex offense.

(b) As used in this section, "sex offense" means any of the following:

(1) Rape (IC 35-42-4-1).

(2) Criminal deviate conduct (IC 35-42-4-2) (repealed).

(3) Child molesting (IC 35-42-4-3).

(4) Child exploitation (IC 35-42-4-4(b) or IC 35-42-4-4(c)).

(5) Vicarious sexual gratification (IC 35-42-4-5).

(6) Child solicitation (IC 35-42-4-6).

(7) Child seduction (IC 35-42-4-7).

71

(8) Sexual battery (IC 35-42-4-8).

(9) Sexual misconduct with a minor as a felony (IC 35-42-4-9).

(10) Incest (IC 35-46-1-3).

(c) A condition of remaining on probation or parole after conviction for a sex offense is that the offender not reside within one (1) mile of the residence of the victim of the offender's sex offense.

(d) An offender:

(1) who will be placed on probation shall provide the sentencing court and the probation department with the address where the offender intends to reside during the period of probation:

(A) at the time of sentencing if the offender will be placed on probation without first being incarcerated; or

(B) before the offender's release from incarceration if the offender will be placed on probation after completing a term of incarceration; or

(2) who will be placed on parole shall provide the parole board with the address where the offender intends to reside during the period of parole.

(e) An offender, while on probation or parole, may not establish a new residence within one (1) mile of the residence of the victim of the offender's sex offense unless the offender first obtains a waiver from the:

(1) court, if the offender is placed on probation; or

(2) parole board, if the offender is placed on parole;

for the change of address under subsection (f).

(f) The court or parole board may waive the requirement set forth in subsection (c) only if the court or parole board, at a hearing at which the offender is present and of which the prosecuting attorney has been notified, determines that:

72

*(1) the offender has successfully completed a sex offender treatment program during the period of probation or parole;*

*(2) the offender is in compliance with all terms of the offender's probation or parole; and*

*(3) good cause exists to allow the offender to reside within one (1) mile of the residence of the victim of the offender's sex offense.*

*However, the court or parole board may not grant a waiver under this subsection if the offender is a sexually violent predator under IC 35-38-1-7.5 or if the offender is an offender against children under IC 35-42-4-11.*

*(g) If the court or parole board grants a waiver under subsection (f), the court or parole board shall state in writing the reasons for granting the waiver. The court's written statement of its reasons shall be incorporated into the record.*

*(h) The address of the victim of the offender's sex offense is confidential even if the court or parole board grants a waiver under subsection (f).*

*As added by P.L.116-2002, SEC.23. Amended by P.L.6-2006, SEC.6; P.L.139-2006, SEC.4, P.L.140-2006, SEC.26, and P.L.173-2006, SEC.26; P.L.216-2007, SEC.41; P.L.158-2013, SEC.399; P.L.214-2013, SEC.34; P.L.13-2016, SEC.13.*

*http://iga.in.gov/legislative/laws/2021/ic/titles/035#35-38-2-2.7*

*IC 35-38-2-2.7 Prohibition on use of social media, instant messaging, or chat rooms*

*Sec. 2.7. As a condition of probation or parole after conviction for a sex offense (as defined in IC 11-8-8-5.2), the court shall prohibit the convicted person from using a social networking web site or an instant messaging or chat room program to communicate, directly or through an intermediary, with a child less than sixteen (16) years*

73

of age. However, the court may permit the offender to communicate using a social networking web site or an instant messaging or chat room program with:

(1) the offender's own child, stepchild, or sibling; or

(2) another relative of the offender specifically named in the court's order.

As added by P.L.247-2013, SEC.4.

NOTE: The Supreme Court has ruled that any law that places a general ban on a sex offender's use of social media is unconstitutional. In 2017, the United States Supreme Court struck down a North Carolina law that prohibited any sex offender from using Facebook. According to the court, such a sweeping ban was unconstitutional because it limited the right to free speech. The court found that in our current times, social media is an essential forum for the exchange of ideas. Therefore, completely denying a sex offender's access was unjustified.

Case Law:

Jones et al v. Stanford et al, Case Number: 1:2020cv01332 US District Court for the Eastern District of New York

https://dockets.justia.com/docket/new-york/nyedce/1:2020cv01332/446262

Packingham v. North Carolina, Case No. 15–1194 (June 19, 2017)

In June 2016, the U.S. Supreme Court struck down a North Carolina law that barred registered sex offenders from using social networking websites. The court ruled that the law unconstitutionally limited offenders' free speech rights.

https://www.supremecourt.gov/opinions/16pdf/15-1194_08l1.pdf

UNITED STATES v. HECKMAN Decided: January 11, 2010 No. 08-3844.

74

http://iga.in.gov/legislative/laws/2021/ic/titles/035#11-8-8-5.2

IC 11-8-8-5.2 "Sex offense"

Sec. 5.2. As used in this chapter, "sex offense" means an offense listed in section 4.5(a) of this chapter.

As added by P.L.216-2007, SEC.14

Sex Therapy:

1) According to the US Supreme court in Vitck vs Jones 100 S.Ct 125, 'While a conviction and sentence extinguish an individual's right to freedom from confinement for the term of the sentence, they do not authorize the state to classify him as mentally ill and subject him to involuntary psychiatric treatment without affording additional due process protections.

Opinion: No immunity offered. So Statements may be used against me in my upcoming PCR case as well as possible perjury charges as I am innocent.

2) In Ohlinger vs Watson 652 F2d 775, it was brought out that people "have a constitutional right to such individual treatment as will give each of them a realistic opportunity to be cured or to improve his mental condition" and "rehabilitative rational is not only desirable, but it is constitutionally required" plus "adequate and effective treatment is constitutionally required" if inmates are being forced into treatment programs through coercion by threat of loss of their good time, or privileges afforded to other inmates then it is quite obvious that the prisons officials are attempting to change the thinking patterns through forced treatment in violation of these constitutional standards.

3) This issue was addressed by the United States Supreme Court in Stanley v. Georgia, 89 S. Ct. 1243, 1248 "Our whole constitutional

heritage rebels at the thought of giving government power to control men's minds". It is interesting that behavior modification programs use the same principles as are used in brainwashing and mind control, something that the American people are adamantly against.

4) BLEEKE v. STATE

The upshot in this case is that the potential for revocation of parole forces Bleeke to give up his Fifth Amendment privilege or possibly return to prison. And although the five-year statute of limitation for perjury has expired, Bleeke is still subject to the possible use by law enforcement of any other incriminating statements. The SOMM program's requirements violate the Fifth Amendment.

https://caselaw.findlaw.com/in-court-of-appeals/1621453.html

Opinion: Unlike Bleeke I am still at risk for Perjury.

5) According to Tracy Berry "Indiana SOMM Program Director (317) 232-5719", when a offender doesnt want to take the Sex Offender Therapy then the offender is offered Sexual Violance Education Classes instead which the offender does not discuss their cases, their past or anything. She also stated that when an offender is going through a PCR or Appeal that is due to the "Lacy Decision " (Lacy v. Butts, U.S.D.C. (S.D. Ind.), Case No. 1:13-cv-00811-RLY-DML) they grant temporary exemption to the offender while it is being litigated. According to Brian Blitch "Indiana SOMM Program Director of Community Services 317 951 1984 x63", You would just have to show that you are in process of a PCR. If you show that you are in the process of a PCR then you are considered temporarily exempt from the Indiana SOMM Program.

6) Relying almost entirely on Justice O'Connor's concurrence in McKune v.Lile,47 the Ninth Circuit used a purpose-based analysis to determine whether Antelope suffered constitutionally

impermissible compulsion.48 Stating that"[c]ountervailing government interests, such as criminal rehabilitation" do not supersede the right to silence, regardless of their ostensibly rehabilitative purpose,49 the court found that further incarceration for failure to comply with the sexual history requirement was impermissibly compulsive.50 While thecourt did not expressly direct the government to grant Antelope immunity, it noted that Antelope was correct to remain silent absent a grant of immunity and that the scope of immunity should be consistent with the protection afforded bythe Fifth Amendment.51 Thus, under Antelope, if the government provides an offender with immunity so that he may undergo treatment, it may not circumscribe the scope of the immunity afforded based on the individual's status as a sex offender.

As a result of the Ninth Circuit's decision, the government effectively must provide sex offenders with use and derivative use immunity if they are required to undergo court-ordered treatment that requires an acceptance of responsibility, and a risk of prosecution exists. At the same time, the decision deprives the government of its ability to use the threat of incarceration as leverage to encourage offenders to co-operate with treatment efforts and to obey probation conditions.

United States v. Antelope, 395 F.3d 1128 (9th Cir. 2005)

Probation Living Conditions:

1) I am classified as a "Serious Sex Offender" not a Violent Offender nor a Offender Against Minors. This removed all of my living restrictions except for the one that states that I can not live within 1000 feet of a school or 1 mile from a complaining witness in the cases.

*Officer Sheets had me sign a paper stating that I could live at my home unless I am classified as a Violent Offender or a Offender Against Minors and that if I do then I would have 30 days to move after being notified by Officer Sheets of the change. The only reason I moved out was because Jacob Otto told me I had to during our first meeting following him being assigned to my case.*

2) *Jacob Otto stated I could not live at home due to my own children living there. Court cases and state law both state that since I was not convicted of an act against a family member that my children do not count to that restriction. So I requested to be returned to my home.*

a) *BLEEKE v. STATE No. 02A05–1201–PL–25. Decided: January 23, 2013*

b) *In the Matter of the Termination of the Parent-Child Relationship of K.P., B.P., and R.P. (Children), and, D.P. (Mother) and R.P. (Father), Court of Appeals Case No. 15A01-1704-JT-901*

*Polygraph While on PCR:*

1) *It seems to us that the state is trying to have it both ways: on the one hand, it wants us to believe that the rehabilitative purpose of INSOMM depends on the disclosures' carrying a meaningful risk of prosecution; but on the other hand, it maintains that this risk is too remote to implicate the Fifth Amendment. Our own independent assessment of the program convinces us that the disclosures do give rise to a real and appreciable risk of prosecution. Lacy v. Butts No. 17-3256 04-25-2019*

2) *More broadly, the Supreme Court has emphasized that punishments implicating the length of confinement are different in kind from those that affect the conditions of confinement. In contrast, the Ninth Circuit held that a district court's decision explicitly to condition a prisoner's supervised release on his*

*successful completion of a treatment program similar to INSOMM violated the inmate's right to be free from compelled self-incrimination. Antelope , 395 F.3d at 1139. Just as in Antelope , Lacy's refusal to incriminate himself has rendered him categorically ineligible for the shorter term of confinement he otherwise would have received. The Fifth Amendment does not allow Indiana to impose such a penalty. Lacy v. Butts No. 17-3256 04-25-2019*

*3) Indiana's arguments to the contrary are unpersuasive. It places great weight on the fact that "[p]articipants are not required to identify their victims or specific dates of the sexual activity" and that they "are specifically advised not to provide identifying information." But that general statement collides with the specific command to provide highly detailed questions about each incident of past sexual abuse, omitting only the date and the victim's last name (or even full name). The required details easily raise a significant risk of incrimination. The state has not explained how it is possible to answer these more specific questions—such as the age of the victim and the victim's relationship to the participant— while taking advantage of the general admonishment to avoid "identifying information." Ignoring the actual questions, the state insists that the disclosures are at such a high level of generality that they "could not support a link in the chain sufficient to support an investigation or even admission at trial." Saying so does not make it so. This ipse dixit does not explain why granular descriptions of the circumstances surrounding specific sex crimes and patterns of criminal sexual behavior would prove useless to investigators or prosecutors. The Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." Kastigar v.*

United States, 406 U.S. 441, 445, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) (emphasis added). Lacy v. Butts No. 17-3256 04-25-2019

4) Polygraph results are inadmissible in Indiana. Goolsby v. State (1987), Ind., 517 N.E.2d 54, 57.

NOTE: Depending on the unknown arguments in the PCR and what would happen if returned to pretrial if PCR is granted, my statements made in the Polygraph could be possibly used against me in my future arguments.

5) Thus, in People v. Marquis (1931), 344 Ill. 261, 265, 176 N.E. 314, our supreme court stated: "Recanting testimony is regarded as very unreliable, and a court will usually deny a new trial based on that ground where it is not satisfied that such testimony is true. Especially is this true where the recantation relied on involves a confession of perjury."

6) Ultimately, the Ninth Circuit held that a probationer cannot be subjected to a longer term of incarceration for refusing to disclose his sexual history in the course of court-ordered treatment if a real risk of prosecution exists.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. Amend. V. The right exists to protect individuals from being subjected to the "cruel trilemma of self-accusation, perjury, or contempt." Chavez v. Martinez, 538 U.S. 760, 767 (2003) (internal quotation marks and citation omitted). A Fifth Amendment claim is, however, subject to substantially different analyses, depending on whether it is considered in the civil or the criminal context. United States v. Antelope, 395 F.3d 1128, 1140-41 (9th Cir. 2005). When the right is invoked in the criminal context, such as in a motion to suppress, a defendant must show that "

*(1) the testimony desired by the government carried the risk of incrimination; and*

*(2) that the penalty he suffered amounted to compulsion." Id. at 1134 (internal citations omitted).*

*If this were a criminal case in which the prosecution was attempting to admit or rely on statements coerced from Chavez, the Court's analysis would follow the elements laid out above. Chavez v. Robinson Civ. No. 1:11-cv-03025-AA 12-10-2018*

*7) "the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." Id. at 436. Minnesota v. Murphy, 465 U.S. 420 (1984). The Murphy Court, in other words, did not hold that someone's incarceration could be extended for his failure to incriminate himself, but suggested that it could not. Minnesota v. Murphy, 465 U.S. (1984). Lacy v. Butts Case No. 1:13-cv-811-RLY-DML.*

*Software:*

*1) Appeals Court Strikes Down Stringent Sex-Offender Probation Conditions U.S. v. Murray, 11-3196 and 11-3197, U.S. Crt. of Appeals, 3rd Cir, (2012) "ask the District Court to more clearly explain why these new release conditions are no greater than necessary to satisfy the Section 3553 sentencing factors." Any "restriction must result in a benefit to public safety." U.S. v. Thielemann, 575 F. ed 265, 273 n. 15 (3d Cir. 2009), citing U.S. v. Loy, 237 F.3d 251, 266,(3d Cir. 2001)."*

*Social Media Sites:*

*1) THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CONRAD ALLEN MORGER, Appellant. (Docket No. 123643) 2019.*

*The restriction of Social Media sites for probationers is too broad. Can not be enforced.*

*"A sex offender must submit to searches of his person and property "at any time, with or without a warrant, by any law enforcement or probation officer with reasonable suspicion" concerning a release violation or unlawful conduct by the offender." Adam Walsh Act, Pub. L. No. 109-248, § 210, 120 Stat. 587, 615–16 (2006).*

*Reasonable suspicion is a legal standard of proof in United States law that is less than probable cause, the legal standard for arrests and warrants, but more than an "inchoate and unparticularized suspicion or 'hunch'";[Terry v. Ohio, 392 U.S. 1, 27 (1968).] it must be based on "specific and articulable facts", "taken together with rational inferences from those facts",[ Terry, 392 U.S., at 21] and the suspicion must be associated with the specific individual.[Ybarra v. Illinois, 444 U.S. 85, 91 (1979).]*

*https://www.justice.gov/crt/deprivation-rights-under-color-law Law of Color Under Rights of Deprivation— 242, § Code. S.U the of 18 Title.*

*DEPRIVATION OF RIGHTS UNDER COLOR OF LAW*

*SUMMARY:*

*Section 242 of Title 18 makes it a crime for a person acting under color of any law to willfully deprive a person of a right or privilege protected by the Constitution or laws of the United States.*

*For the purpose of Section 242, acts under "color of law" include acts not only done by federal, state, or local officials within their lawful authority, but also acts done beyond the bounds of that official's lawful authority, if the acts are done while the official is purporting to or pretending to act in the performance of his/her official duties. Persons acting under color of law within the meaning of this statute include police officers, prisons guards and other law enforcement officials, as well as judges, care providers in public*

82

*health facilities, and others who are acting as public officials. It is not necessary that the crime be motivated by animus toward the race, color, religion, sex, handicap, familial status or national origin of the victim.*

*The offense is punishable by a range of imprisonment up to a life term, or the death penalty, depending upon the circumstances of the crime, and the resulting injury, if any.*

*TITLE 18, U.S.C., SECTION 242*

*Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, ... shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.*

248.    On August 30, 2021, Mr. Jackson had issues with the Covenant Eyes software, so he called and spoke to the Member Care team. While speaking to them it became clear as to the use of the software in which the Covenant Eyes representative informed Mr. Jackson that the use by the government violates the User Agreement, License Agreement and Terms of Service. They sent an email to Mr. Jackson informing him of this. Mr. Jackson would then forward this email to Mr. Otto and Mr. Brown. The email states:

83

Hello David,

Here is the End User Agreement article that I promised to send to you.

https://www.covenanteyes.com/support-articles/can-covenant-eyes-used-parolees/

Can parolees use Covenant Eyes? - Covenant Eyes

It is a clear violation of our End User License Agreement to use the Covenant Eyes software for premeditated legal purposes. The software is not designed to function as a legal document of digital activity. Covenant Eyes is intended to foster healthy conversations between people who care about one another.

www.covenanteyes.com

KB solutions might be of interest.

http://www.kbsolutions.com/html/field_search.html

Field Search Software - KBSolutions

FIELD SEARCH V 5 IS AVAILABLE NOW. The National Law Enforcement and Corrections Technology Center (NLECTC) has released Field Search.. Design and development of Field Search was initially funded by NLECTC, a branch of the National Institute of Justice.It is now a cooperative volunteer project between KBSolutions, Silent Shield, and NLECTC.The software is a FREEWARE product available to justice ...

www.kbsolutions.com

Trevor B.

Member Care

84

*Covenant Eyes*

*989-720-8000*

249.    Not only did it show why it is not permitted for use as it is technologically deficient to protect the rights of Parolee and Probationers and has led to unlawful and false arrests and illegal revocations but also its reporting is subjective to other standards and could be abused as the potential threat emails a majority of the time, based on how the software works, would be proof enough for officers to file requests for searches and phone dumps when nothing was wrong. It also did not protect private information that the State would not have legal rights too like email information between lawyers and defendants, personal health information, etc.

250.    The email even provided alternative software that was designed to be used in the manor that the Probation and Parolee departments could use and was designed for that purpose. This was ignored by Mr. Otto.

251.    On August 29, 2021, Mr Jackson would send another email to both Mr. Otto and Mr. Brown stating:

> *A man served a sentence for attempted sexual abuse and then was placed on probation. He was required to enroll in a sex offender treatment program while on probation and was refused admission to the program since he refused to admit his guilt before the program began and instead invoked his Fifth Amendment privilege against self-incrimination. When his probation was then revoked, he sued his probation officer and therapist. The trial judge, screening the pro se in forma pauperis complaint, dismissed the lawsuit on the basis of qualified immunity. A federal appeals court reversed and remanded for further proceedings because the facts alleged in the complaint did not foreclose the possibility that the plaintiff could have overcome qualified immunity. Chavez v. Robinson, #14-35384, 2016 U.S. App. Lexis 5765 (9th Cir.). https://law.justia.com/cases/federal/appellate-courts/ca9/14-35384/14-35384-2016-03-29.html*

https://www.aele.org/law/Digests/jail138.html

*Revoking sex offender's supervised release or probation after he allegedly refused to incriminate himself as part of his sex offender treatment was a violation of the privilege against compelled self-incrimination provided by the Fifth Amendment. Appeals court also orders further clarification of which sexually explicit materials the offender was prohibited from possessing, finding a blanket prohibition on "sexually stimulating" materials unconstitutionally vague. United States v. Antelope, No. 03-30334, 2005 U.S. App. Lexis 1327 (9th Cir.). [2005 JB Mar]*

*https://www.aele.org/law/Digests/jail138.html*

*"The Supreme Court of Indiana in Gilfillen v. State, 582 N.E.2d 821 (Ind.1991) was confronted with a similar situation where Defendant continued to assert his innocence despite participating in sexual abuse therapy as a condition of probation. Gilfillen's refusal to admit guilt resulted in his probation being revoked and the imposition of a suspended sentence. The Supreme Court in Gilfillen found the requirement that Gilfillen admit guilt to be "unacceptable." Id. At 824. The court continued on to say that the revocation of probation based on Gilfillen's refusal to admit guilt was tantamount to requiring that he admit that he was guilty of crimes charged, in violation of his right to be free of self-incrimination. Much as the Gilfillen court resolved, [DOC's] change in credit time application has put [Moore] in a situation where he would have to admit guilt in order to avoid revocation of credit time. This scenario is exactly what was prohibited by Gilfillen. Accordingly, [Moore] seeks the court's intervention. We recognize that probation is a matter of grace, and*

*whether probation is granted is within the trial court's discretion. Hoffa v. State (1977), 267 Ind. 133, 136, 368 N.E.2d 250, 252."*

*"Reasonable conditions on probation may be imposed on a defendant, but thought control is not one of them."* https://www.courtlistener.com/opinion/2227492/gilfillen-v-state/

*"This approach mirrors that taken by other federal circuits. Both the First and Tenth Circuits, applying McKune, have found that sex offender treatment programs do not violate the Fifth Amendment even though the failure to participate in the programs places parole or good-time credits at stake. See Ainsworth v. Stanley, 317 F.3d 1, 5 (1st Cir.2002) (parole at stake and affirming district court's dismissal of claim by applying the standard established in Turner v. Safley, 482 U.S. 78, (1987)); Searcy v. Simmons, 299 F.3d 1220, 1226 (10th Cir.2002) (holding that "foreclosing [the inmate] from the mere opportunity to earn good time credits is not a new penalty, but only the withholding of a benefit ... [Kansas] is under no obligation to give"). This is also in accord with what other circuits have done in regard to circumstances such as revoking probation and parole. DeFoy v. McCullough, 301 Fed. Appx. 177, 181-82 (3rd Cir. 2008) (noting that inmate "chose not to participate in a valid treatment program in order to avoid potential self-incrimination, and he suffered because of his choice" by refusal to reparole); Entzi v. Redmann, 485 F.3d 998, 1002 (8th Cir. 2007) (mere filing of petition to revoke probation—before inmate is released from incarceration—because of failure to comply with sex offender program "is not a consequence serious enough to compel him to be*

*a witness against himself in violation of the Fifth Amendment" and, also, petition was denied by state court)."*

*"The third phase of INSOMM is Community Management and Monitoring."*

*"Offenders who are required to participate in INSOMM are exempt from participation during the pendency of an appeal of their conviction of a sex crime and any petitions for post-conviction relief relating directly to their sex crime conviction. During the pendency of these actions, provided they submit documentation of their appeal or postconviction relief petition, such offenders are not subject to discipline for failing to participate in INSOMM (Id.)." Lacy V Butts Case No. 1:13-cv-811-RLY-DML*

*"Offenders who pled "not guilty" to their sexual offenses may be temporarily exempted from the program if their conviction (not sentence) is in "appeal" or "post-conviction relief" status. Documentation of a pending case must be re-verified every 90 days." Lacy V Butts Case No. 1:13-cv-811-RLY-DML*

*"The respondent compares this case to that in Neal v. Shimoda, 131 F.3d 818, 833 (9th Cir. 1997), where the Ninth Circuit held that the disclosures required by a similar treatment program did not create a risk of self-incrimination. But the plaintiffs in that case challenged the requirement that they admit the crimes for which they were convicted. Because one had already been convicted and was not pursuing post-conviction relief and the other had pled guilty and his plea included a waiver of prosecution for other offenses, there was*

no possibility that these plaintiffs would be prosecuted based on their statements. In other words, there was no chance that a responsive answer "might be dangerous." See Hoffman, 341 U.S. at 486-87." Lacy V Butts Case No. 1:13-cv-811-RLY-DML.

NOTE: I have a pending PCR. It was already decided by this court via the motion to stay lie-Detector that there is a real threat of self-incrimination. And there was no waiver. Not to mention the Probation Officer explicitly stated that they would give me a sexual history polygraph to find more possible victims to charge me with.

Once directed to participate," "...can defer participation in the SOMM Program if he can show that he has a pending appeal of his conviction or has filed a petition for post-conviction relief."

"...will be excused from the SOMM Program during the pendency of any post-conviction relief that he may file. As of the time he filed his motion for summary judgment, Mr. Clark indicated that he was "in the process of filing a petition for Post-Conviction Relief." [Dkt. 38 ¶3.] If that petition is ultimately filed and granted, he could be acquitted of the charges that made him eligible for the SOMM Program. Thus, deferring consideration of his claim may permit the Court to avoid having to make a constitutional evaluation of the SOMM Program, a desirable outcome, see Rehman v. Gonzales, 441 F.3d 506, 508 (7th Cir. 2006)"
https://www.leagle.com/decision/infdco20101005892

## More Probationary Fraud

252. On September 2, 2021, Mr. Jackson emailed a copy of the second Addictions Evaluation as an attachment PDF to Mr. Otto and Mr. Brown stating:

> *Here is the SECOND Addiction Evaluation I have had done at Porter Starke in Valpo. You have had the first in your possession since the beginning of my Probation period. You also received confirmation from Porter Stark following the conclusion of my second eval but you stated that their medical verbiage of UNREMARKABLE was not enough... So they put this together for you per your request even though they stated they never had to do this for ANYONE ELSE...*
>
> *I am sending it to you via email so that you and my attorney are aware that you are now in receipt of it.*
>
> *David*

253. On September 3, 2021, Mr. Jackson sent an email to Mr. Brown and Mr. Otto, which was never replied too, stating:

> *Can you please provide me a copy of any probation agreement that was made during the sentencing hearing? I do not mean any sapossid agreement made following the Sentencing hearing. Can you please provide it as soon as possible?*

254. On September 23, 2021, Jackson's lawyer Attorney Russel Brown, filed a notice to the court. This motion states that Jackson and Otto did not meet until the following morning. This is backed up by the transcripts of the day of sentencing stating that Diaz was the only officer available and that there were no Special Conditions of probation offered in writing or orally. The conditions of probation entered on the record were signed by Diaz. Magistrate Sullivan had the ability to review any submitted document on the docket of the court to verify this claim.

255. Jackson would try to enroll into the referred therapy program under Kevin Malloy. The conversation was held through text messages which Jackson submitted to the court. It clearly shows that he was unable to enroll for two reasons.

    a. Mr. Jackson had an active Post Conviction Relief that challenged his plea of guilt.

    b. Mr. Jackson had an active Petition to Revoke.

c.  See Clark v. Buss, No. 1:09-cv-00308-JMS-DML, 2010 WL 3927725, *1, *4 (S.D. Ind. 2010) (noting it was an uncontested fact that the INSOMM program allowed deferment of participation if convict could show he had a direct appeal or post-conviction relief action pending).

256.  The State's Reply falsely claims that Jackson agreed to the conditions during his probation meeting and the date on the paper, filled in by Otto, was for the date of sentencing so they apply. It was acknowledged that he signed them under duress under threat of revocation of his probation in the transcripts.

257.  Special Conditions of Adult Probation lacks the filing stamp, is not part of the record at sentencing or part of the two-page conditions of probation entered anywhere up until October 11, 2021. It was not signed nor ordered by the judge and was filled out by Otto, was a separate exhibit from the regular conditions of probation, assigned Jackson every condition on the sheet including conditions that would not have applied to Jackson's convictions.

258.  In using the knowingly falsified Special Conditions of Adult Probation along with testimonies given in support of that document, Otto and Wardrip knowingly used falsified records, in a conspiracy as defined by I.C. § 35-32-2-4, providing false or inaccurate reporting of case or proceedings, I.C. § 34-47-3-4.

259.  Mr. Jackson would end up having a panic attack at the Probation Office that went on for 45 minutes while waiting for the following session with Mr. Otto. No one offered Mr. Jackson medial aid. Finally, Mr. Otto stated that Mr. Jackson had to install Covenant Eyes on his phone. Mr. Jackson stated that he will let him know for sure later.

260.  Later that night Mr. Otto would call Mr. Jackson who recorded the call. Mr. Otto stated that Mr. Jackson had to install the software. On the phone call Mr. Otto stated that he had spoken to the Magistrate about it, and she had agreed that it would be ordered. Mr. Jackson became upset and stated that Mr. Otto spoke to the Magistrate Ex Partee outside of the courtroom and addressed issues that Mr. Jackson would have objected too. Mr. Otto stated that if Mr. Jackson did not install the software, he was going to initiate a warrant for his arrest.

261.  Mr. Jackson contacted his attorney and informed him of the issues. As he was speaking to his attorney Mr. Otto called him and so Mr. Jackson merged the calls. This was

recorded. On it, Mr. Otto admitted that it had not been ordered yet or officially requested but it would be soon.

262.    The Magistrate would later order Covenant Eyes to be installed on his devices.

263.    Mr. Jackson was worried about his rights as he uses his computer a lot to communicate with his attorney and research his case and was worried it would be abused. Mr. Jackson found out that the software was technologically deficient for use by Parol and Probation and such use would violate the terms of service of the software. Mr. Jackson would send a copy of the chat and terms of service to Mr. Otto who would ignore it. This is verified by email.

264.    Mr. Jackson asked the company if there was a risk of his privileged communications had a chance of being seen by the state and the company stated yes and that it was not to be used for that purpose and was not designed to be able to protect the constitutional rights that even Probationers and Paroles still would have.

265.    Mr. Jackson also used his computer for personal therapy services and was worried about what would be monitored.

266.    Later, the Covenant Eyes would falsely flag Mr. Jacksons therapy session as potentially porn. This was easily dismissed.

267.    Mr. Otto would request that Mr. Jackson take a Polygraph Test. His attorney would file a motion to stay that pending the PCR. Mr. Jackson believes that Mr. Otto was trying to gather material for Nadia Wardrip knowing that Mr. Jackson conviction was going to be overturned and it would give her greater leverage.

268.    Mr. Jackson would have to take random drug screenings with Mr. Otto who would tell Mr. Jackson that he failed his tests due to his medications. This was done to antagonize and harass Mr. Jackson. Luckily, Mr. Otto would not use that to violate his probation.

269.    Mrs. Jacksons would send a message to Mr. Jackson with a picture of their daughter playing in the yard. Mr. Otto was informed with a "Potential" concern by the Covenant Eyes software. Mr. Otto would use this clearly erroneous picture to request the court to Dump Mr. Jacksons phone.

## Jailed! - Enter the Biased Magistrate

270.    Mr. Jackson noticed that an arrest warrant was issued for him, so he turned himself in. At the location Mr. Jackson turned over his phone instead of leaving it somewhere else. Angella McFarlen was there smiling and excited regarding Mr. Jackson turning over his phone. She and the detective and soon Mr. Otto would act happy, and they finally came and had Mr. Jackson arrested.

271.    Mr. Jackson was denied bond as a "Flight Risk" and a "Danger to Society" due to not being in therapy and being a sex offender. Magistrate Sullivan would agree and would deny Mr. Jackson bond even when he was not allowed to have an evidentiary hearing within 15 days violating I.C. § 35-38-2-3(d); I.C. § 35-38-2-3(f).

Transcript September 16, 2021 - PTR Bail Hearing

Page 8 Line 2 - Page 9 Line 16

*BY MR. BROWN: And then lastly, Judge, there was a - - on the Amended Petition to Revoke there was a request for a warrant that was issued. That warrant was, in fact, issued. Mr. Jackson surrendered himself on that warrant on Monday, the 13th, if I got my calendar right. Yes, Monday, the 13th. Respectfully request that he be released back on the previously posted bond with the previously ordered conditions of home detention and ICU monitoring.*

*BY THE COURT: Do you have a response to that request, Mr. Otto and/or Ms. Wardrip?*

*BY MR. OTTO: Your Honor, Probation would object to that. We're already on our Amended Petition to Revoke, and he's already been given the chance to be released and get back in compliance with probation and he's failed to do so, so we would object to that.*

*BY MS. WARDRIP: Your Honor, the State is also objecting, in addition to the new allegations that are certainly recent in time.*

*BY THE COURT: The allegation that's here. Okay. Yes. Alright, I'll show a request for bail has been made, the State has objected, and that request at this time is denied.*

*BY MR. BROWN: Then, Judge, respectfully we move for an early hearing on the Petition to Revoke Probation, under the statute, request a hearing within 15 days.*

*BY THE COURT: He's had a hearing within 15 days. It doesn't say an evidentiary hearing. We've already given you a date of October 8th, which is outside of the normal schedule to fit you in. That's the best I can do. We're congested aside from that. There are no dates between now and well beyond that during our PTR court call that don't have evidentiary hearings set. But we haven't -- I don't read that statute to say that requires an evidentiary hearing within 15 days.*

*BY MR. BROWN: Respectfully, Your Honor, the statute indicates it requires a hearing within 15 days, or that the Defendant shall be released pending disposition.*

*BY THE COURT: He's had a hearing within 15 days. He's having a hearing today, so your request is denied. That's the soonest I can give you based on my calendar. There are no other settings that are available prior to that date. We are congested. So, we'll see everybody on October the 8th. That will be all.*

272. NOTE: Not only did the record show that Mr. Jackson was not a flight risk as he turned himself in. The record shows that Magistrate Sullivan was informed of the status and violated them to Mr. Jacksons detriment. Not just this time but later as well. Every time Sullivan held Mr. Jackson on a PTR, she would ignore this statute.

273. According to Knott v. State 176 N.E.3d 580 (Ind. App. 2021), "Although a probationer is not entitled to the full due process rights afforded a defendant in a criminal proceeding, probation revocation proceedings implicate a probationer's liberty interests such that

94

she is entitled to some procedural due process. Utley v. State, 167 N.E.3d 777, 781 (Ind. Ct. App. 2021), trans. denied. The minimum requirements of due process that apply to a probationer include: (a) written notice of the claimed violations of probation; (b) disclosure of the evidence against her; (c) an opportunity to be heard and present evidence; (d) the right to confront and cross-examine adverse witnesses; and (e) a neutral and detached hearing body. Id."

274.    Upon a petition to revoke probation—unless the probationer has waived a hearing "the court shall conduct a hearing concerning the alleged violation." I.C. § 35-38-2-3(d).  That hearing is civil in nature, with the State obligated to "prove the violation by a preponderance of the evidence." I.C. § 35-38-2-3(f). I.C. § 35-38-2-3(f) states that this hearing must be an evidentiary hearing. Supported by: Utley V. State. 167 N.E. 3d 777

275.    To address this issue regarding case law that interprets this statute to require an evidentiary hearing, we can refer to the case of "Isaac v. State, 605 N.E.2d 144 (Ind. 1992)". In this case, the Indiana Supreme Court held that a probationer is entitled to a hearing that includes the opportunity to present evidence and cross-examine witnesses, which essentially constitutes an evidentiary hearing. The Indiana Supreme Court held that the probationer is entitled to an evidentiary hearing where they can present evidence and cross-examine witnesses. The court emphasized that such a hearing is necessary to ensure that the probationer's due process rights are protected. This case law clarifies that the hearing mandated by IC 35-38-2-3 must indeed be an evidentiary hearing to ensure the protection of the probationer's due process rights.

276.    On October 8, 2021, prior to accepting the new Plea Agreement during a Petition to Revoke Hearing for Conditions of Probation (which are contested and addressed elsewhere in this brief), Jackson was informed by Magistrate Sullivan that participation was mandatory. This is not true. Case law clearly states that any deprovision of rights, especially ones relating to parenting rights, need individualized determination before those rights can be removed or suspended. Some of the conditions would not apply to Jackson even by statute but were done so by her understanding. (24 days following arrest in violation of I.C. § 35-38-2-3(d); I.C. § 35-38-2-3(f))

277.    *Ratliff*, 546 N.E.2d at 313, simply holds that "a defendant's probation cannot be revoked for the violation of conditions not specified, either orally or in writing, at the time of sentencing." *See also Disney v. State*, 441 N.E.2d 489 (1982).

278. Transcript October 8, 2021 - PTR Bail Hearing

*Page 11 Line 23 - Page 12 Line 21*

*BY MR. BROWN: Okay. So, Judge, respectfully I understand that Your Honor has already made a ruling on the Defendant's Motion to Dismiss the PTR. I would like to, just for purposes of the record, submit for the Court a copy of the sentencing transcripts in this matter, and a copy of the rules and conditions of probation that were executed by Mr. Jackson in this matter. If I may approach to have them marked?*

*BY THE COURT: You may.*

*[WHEREUPON DEFENDANT'S EXHIBIT NUMBERS 1 AND 2 WERE MARKED FOR IDENTIFICATION.]*

*BY MR. BROWN: Judge, tendering Defendant's Exhibit 1, which is the transcript of the sentencing hearing on March 22nd of 2021. And then also tendering Defendant's Exhibit 2, which is an executed copy of the rules and conditions of probation, which include the rules and conditions of sex offender probation, as well.*

*BY THE COURT: Any objection to their admission?*

*BY MS. WARDRIP: No objection for purposes of this hearing.*

*BY THE COURT: Alright, they're admitted.*

*[WHEREUPON DEFENDANT'S EXHIBIT NUMBERS 1 AND 2 WERE ADMITTED INTO EVIDENCE.]*

*Transcript October 8, 2021 - Evidentiary Hearing on PTR*

*Page 14 Line 2 - Page 15 Line 10*

*BY THE COURT: Okay, so I'll accept that. So you were moving on, Mr. Brown, to Motion to Stay the Sentencing Pending the PTR (sic)?*

*BY MR. BROWN: That is correct, Your Honor. Judge, for purposes of judicial economy, a PCR has been filed in this matter that would --*

*that relate to all three cause numbers, F3-00011, F4- 00009, F4-00011. All three of those cause numbers have been adjoined for the purposes of the PCR. What is in dispute -- or undisputed, excuse me. What is undisputed at this point in time, based upon Defendant's Exhibit 1, which is the sentencing transcript, the sentencing order that is a part of these causes, and the plea agreement that was originally filed in this matter, it was the intent of the parties, the State of Indiana and Mr. Jackson, when negotiating the plea agreement that Mr. Jackson be required to register as a sex offender for a period of 10 years. It was ordered by the Court that Mr. Jackson be ordered to register as a sex offender for a period of 10 years. He is -- he has been determined by parole to be a lifetime -- required to register as a lifetime sex offender, contrary to the parties' intent, contrary to the Court's order. The parole has that legal ability to do so, and quite candidly, the Trial Court has no authority to overrule parole. That was a key issue in Mr. Jackson's determination to -- of whether or not to accept this plea agreement. And he was told by the State, he was told by his attorney, he signed a document, he was told by the Court that, "Your requirements under this plea agreement would be to register as a sex offender for a period of 10 years." That promise, that requirement has been stripped from him. Nothing -- not because anything that Mr. Jackson did, but just because of the law. The statute is clear.*

*BY THE COURT: Was the statute in effect at the time that he pled?*

*BY MR. BROWN: It was.*

*BY THE COURT: For lifetime parole?*

*BY MR. BROWN: Yes.*

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 17 Line 11 - Page 18 Line 4

*BY THE COURT: Alright, in terms of the Motion to Stay the Sentence Pending the PTR -- I mean PCR, I'm sorry. If the PCR -- assuming for the purposes of argument here. If the PCR is granted, and of course I've been doing PCRs since 1985 so I'm very familiar with them, what that does is it vacates the Defendant's convictions and puts him back in the jail with all of those charges re-filed and pending. Unless there's laches, which would preclude granting the PCR. So at least, conceivably, the Defendant is ultimately going to be re-tried on those matters, and conceivably, and probably even likely, you know, if it works its way through the system, the Defendant may plead to something else again to correct whatever issues you perceive in the sentence, but it's likely that another sentence will be impose. So it makes no sense to stay the sentence pending the resolution of the PCR because he would get credit for any time that he has spent serving out his sentence, as far as I can tell. I don't see any way that it -- I don't see any overriding need to hold the sentence in abeyance simply because there's a pending PCR. So to that extent, the Motion to Stay the Sentence Pending the PCR is denied.*

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 18 Line 6 - Page 26 Line 15

*BY MR. BROWN: Judge, the next issue would be the Defendant's Motion to Modify the Terms of the current probation. And the arguments are intertwined with the Defendant's Motion to Dismiss the PTR in that the case law and the statute is very clear that the rules of probation shall be put on the record and shall be determ -- or shall be given to the defendant at the time of sentencing. The only condition of probation that was in the plea agreement, and that was*

98

*expressed by the Court in the sentencing hearing, and is included in the sentencing order is that Mr. Jackson be placed on probation, that Mr. Jackson register as a sex offender for a period of 10 years, and that the no contact orders that were in place for conditions of bond be put in place during the time of his sentencing. Those were the only three conditions. And specifically Judge Bokota asked at that time during the sentencing hearing of Mr. Randall, who was covering the matter for the State, of whether or not there were any other conditions of probation that needed to be put on the record. And Mr. Randall said, "Nothing has been reduced to writing." So after the sentencing hearing, Mr. Jackson went and met with Ms. Rais, I believe it was, and went over the regular rules of probation. If you look at Defendant's Exhibit 2, which is the regular rules of probation, in the mental health evaluation there was nothing that was checked in that Mr. Jackson had to participate in a mental health treatment or evaluation. That is on page two of Defendant's Exhibit 2, Specific Conditions. Nothing checked indicating that has to undergo any psychiatric or psychological treatment, no drug evaluation, or anything like that. That is one of the issues that is currently in Mr. Jackson's Petition to Revoke his Probation and the Amended Petition to Revoke his Probation. Additionally, Judge, when we get to -- starting on page three, the Indiana Special Probation Conditions for Adult Sex Offenders, none of these, again, were advised to Mr. Jackson that he would be required to abide by these. Nor did the Court order these. And, in fact, if you go to the signature page on Defendant's Exhibit 2, which is page seven, it says, "Ordered by the Court this 26th day of March, 2021." Signed by what purports to be Mr. Jackson, signed by what purports to be Mr. Otto, a signature for the Judge, and it is not signed.*

BY THE COURT: We never sign those. I've never signed one ever. Ever. Do you usually get the Judge's signatures on those?

BY MR. OTTO: No, Your Honor.

BY THE COURT: Never. Never.

BY MR. BROWN: So it's never been -- so there's nothing in the plea agreement that he would be required to abide by the sex offender -- rules of sex offender probation. There is nothing in the sentencing order that he would be required to abide by the sex offender rules of probation. There's nothing in the transcript, nothing in the order, and there has been no order signed by the Judge indicating that those conditions apply. If you go through the sex offender rules of probation, there are some that are statutorily required. Others are not. Others are imposed by the Court. Not by probation, by the Court. And there is absolutely nothing, no record whatsoever in these causes of where the Court has imposed these conditions. So if --

BY THE COURT: Are these the conditions that the Supreme Court has enacted?

BY MR. OTTO: Yes, Your Honor.

BY THE COURT: Okay.

BY MR. BROWN: So, and Judge, I --

BY THE COURT: So we haven't come up with any as a Court in addition to what the Supreme Court has required us to impose.

BY MR. BROWN: Well, and Judge, again, it's not -- it's not -- the rules are -- some rules are discretionary by the Trial Court.

BY THE COURT: According to?

BY MR. BROWN: Well, there's statutes that the statute requires some rules of probation.

BY THE COURT: Correct.

*BY MR. BROWN: There are some rules of probation that are not statutorily required, which then would be a discretion -- means that it would be a discretion by the Court of whether or not to impose those.*

*BY THE COURT: Except that this Indiana Supreme Court has indicated rules that sex offenders, through the training and stuff through the probation office down state, they're the ones who have told us what the special conditions of probation should be in sex offender cases. I think that's coming from the Supreme Court in terms of the rules that we are required to adhere to, but we can look into that a little bit more carefully.*

*BY MR. BROWN: Judge, I would direct the Court's attention to Freije v State.*

*BY THE COURT: Spelling?*

*BY MR. BROWN: F-r-e-I-j-e.*

*BY THE COURT: Okay.*

*BY MR. BROWN: v State.*

*BY THE COURT: Okay.*

*BY MR. BROWN: Just so the Court's -- so Freije, it's a 1999 Court of Appeals -- I'm sorry, the Supreme Court of Indiana decision. And what Freije decided was whether or not the Trial Court could implement rules that were not a part of the plea agreement.*

*BY THE COURT: Is that a sex offender case?*

*BY MR. BROWN: It is not. It is not specifically a sex offender case. That case, Judge, dealt with, as rules of probation the Trial Court implemented community service and home detention.*

*BY THE COURT: Yes, I would agree with that case. We can't do that if it's an agreed term and not part of a plea.*

*BY MR. BROWN: Correct.*

*BY THE COURT: The sex offender stuff is different, I think, because it's what we're told to do by a higher-up court. So, like I said, I've never looked at those. Never had to because this hasn't been raised before, but I guess we can address that further in a little bit. But I don't disagree with Freije. We can't do that normally, no.*

*BY MR. BROWN: Again, with Freije, that dealt with that particular issue.*

*BY THE COURT: Right.*

*BY MR. BROWN: But there's language in there where the Supreme Court said, "Unlike the standard conditions that are merely numbered, the special or additional conditions must be checked off by the Judge." And in that particular case, again, the special or additional conditions was -- or were the community service and the home detention. But, Judge, I guess that Your Honor's comments about it coming from the Supreme Court, enhances -- it comes from the Supreme Court, but if Mr. Jackson is not -- Mr. Jackson doesn't know it came from the Supreme Court. Mr. Jackson has no idea of what these conditions are, and if they're not noted in the plea agreement, not noted in the sentencing hearing, not noted in the sentencing order, never signed by a Judge, being a defendant, a lay person that is relying upon advice of counsel, what the State says, what the Court says, he doesn't have knowledge of this.*

*BY THE COURT: Right, he's relying on presumably what he discussed with his attorney. I don't know what the other Judges do, to be honest with you, but I always ask does the defendant waive the reading of the terms and conditions in open court. Don't shake your head at me. You're not testifying.*

*BY THE DEFENDANT: Oh, Your Honor, I'm sorry.*

*BY THE COURT: And you have given me the sentencing hearing and I'll be able to look at that to see that's asked. And I don't know if they're doing that, or not. I always do that.*

*BY MR. BROWN: I can tell you, in that particular sentencing order, it does not appear. That language, or that question does not appear in the sentencing order.*

*BY THE COURT: Okay.*

*BY MR. BROWN: Judge Bokota did say in the sentencing order that you're ordered to go down to probation and sign up for probation. Asked whether or not there was a probation officer still in the courtroom. There was. And he was directed to -- I think it was Ms. Diaz who was sitting in the courtroom at that time.*

*BY THE COURT: So they went over those with him in the courtroom before he left?*

*BY MR. BROWN: I believe that he went downstairs and checked in with probation. But the conditions of probation that he went over on that Friday, the 26th, were the standard rules of probation. Mr. Otto was not available on the 26th. He met with Mr. Jackson on that Monday, the following Monday to go over the sex offender regi -- the sex offender special conditions on that Monday.*

*BY THE COURT: Okay.*

*BY MR. BROWN: So the reason for the modification, Judge, is in addition to having to go through the sex therapy, having to have the monitoring systems put on his devices, and the requirements that he not participate -- or go to chat rooms and internet sites, so on and so forth. The most important one is he's got a young daughter, two young daughters, and he was ordered to move out of his house. His family home where his wife and his kid live, his daughter. His other older daughter lives with her mother. He was ordered to move out of*

103

his house, and he has, since March 26th of 2021, has been required to stay at a different residence than his own house. Additionally, he has not been able to have any contact whatsoever with either of his children.

BY THE COURT: Okay, the complaining witness in these cases weren't his own daughters?

BY MR. BROWN: Correct.

BY MS. WARDRIP: Correct.

BY THE COURT: There was a no contact order I thought I saw referenced in here. Okay.

BY MR. BROWN: That is correct, they were not his own daughters.

BY THE COURT: Okay.

BY MR. BROWN: And so March 26th comes around, he gets sentenced, he goes and checks in with probation, I believe it was that Monday when he had the conversation with Mr. Otto, "Hey, you got to move out and find another place to live. You can't have any contact with your kids. You can't have any -- you can't be at your house and live at your family house." There is an available remedy to that, and we cite Bleeke v Lemmon with regards to having an exception for him to be able to be around his children. But -- so that -- I guess that's the main issue as far as a modification goes of allowing him to be around his children and to be able to live at his house during the period of probation. It is not a violation of the -- it's a specific condition of probation that can be modified by the Court. It's not a statutory requirement that cannot be modified by the Court. So with regards to the Motion to Modify the Terms of Probation, again, none of these conditions were explained to Mr. Jackson, none of them appear in the record, none of them are signed by the Judge. But the biggest one that Mr. Jackson is concerned with is that he

104

wants to be able to reside at his home with his wife and his daughter and have contact with his other daughter. Thank you.

BY THE COURT: So in terms of the terms you want to modify, what I'm hearing is you want it modified so he can live at home and so that he can have contact with his children. That's what you're requesting.

BY MR. BROWN: Judge, those are the main ones, yes. Again, none of the conditions outside of the standard conditions we believe apply to Mr. Jackson because they weren't part of the record, but understanding that there are statutory because of the sex offense. There are statutory requirements. I guess, at a minimum, the modification to allow him to be in the home and to have contact with his children. But any of the non-statutory required special conditions of sex offenders, we would ask to be modified, as well.

Transcript October 8, 2021 - Evidentiary Hearing on PTR
Page 28 Line 13 - Page 30 Line 6

BY MS. WARDRIP: In terms of his daughter living at that residence, assuming the residence is permissible by Porter County, Probation and the State are still objecting because the Defendant is not in any sort of therapy to address his sexual deviancy issues. The charges in this case and convictions in this case are for sexual misconduct to a minor, indicating all three of our victims are under the age of 18. I'm not sure the age of his older child, but I believe both of his children are still minors. So unless and until he is in sex offender therapy to address his sexual issues then we would object due to the concern that we have for him being around children, given his conviction.

BY THE COURT: Is he permitted to have supervised visitation with his children?

105

*BY MS. WARDRIP: Your Honor, I don't know if we'll be circling back to this, but just to mention it now, I would like an opportunity to address regarding his notice of the sex offender rules because I think some of the information and dates, I think needs clarified. But specifically as it relates to having contact with a person under the age of 16, per the sex offender rules, it is permissible, if he receives Court approval or successfully completes a Court approved sex offender treatment program pursuant to statute. And contact includes face-to-face, telephonic, written, electronic, or indirect contact by a third party. So certainly it is permissible with Court's approval, or upon completion of a sex offender program.*

*BY THE COURT: And that's supervised, I'm assuming? It doesn't say that?*

*BY MS. WARDRIP: If I could have a moment. Your Honor, we are not finding anything specific whether it would be supervised, or not.*

*BY THE COURT: Alright. So in terms of the notice of the sex offender rules, that really tends to go more toward the PCR itself and whether his plea was knowing, intelligent, and voluntary, not whether I should modify the terms at this point. So I'm going to leave that question for when we have the PCR hearing on November the 4th. In terms of the living at home. If you get something in writing from the sheriff that it's an approved site, that's one thing. Another thing was the visitation. I don't want him around the children unless it's supervised visitation. So as long as the children are in the home, I don't believe he should be living there, even if it's an approved site, as long as they're minors. But I do think he should be able to have supervised visitation with his children, so I would order that.*

Transcript October 8, 2021 - Evidentiary Hearing on PTR

106

Page 31 Line 4 - Page 32 Line 22

BY MR. BROWN: Judge, the Defendant -- or the Defense's position on both matters is one of the key issues for sex offender therapy that's required is that the Defendant admit his guilty and admit his involvement and the acts that are alleged. I know Mr. Jackson has already done that. He did, in fact, plea guilty where he established the factual basis for that guilty plea. However, we do have a PCR, and if the PCR is granted, then Mr. Jackson has the constitutional right to go to trial. If he goes to trial, then the plea agreement and the plea colloquy can't be used against him. But any statement that he makes to a polygraph examiner could be used against him. Any statement that he uses and says in the sex offender therapy could be used against him. So in order for him to maintain his 5th Amendment Rights, because he's intending -- not only intending, he is -- has filed and we'll be prosecuting the PCR, the sex offender therapy -- forcing him to participate in the sex offender therapy and forcing him to participate in the polygraphs violates his 5th Amendment Rights. It's also my understanding, Judge, and I know Mr. Otto is going to provide some testimony about his particular conversations with these therapists. But there are three separate therapists that Mr. Jackson has attempted to go to in order to get signed up for the sex offender therapy. All three of them have declined to treat him. There are other issues, but one of the issues is what I just said, that he has to admit what he did and there's this PCR pending, the therapists aren't comfortable because of the PCR pending of --

BY THE COURT: Well, that's easy. That's an easy fix. I'll just order that any statements that he makes on the polygraph or during

107

*treatment can't be used against him if he ends up being -- please don't crack your knuckles.*

*BY MR. BROWN: Yes, ma'am.*

*BY THE COURT: If they end up being -- he ends up going to trial on the charges down the road. I mean, that's easy.*

*BY MR. BROWN: Okay.*

*BY THE COURT: You can't use them. It's compelled at this point.*

*BY MS. WARDRIP: I'm going to suggest an immunity letter by the State if he felt comfortable with that. Certainly that was never our intention. Our only intention is for his own rehabilitation and safety of the community.*

*BY THE COURT: Sure.*

*BY MS. WARDRIP: So whether it be an immunity letter or Court order, we have no intention of using any of those statements in future criminal proceedings against him.*

*BY THE COURT: Alright. So that takes care of that.*

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 33 Line 17 - Page 34 Line 22

*BY MR. BROWN: The location is in Fort Wayne, Indiana, so that's why he was requesting that it be Zoom purposes. And as far as the recording, respectfully, Your Honor, Mr. Jackson has been told various things throughout various times of these proceedings, pretrial -- or pre-plea, post-plea, in probation, in treatment, he's got trust issues. He's got trust issues with the legal system, he's got trust issues with some of us that are part of the legal system. He's been told certain things, has acted on those certain things, and then has been told that those are now wrong and, "I never told you that." So that's what the purpose of him attempting or wanting to record.*

108

Now, Phoenix, again, was Mr. Jackson's attempt to come into compliance with probation. After the first two, as Mr. Otto just indicated to you, refused to treat him because of the pending PCR and his refusal to admit guilt. So Phoenix was Mr. Jackson's attempt, personal attempt to come into compliance. But that's what, as far as the location and the recording.

BY THE COURT: Well it certainly shouldn't be an issue for him to find a place where he can engage in treatment if the State's willing to give a letter of immunity regarding statements made on a polygraph and during treatment. The fact of the matter is, is that your client needs to engage in good faith or he's looking at the sentence being imposed, at which -- I mean, we still have this pending PTR that I guess we're going to address today which may still end up being the case. But that's -- he's the one that has the most to lose here, it's in his best interest to do what he needs to do in terms of that.

BY MR. BROWN: I understand, Judge.

BY THE COURT: In good faith. So the State will provide a letter of immunity, so the Staying of the Polygraph and Sex Offender Therapy is denied with that condition.

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 43 Line 12 - Page 43 Line 19

BY MS. WARDRIP:

Q. Now, Detective, in your original meeting with Officer Otto on or about August 30th, you were guided by Officer Otto in terms of the exact dates of probation for this Defendant and therefore were able to filter the contents accordingly from March 26th, 2021 through August 30th, 2021, is that correct?

[BY MR SANDERS]

109

A. Yes.

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 45 Line 14 - Page 47 Line 4

BY MS. WARDRIP:

Q. Detective, turning your attention to State's Exhibit 3, how many videos were you able to download and collect in that report?

A. Thirty-one.

Q. And what are the dates of the videos in that report?

A. Pretty much all on August 2nd.

Q. Of what year?

A. Of '21.

Q. August 2nd, 2021.

BY THE COURT: All 31 videos were from that same date?

BY THE WITNESS: Yes, ma'am.

BY THE COURT: Okay.

BY MS. WARDRIP:

Q. And based on how that date of August 2nd, 2021 is collected, are you able to discern if that means that's when the videos were viewed, downloaded, or something else?

A. The date here is the modified date, which is the information obtained from the file that we download, so the modified date is what we have. So on that date either that movie was either downloaded or viewed, or it was somehow opened up on that date.

Q. And there are various URL addresses, web addresses associate with each of those video files, is that correct?

A. Correct.

Q. What is the main post name, or domain name of the website that those videos were collected from?

A. From a website called Reddit.

Q. Can you please spell that for the Court?

A. R-e-d-d-l-t dot com.

Q. And are all 31 videos from the same website?

A. Yes.

Q. And in your law enforcement experience and the investigations that you've conducted I'm sure on a number of different matters, are you familiar with the website, reddit.com?

A. Yes.

Q. Are you able to explain a little bit about what reddit.com is?

A. It's a social media platform where, you know, people go on and they can discuss different topics or look up different -- on a multitude of subjects. It's a social site where just a bunch of people go in and talk about different subjects and exchange different media items.


Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 48 Line 7 - Page 48 Line 23

[WHEREUPON THE FOLLOWING DISCUSSION WAS HAD AT THE BENCH OUTSIDE THE HEARING OF THE COURTROOM.]

BY THE COURT: Why is your client in custody?

BY MR. BROWN: Because of this Petition to Revoke Probation.

BY THE COURT: I'm showing there was a hearing.

BY MR. BROWN: Your Honor revoked bond.

BY THE COURT: Pardon?

BY MR. BROWN: Your Honor revoked bond.

BY THE COURT: I did?

BY MR. BROWN: Yes.

BY THE COURT: Okay. Alright, thank you.

*[WHEREUPON THE FOLLOWING PROCEEDINGS WERE ONCE AGAIN HAD IN OPEN COURT.]*

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 50 Line 4 - Page 50 Line 9

*BY THE COURT: When exhibits get scanned in that are like that, they have to be confidential documents. Actually I think they need to be restricted documents. Yes, because -- are there children in those?*

*BY MS. WARDRIP: There are no children, and that's why I wasn't sure since they are all adults.*

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 51 Line 11 - Page 60 Line 13

*CROSS-EXAMINATION BY MR. BROWN*

*Q. Good afternoon, Detective.*

*A. Good afternoon.*

*Q. I'm handing you what's been admitted as State's Exhibit 3. You had testified that all of those videos that you were able to extract from Mr. Jackson's cell phone were on August 2nd of 2021, is that correct?*

*A. Correct.*

*Q. You did not find any other --*

*A. August 30th.*

*Q. You extracted it on August 30th.*

*A. Yes.*

*Q. But the videos are from August 2nd, 2021?*

*A. Yes.*

*Q. Correct?*

*A. Yes.*

112

*Q. You did not find any explicit pornographic videos outside of the date of August 2nd of 2021, correct?*

*A. No, none that I saw.*

*Q. We're going to go through these in detail, okay?*

*A. Okay.*

*Q. Looking at Video Number 1 on page one of State's Exhibit 3. There's a file name, and it indicates reddit.frontpage. Do you see that, sir --*

*A. Yes.*

*Q. -- on the path? Is that correct?*

*A. That's correct.*

*Q. And it says cache, c-a-c-h-e, is that correct?*

*A. Correct.*

*Q. And then it has a video ID number, mp4.download, right?*

*A. Correct.*

*Q. Through your training and experience, cache is a file that is created when you go and visit a website, is that correct?*

*A. That's correct.*

*Q. And once you go and visit a website, for the purposes of the record, you go and visit a website, your computer stores a cache file, correct?*

*A. Correct.*

*Q. So if you then go to that website again, instead of redownloading all the images and text on this website, it will download from the cache file, right?*

*A. It would check that website to see if that is a current.*

*Q. See if it has a cache file, right?*

*A. That's correct.*

Q. It allows for websites to upload faster when you're trying to view them, is that fair?

A. Correct, yes.

Q. Okay. So every single video that you extracted on August -- that are depicted in State's Exhibit 3 are from the Reddit -- have a Reddit cache file name, correct?

A. Correct.

Q. None of these videos were actually in the camera roll of the phone indicating that there was video that was actually downloaded on the phone, correct?

A. The videos in the camera roll would be pictures and videos taken with that device's camera.

Q. But you can also download a video and save it to a camera roll, can you not?

A. You can designate it, but most of them will go in your downloaded folder.

Q. In the downloaded folder of the internet cache file?

A. No, just the downloaded folder.

Q. Okay. So there are no videos on State's Exhibit 3 that were extracted from the downloaded folder, correct?

A. There where you see, no. There was just the cache, and then you can see at the end it says download.

Q. I understand, but it's the cache file. What we're seeing on State's Exhibit 3 is the cache file of all of these videos, correct?

A. I see cache within the directory of it, but I can't say if that's an actual cache file because it says it's downloaded.

Q. When you extract -- so you don't -- as you're sitting here today, based upon your training and experience and being certified on Cellebrite, you don't know where these files came from?

114

A. Yes, that's the path right here.

Q. Okay. That's the file path, right?

A. Yes.

Q. And the file path is the cache file, correct?

A. Cache is in the directory, yes.

Q. Which tells you, based upon your training and experience, that it's the cache file?

A. That when the video is viewed and downloaded it went to that directory, yes.

Q. Okay. Do you have to necessarily download a video to view it on the website?

A. Yes.

Q. You do?

A. Yes.

Q. You can't just look at a video on a website without downloading it?

A. You look at it, but it's actually getting downloaded onto your computer.

Q. So you don't actually click a button to say download in order to download it on your computer or onto a cell phone, it automatically downloads behind the scenes to the phone?

A. Yes.

Q. Going on Video Number 1. It indicates that there's a modified time of August 2nd, 2021, is that correct, sir?

A. Correct.

Q. Again, you don't specifically know what modified means in this specific instance, do you?

A. No, I just know that in some form or fashion that file, it was changed. It was played, or was moved, or whatever. It was modified.

115

Q. It was modified?

A. Yes.

Q. But it's not your testimony that because it says modified that that specific file was viewed on August 2nd, 2021. It could have been something that modified it in the background of the phone, is that fair?

A. That's a possibility.

Q. Okay. Alright.

BY THE COURT: I'm not sure I understand, I'm sorry. Maybe you're more technology savvy than I am. Does that mean that it was either -- I mean, how could it have been modified, it was either viewed or downloaded? Is there something else it could have been?

BY THE WITNESS: That file -- but the thing -- here it is here. Like I say, he went on that website and, like I say, he went through the files, but that file on this computer was somehow altered on that day on his phone.

BY MR. BROWN:

Q. Right. So --

BY THE COURT: And how would you do that? I mean, what do you mean by altered? Do you mean it was either -- like it was sent to somebody else? It was downloaded? It was viewed? I mean, what else could it --

BY THE WITNESS: Either viewed or moved, or something. It was -- so whenever you click on a file, open a file, it's being modified.

BY THE COURT: So just opening it modifies it?

BY THE WITNESS: Opening it modifies it.

BY THE COURT: Okay.

BY THE WITNESS: Because you're changing as far as the date and time. Now, if you opened that file last week, now the new time it's

being opened is the day, so that's modifying the actual time on that file.

BY THE COURT: So like with a document, it's modified when you reopen it, it changes.

BY THE WITNESS: Yes.

BY THE COURT: Alright, go ahead.

BY MR. BROWN:

Q. But on specific computers, particularly when we're talking about the internet, that file can be modified without actually viewing the file, fair?

A. That I can't -- you have to go to that website on that day.

Q. Okay. Are you familiar with Google Chrome?

A. Yes.

Q. Okay. When you have Google Chrome you can open up several different tabs on Google Chrome, correct?

A. Correct.

Q. So if these tabs are open and you go on to Google Chrome, all of those tabs could be modified in the directory even though you don't actually click on the tab to see that website, fair?

A. Just because you opened up that tab. Whether or not you click on it to actually look at it, yes.

Q. Yes, sir. So if you have something on Google Chrome and you have multiple tabs open, you open back up Google Chrome and those tabs are still open, that's going to change the modified date, right?

BY THE COURT: On all of those tabs?

BY MR. BROWN: On all of those tabs.

BY THE COURT: Without clicking on any of them, that's what he's asking you.

BY MR. BROWN:

Q. Regardless if you specifically click on a tab, that modified date is going to change?

A. Are you talking about are you opening up that tab to go into a website, or are you just opening up a blank tab? What are you doing with each tab?

Q. I'm not shutting -- okay, I'm not shutting down Google Chrome.

A. Mm-hmm.

Q. I go on Google Chrome, I open up 20 tabs with 20 different websites, okay?

A. Mm-hmm, yes.

Q. I minimize Google Chrome. I don't actually kill the app on my phone. Fair? Are you following me?

A. Yes.

Q. And then I open back up the app again and all of my 20 tabs reappear. Are you following me?

A. Yes.

Q. By re-opening up Google Chrome all of those tabs filed in my phone are going to modify to that date that I opened -- re-opened Google Chrome, correct?

A. That's a possibility, yes.

Q. Alright. Going to Number 1, sir. On this modified date, we have August 2nd, 2021, 10:10:28. Do you see is that, sir?

A. Which number are you on?

Q. Number 1.

A. Okay. Yes, I see it.

Q. So that is 10:10 p.m., 28 seconds, is that correct?

A. Correct.

Q. The next document, same date, August 2nd, 2021, is that correct?

118

A. Correct.

Q. 10:10:40, correct?

A. Correct.

Q. The next number, August 2nd, 2021, correct?

A. Correct.

Q. 10:10:46, correct?

A. Correct.

Q. So within a period of 18 seconds, according to this record, the first three videos were modified within 18 seconds, is that correct?

A. Correct.

Q. Going down to Number 4. August 2nd, 2021, 10:11:15, correct?

A. Correct.

Q. Next one, 10:11:43, correct?

A. Correct.

Q. Next one, 10:11:45, correct?

Q. 10:11:55, excuse me, sir, thank you. 10:11:55, correct?

A. Correct.

Q. Similar question, so within 40 seconds those next three videos were modified, correct?

A. Correct.

Q. I'm not going to bore the Court and go down every single 31, but from the first picture -- or the video that was modified on 10:10:28 through the last one that indicates Number 31, that was modified on 10:17:47, is that correct?

A. What was the last one you stopped at?

Q. The very last one on the last page, sir.

A. Oh, last page. Yes, 10:17:47.

Q. So based upon these records, 31 videos were modified within a period of less than seven minutes?

A. Yes.

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 62 Line 16 - Page 63 Line 18

[BY MR BROWN]

Q. Just for clarification, Detective. I understand that Reddit would have to be open, like the website would have to be open, but it can be open in a tab that is not being viewed at that time by the viewer, correct?

A. (No response.)

Q. It could be open in the background, fair?

A. Yes, but it will be open. It's open, yes.

Q. Fair.

BY MR. BROWN: No further questions. Thank you.

BY THE COURT: But at some point somebody had to have to looked at that cache for it to have been showing up on your thing? At some point in time, whether it was on the 2nd, or not, is that right?

BY THE WITNESS: That's correct, yes.

BY THE COURT: Yeah, so he watched it at some point?

(Recross Examination continued)

BY MR. BROWN:

Q. And you have no idea of when that initial file on any of State's Exhibit 3 was actually viewed and downloaded for the first time, right?

A. No.

BY MR. BROWN: No further questions.

120

*BY MS. WARDRIP: Nothing.*

*NOTE: Covenant Eyes would have taken pictures of any video viewed as it was installed on the phone on that date. Also the judge doesnt care if the video was watched during the probation period or not but the fact at any time they were watched she has a issue with it.*

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 65 Line 6 - Line 12

*Q. And do you recall what day you first met Mr. Jackson?*

*A. March 26th, 2021.*

*Q. And under what conditions did you meet Mr. Jackson on that day?*

*A. He was sentenced to probation on that date. He did an intake with a different probation officer. And then after they went over the regular rules, they had me go over the sex offender rules with him.*

*Q. And How long have you been responsible for monitoring or supervising those convicted sex offenses specifically?*

279.    NOTE: Mr. Otto lies about when he first Mr. Jackson. Subpoena the record of that day including his messages to find out if he was in the courthouse that day. This should be reflected in either his terminal, the probation office logs, etc.

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 83 Line 16 - Page 86 Line 10

*[Cross Examination by Mr. Brown]*

*Q. Nothing outside for Rule Number 30 alleged violation that is contained in State's Exhibit 3 and State's Exhibit 4, is that correct? Those are the videos from the Cellebrite report?*

121

A. Yes, all the videos were directly related to Reddit.

Q. Got it. No other evidence outside of State's Exhibit 3 and 4 apply to Rule Number 30, is that correct?

A. Only the videos that were presented were directly from Reddit. Nothing else.

Q. State's Exhibit 6, the Indiana special conditions, you had indicated that when you went over those with Mr. Jackson you recall him having questions on almost every single one of them, is that fair?

A. That is fair.

Q. And you indicated that he initialed each and every one of them, is that right?

A. That is right.

Q. He was told by you, was he not, that he had to initial them in order for him to be on probation?

A. That is correct.

Q. And then you had testified that you went over these special conditions of probation on March 26th of 2021, is that correct?

A. Yes.

Q. How do you know it was March 26th, 2021?

A. Because that's what it's dated on the last page of the rules, and I recall meeting with him.

Q. Alright. And so just so we're clear, it's not actually dated of a date of when you signed it and/or a date when Mr. Jackson signed it, is that fair?

A. No, this is -- the date of March 26th, 2021, me and the Defendant went over these rules and it was signed on that date.

Q. It says -- where you're getting this date, it says, ordered by the Court this 26th day of March, 2021, right?

A. Yes.

Q. It's not a separate date specifically of when you signed it. That's the sentencing order date of when Mr. Jackson was sentenced, March 26th, 2021, right?

A. Yes, he was sentenced that day.

Q. But it's your testimony that you have an independent recollection that you met with him on that Friday, March 26th, 2021, and went over these rules?

A. Yes, and I have other -- on that date after he was sentenced and placed on probation, we went over these rules.

Q. Do you have any notes in your file to that affect that it was March 26th, 2021?

A. I do, actually. It would have been the first initial paperwork he did that the -- the officer of the day, which would be the probation officer that was assigned to that courtroom for that date actually went over the regular rules with him. And due to me working with the sex offender population, they have me review the actual sex offender rules with him. And that was all dated on -- let's see. On March 26th, 2021. And then he was set up a follow-up appointment a couple days -- three days later.

Q. Okay. Who set up that follow-up appointment?

A. Ms. Diaz. Probation Officer Diaz.

Q. Okay. So why would Ms. Diaz set up a follow-up appointment three days later in order to meet with you?

A. Because when they go over the rules we -- at this time they're actually supposed to set up a follow-up appointment to then meet with their actual assigned probation officer because at the time of doing the intake it is -- we're not aware of who's going to be assigned the Defendant for supervision purposes.

Q. Okay. So on that Friday, March 26th, he wasn't assigned a specific probation officer, correct?

A. No.

Q. But he was assigned to you on that Monday which would have been the 29th, correct?

A. That is correct.

Q. Which is when you would have went over the special rules of sex offender probation with him when he was assigned to you?

A. We already went over the rules on the 26th.


Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 97 Line 7 - Page 99 Line 18

DIRECT EXAMINATION BY MR. BROWN

Q. Mr. Jackson, I'm going to direct your attention to August of 2021. Did you have a Samsung Galaxy cell phone?

A. Yes, I did.

Q. Okay. And what internet browser did you use when you would go on your Samsung Galaxy?

A. I used the built-in -- built-in browser marked 'internet', and then I used Chrome.

Q. And is that Google Chrome?

A. Yes, it is.

Q. Okay. Do you recall there being a time in August of 2021 that you accessed your Google Chrome?

A. Yes.

Q. What was the purpose of accessing your Google Chrome?

A. Because I had constantly had questions about the conditions which are on the record that I repeatedly went over with my PO trying to come to --

Q. What do you mean by PO?

A. My probation officer.

Q. Okay.

A. As he had stated, I had repeatedly asked for the understanding and clarification of all the different conditions. And since the record shows that he has been constantly filing violations, I wanted to remove anything that he could interpret as a way of avoidance or anything that would possibly be considered a violation on the terms of probation.

Q. Okay. So during August of 2021, did you notice a setting, or something on your phone, that gave you cause for some concern?

A. Yes.

Q. What was the setting on your phone that gave you cause for concern?

A. Google Chrome has an option for incognito. And because of that and because I didn't want it to be a question, I loaded up Chrome, which I hadn't done in months because I've been restricting my use, and then I uninstalled it.

Q. So you uninstalled Google Chrome?

A. Correct, because I had an incognito option.

Q. And you didn't want any allegation or thought that maybe you had been using the internet under the incognito option?

A. Correct. I wanted to have that completely ruled out.

Q. Okay. So did you, in fact, uninstall Google Chrome from your phone?

A. Yes, I did. In fact, the Google Play store will tell you when apps were installed and uninstalled, and that was uninstalled on that date.

Q. On what date?

125

*A. The dates that he claimed that I viewed all those videos.*

*Q. August 2nd of 2021?*

*A. That is correct.*

*Q. You had an opportunity to review State's Exhibit 3 this afternoon, is that correct?*

*A. That is correct.*

*Q. Did you, on August 2nd of 2021, access the Reddit website and view porn?*

*A. No, I did not.*

*Q. Okay. At any time during your probation, have you -- from March 26th, 2021 until when you went into custody, did you use Reddit on your phone to access any type of pornography?*

*A. No, I did not.*

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 100 Line 24 - Page 101 Line 4

*BY THE COURT: I'm sorry, are you talking to me?*

*BY THE WITNESS: No.*

*BY THE COURT: I thought you were talking to me. Because I'm the fact finder.*

*BY THE WITNESS: No. I'm sorry.*

*BY THE COURT: Okay. Next question.*

280.    NOTE: Mr. Jackson was answering questions about preparing his phone for probation and talked about the process in which he did so. The court interrupted Mr. Jackson and was short and rude to him.

Transcript October 8, 2021 - Evidentiary Hearing on PTR

Page 113 Line 7 - Line 25

*[The Court]*

*The talk of this being a cache, cache, however you want to pronounce it, in terms of being on his phone, and it is on his phone,*

*it's not like it's on some household computer, it's his phone, to say that there were tabs that were open and so it was modified because he went into the website and it just updated all of the tabs that were open doesn't really answer the question as why they were -- the tabs were up there in the first place. I mean, at some point he had them open. At some point he had it on his phone. And I don't know how other people use their phones, but I find it incredible to me that from the time he went on probation when he deleted everything that could possibly get him in trouble, until August 2nd he left all of those tabs up on his phone. I don't believe that. I believe that his testimony is self-serving. I believe that he did have that material. I believe he tried to hide what he was doing because, you've asked me to take judicial notice of the file so I did, the fact that they had to come to court to have Covenant Eyes put on it. He didn't want probation to see what he was doing. So I do find that he had that material, that it was obscene, based on what's been described in court, even without looking at it.*

## Hostility, Ignorance and Biased Assumption

281. Magistrate Sullivan had shown here that her decision was based not only on her lack of understanding of how smart phones work and on her own views of how people use their phones but also based her opinion on no pattern of behavior in which she could establish or that had been presented to show Mr. Jackson had done anything to attempt to hide anything.

282. Android OS is a Linux based operating system. Smartphones, tablets and even some laptops are made with similar hardware and run off the same exact software. Mr. Jacksons phone can and was designed to be used as a computer / laptop simply by plugging it into a monitor and keyboard or an accessory called a Dock and can run a lot of the same or similar software all of which functions the same as they do on computers including file structures.

127

283.    The evidence clearly shows that there were only cache videos that had the admitted potation by the special officer to be "modified" by simply loading a browser with already opened tabs. The time between views is consistent with load times based on bandwidth and would not be conducive to being viewed in such rapid succession, including the last video.

284.    The specialist not only stated that it was a possibility but Google Chrome themselves acknowledged that is how the browsers function.

285.    Google created a new feature on December 8, 2022, to provide a way to prevent this from happening to save batter life and system resources.

> *Source:*
>
> *https://blog.google/products/chrome/new-chrome-features-to-save-battery-and-make-browsing-smoother/*
>
> *From the beginning, we designed Chrome for speed. But performance is more than just delivering a fast browsing experience. Today, we're announcing Chrome will now be optimized for your device's battery and system memory.*
>
> *With the latest release of Chrome on desktop, we're introducing two new performance settings so Chrome uses up to 40% and 10GB less memory to keep your tabs running smoothly, and extend your battery when it's running low. We'll be rolling out both Memory Saver and Energy Saver modes over the next several weeks globally for Windows, macOS and ChromeOS.*
>
> *Memory Saver provides a smoother-running browser experience*
>
> *Have a bunch of tabs open in Chrome that you plan to come back to later? Memory Saver mode frees up memory from tabs you aren't currently using so the active websites you're browsing have the smoothest possible experience. This is especially useful if you're running other intensive applications, like editing family videos or playing games. Any inactive tabs will be reloaded when you need them.*

286.    This would also be addressed in other sources for people who wanted to disable this feature.

*Source:*

*https://www.howtogeek.com/how-to-fix-chrome-automatically-refreshing-tabs/*

287.    No other material was discovered to have been modified, accessed or downloaded before or after the modified date of the videos found. Reddit is not a Porn Site nor is it considered a social media site either even though it has some similar capabilities.

288.    In fact, Magistrate Sullivan interpreted Mr. Jacksons interest in preserving his constitutional rights as evidence of wrongdoing as if he wasn't protecting his rights but instead seen as having something to hide. It is the same as how when a person pleads the 5th it should not be determined that they are guilty.

289.    Under both Indiana and federal law, a defendant's exercise of constitutional rights (such as invoking the right to remain silent or seeking legal counsel) should not be viewed as an implication of guilt. These rights are fundamental protections, and their assertion does not indicate wrongdoing. Courts recognize that defendants have the right to protect themselves and ensure a fair trial.

290.    **Constitutional Violations:**

a.    **Fifth Amendment:** The Fifth Amendment to the U.S. Constitution protects against self-incrimination. If a judge implies guilt because a defendant exercises their right to remain silent, it violates this constitutional protection.

b.    **Sixth Amendment:** The Sixth Amendment guarantees the right to a fair trial. A judge's bias or implication of guilt based on the defendant's exercise of constitutional rights undermines the fairness of the trial.

c.    **Fourteenth Amendment:** The Due Process Clause of the Fourteenth Amendment ensures that no person is deprived of life, liberty, or property without due process of law. Implying guilt based on the exercise of constitutional rights violates due process.

291.   **Code of Conduct for United States Judges:** Canon 2 of the Code of Conduct for United States Judges requires judges to avoid impropriety and the appearance of impropriety in all activities. Canon 3 requires judges to perform their duties impartially and diligently. Implying guilt based on the exercise of constitutional rights would violate these ethical standards.

292.   In summary, a judge's ruling that implies guilt based on a defendant's exercise of constitutional rights and protections violates the Fifth, Sixth, and Fourteenth Amendments, relevant federal statutes such as 42 U.S.C. § 1983, and judicial ethical standards. Such actions undermine the fundamental principles of a fair and impartial judicial process.

293.   Mr. Jackson admitted to his actions, which were not punishable and should be viewed as being complaint and stated clearly that he did them to stay in compliance and in no way to hide anything.

294.   As shown in the above transcripts, Magistrate Sullivan had even conducted herself toward Mr. Jackson hostilely when unprovoked. She spoke to him with disrespect when he was simply answering a question asked by the prosecutor. There was no objection, complaint or request by the prosecutor about Mr. Jacksons conduct or how he answered her question. The way Magistrate Sullivan responded was unprofessional in nature as well. She spoke toward Mr. Jackson sarcastically when Mr. Jackson had always respectfully addressed her and apologized whenever there was an issue or when he struggled to answer questions.

295.   It was never taken into consideration that Mr. Jackson has multiple mental health diagnosis which do affect his behavior and no accommodations had been made even though the court was made well aware of it repeatedly. This would not be the last time either.

296.   Americans with Disabilities Act (ADA)

   a. Title II of the ADA prohibits discrimination by public entities, including courts. If a judge or court officer discriminates against a defendant based on their mental illness, it could be a violation of the ADA.

   b. Reasonable Accommodations: The court is required to provide reasonable accommodation to individuals with disabilities, including mental illnesses, to ensure they have equal access to the judicial process.

297.    Section 504 of the Rehabilitation Act of 1973: This federal law prohibits discrimination based on disability in programs and activities that receive federal financial assistance, which includes most courts.

298.    **Constitutional Rights:**

a.    **Due Process (14th Amendment)**

b.    **The 14th Amendment** guarantees due process rights, which include the right to a fair trial. Disrespectful treatment or negative interpretation of behavior due to mental illness could be seen as a violation of due process.

299.    **Equal Protection (14th Amendment):** The Equal Protection Clause requires that individuals in similar situations be treated equally by the law. Discriminatory treatment based on mental illness could be a violation of this clause.

300.    **Judicial Conduct:** Judges are bound by codes of judicial conduct, which require them to act impartially and with respect towards all parties. Disrespectful treatment of a defendant due to mental illness would likely violate these ethical standards.

301.    **Professional Responsibility:** Attorneys and court officers are also bound by professional codes of conduct that require them to treat all individuals with respect and to avoid discriminatory behavior.

302.    **Discrimination Claims:** A defendant could potentially file a discrimination claim under the ADA or Section 504 of the Rehabilitation Act if they believe they were treated unfairly due to their mental illness.

303.    **Civil Rights Violations:** Claims under 42 U.S.C. § 1983 for violations of constitutional rights, such as due process and equal protection, could be pursued if the treatment by the judge or court officer is egregious.

304.    Jackson would not receive a copy of the letter prior to the acceptance of the new Plea Agreement nor was he aware when it was submitted as he would have asked for it for review. The Immunity Letter, however, did not address the concerns made. It only addressed the admittance of guilt solely for acts related to the conviction. This Letter Requirement, which was made clear during that hearing, is also addressed in other cases both State and Federal.

## Solitary Confinement and Mental Decline

305.     While in custody of Lake County Jail, the county jail denied Mr. Jackson his mental health medications as well as other medical necessities including his denture cream to eat. Mr. Jackson also had a Non-Alcoholic Fatty Liver and was on a special diet. Mr. Jackson informed the Jail of his needs, and they were ignored. Mr. Jacksons health would worsen while in the custody of the Lake County Jail.

306.     Mr. Jackson was also assaulted twice while in custody of the Jail. Mr. Jackson would even write a "Kite", or a note, and slide it to the guards in the middle of the night, but the guards would ignore it as he was being consistently threatened by a few individuals who were stealing from him.

307.     The second time Mr. Jackson was assaulted no guard made the regular rounds. Mr. Jackson would bang on the door following the assault and it was ignored for hours while he was bleeding and barely able to stand.

308.     Mrs. Jackson would be called by another inmate who would tell her that her husband was in danger, and she would call both Lake County Sherriff and the Lake County Jail with no answer at the Jail and no help from the Sherriff's department. Mrs. Jackson would then contact 911 who would finally reach someone at the Jail who was able to secure Mr. Jackson and get him out of danger.

309.     Mrs. Jackson would contact the Jail repeatedly on Mr. Jacksons behalf as all of the inmate requests Mr. Jackson would put in would not be responded too or granted. This included restoring his credits that were stollen, requesting to press charges for the assaults Mr. Jackson suffered, the overcharging of or denial of commissary (especially needed hygiene products), the day that the jail did not provide adequate meals in which she took a picture of, loss of water facilities and temperature issues, about denial of essential denture care products, about how a inmate who needed serious medical aid that was being ignored, how he was not provided with sleeping materials, or that he had to sleep on a spring bed with no mattress for nearly a week, etc.

310.     On October 25, 2021, Mrs. Jackson wrote to the Jail to inform them that the guards had been ignoring Mr. Jackson for hours when he was requesting the jail to do something about the

imminent threat to his safety by three people named in that email and informed them that she, Mrs. Jackson, had to call 911 to be able to get through to someone at the jail after Mr. Jackson had spent hours being assaulted and harassed by these individuals and the guards did nothing.

311. Instead of removing the three offenders, Mr. Jackson would be moved instead. He was not transferred to the other block for offenders but instead was placed in 23/1 "Protective Custody" isolation. Due to this Mr. Jackson was on lockdown and most of the time completely isolated from any human contact. He was denied use of the phone during 23 hours of the day and use of the tablet to communicate with his family and attorney most of that time. He was denied therapy sessions most of the time he requested it. He had one hour out each day that would change without a schedule.

312. Mr. Jackson would have to choose to shower, clean his cell, or try to spend what time he had trying to call someone who would answer.

313. Mr. Jackson's mental health was declining, and he was placed on suicide watch by the guards. Mr. Jacksons attorney, Mrs. Jackson and his therapist would inform the court which is visible through filings about Mr. Jacksons deteriorating mental state. All were ignored by the court and the jail and by the court who was receiving notice of Mr. Jacksons condition.

314. Mr. Jackson was denied being able to be a Trustee, or transferred to work release, or transferred to the alternative block for offenders. He was also denied release on home detention where his dietary, medical and psychological needs could be met.

315. On October 25, 2021, Mrs. Broshar wrote and emailed a letter for the court to Mr. Brown. This letter was filed on the record later and it stated:

> To Whom It May Concern,
>
> My name is Alyssa Broshar, and I am the current therapist seeing David Jackson. I began seeing David for weekly individual counseling services on November 15, 2019. Since March 2021 David has been seen for twice weekly individual sessions due to heightened stress.
>
> Since I began seeing David, he has been consistent in maintaining his counseling sessions and has been actively working on meeting treatment objectives.

*Based on my initial diagnostic interview and assessments, I have diagnosed David with Post-Traumatic Stress Disorder (PTSD). Common symptoms of PTSD are flashbacks of the traumatic event, increased arousal, avoidance, and frequent worry. David specifically has spoken about being fearful and having somatic symptoms such as muscle tension and cold sweats whenever he hears a door knock for example. He has described fearing leaving his home and has avoiding going out in public unless absolutely necessary. David has also mentioned sleep disturbances and panic attacks that were not present before his arrest. David previously disclosed past trauma that began as a child, but reported no PTSD symptoms occurring until his initial arrest. On David's recent assessment (National Stressful Events Survey PTSD Short Scale) completed July 2021, his score indicated "severe" PTSD symptoms. On October 22, 2020 David was seen by a psychologist at Porter Starke to confirm his previous ADHD diagnosis so he could continue to receive medication to manage symptoms. The results of the full psychological assessment confirmed the previous ADHD diagnosis and this therapist's PTSD diagnosis; David was additionally diagnosed with Generalized Anxiety Disorder as well at the time of the psychological assessment.*

*David has reported heightened anxiety symptoms since suddenly having to leave his home due to not being adequately prepared by his previous attorney on the possibly of not being able to live at home and see his child after accepting a plea. Symptoms of depression have also been present such as feelings of hopelessness, low motivation, weight gain, insomnia, and difficulty concentrating. David has stated in sessions that he struggles with utilizing coping skills and positive thinking strategies with the loss of his support*

*system. David has become emotional in sessions due to missing his family and feeling a sudden loss of social support. Since David has been in jail, these mental health concerns have intensified more; David has gotten emotional in every session since being in jail and struggling to form clear thought patterns at times throughout the session, often starting a thought and then trailing off or starting a new thought before processing the current thought.*

*In sessions David has been actively participating in developing healthy coping skills when feeling anxious. Specifically he has learned different breathing exercises, grounding techniques, positive thinking strategies such as cognitive restructuring, and body mapping. Before this recent arrest, David had decreased his panic attacks overall to about once every two weeks; however, David has currently identified difficulty managing his symptoms overall and feelings of panic almost daily since being in jail.*

*Please feel free to contact me by cell phone with any additional follow up questions or concerns. My phone number is (219) 742-4972.*

*Thank you,*

*Alyssa Broshar, MAT, LMHCA*

316. On October 26, 2021, Jackson's attorney filed the Defendant's Sentencing Memorandum which explicitly points out the deterioration of Jackson's mental illness and cognitive decline and how it is by law a mitigating factor. It also states Jackson's physical health issues that required a special diet. That diet was not explained in detail as it was not a regular diabetic diet, but it was concluded by the jail staff that they were not able to meet it.

317. On October 27, 2021, Mrs. Jackson sent an email to Lake County Sherriff and CC'ed a copy to Mr. Jacksons attorney informing them Mr. Jackson was attacked for a second time while in Lake County Jails custody. Mr. Jackson was assaulted, robbed and was being extorted by other inmates in his section. In that email, Mrs. Jackson stated clearly that Mr. and Mrs. Jackson wished

to press charges against the individuals. This was never done despite both Mr. and Mrs. Jackson both requesting it.

318.    Lake County Jail would instead place Mr. Jackson in "Administrative segregation" (210 Ind. Admin. Code 3-1-1) instead of removing the bad actors and punishing them for their acts. This allowed them to continue to operate as Pod Boss's. The Lake County Jail's actions are seen as ignoring their own "Pod Boss" policy and to punish those who complain while continuing to allow the problem to continue and to further subject the other inmates to the continued abuse of those individuals.

319.    As defined by Cornell Law School's Legal Information Institute: Solitary confinement, also known as isolation or administrative segregation, is when a prisoner is placed in a cell away from other prisoners, with limited contact with others. Prisoners are usually placed in solitary confinement as a form of internal discipline for serious infractions (e.g. fighting) and minor infractions (e.g. getting caught with contraband). Prisoners may be placed in solitary confinement in an attempt to keep the general population safe, but also to keep them safe from others.

320.    Mr. Jackson would develop Security Housing Units (SHU) Syndrom. SHU syndrome is "characterized by perceptual changes; affective disturbance; difficulty with thinking, concentration, and memory; disturbance of thought content; and problems with impulse control."

321.    SHU Syndrome is a recognized psychiatric syndrome associated with solitary confinement. SHU syndrome is a psychiatric syndrome that Harvard Medical School psychiatrist Dr. Stuart Grassian identified in 2006 as a result of prolonged solitary confinement in prison Security Housing Units (SHU). Grassian first described SHU syndrome in a 1983 journal article, noting that solitary confinement can cause vivid hallucinations in multiple senses, as well as other mental health issues. He observed that solitary confinement can cause existing mental health issues to worsen or recur, or it can lead to new mental illnesses.

322.    Symptoms of SHU syndrome include:

    a.    Perceptual changes

    b.    Affective disturbance

    c.    Difficulty with thinking and concentration

d. Anxiety symptoms, such as nervousness, worry, increased heart rate and respiration, sweating, muscle tension, hyperarousal, paranoia, nightmares, intrusive thoughts, and fear of losing control

e. Emotional numbing and desensitization

f. Ruminations

g. Irrational anger

h. Oversensitivity to stimuli

i. Confused thought processes

j. Other studies have found that solitary confinement can also lead to suicidal thoughts.

323. Solitary Confinement is considered "torture". Prison isolation fits the definition of torture as stated in several international human rights treaties, and thus constitutes a violation of human rights law. The U.N. Convention Against Torture defines torture as any state-sanctioned act "by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person" for information, punishment, intimidation, or for a reason based on discrimination.

324. Since the 1990s, the U.N. Committee Against Torture has repeatedly condemned the use of solitary confinement in the U.S. In 2011, the U.N. special rapporteur on torture warned that solitary confinement "can amount to torture or cruel, inhuman, or degrading treatment or punishment when used as a punishment, during pre-trial detention, indefinitely or for a prolonged period, for persons with mental disabilities, or juveniles."

325. In 2014, AFSC submitted a "shadow report" to the U.N. Committee Against Torture, featuring testimonies from people subjected to long-term isolation.

326. The ADA states that persons with pre-existing mental disorders run a higher risk of suicidal thoughts as well as permanent damage due to the conditions in conjunction with their existing mental illness.

327. Shortly after placement in confinement, Mr. Jackson was placed on Suicide Watch by the Lake County Jail staff due to his deteriorating mental state. Yet they offered no services or made any recommendations to the court or to administrators regarding the risk or to consider alternative actions.

328.    Prior to Mr. Jackson being placed in Solitary Confinement, the prosecutor warned Mr. Jackson in court on the record that if Mr. Jacksons PCR where to be successful that he would be recharged with all the dropped charges. Then the Prosecutor asked Mr. Jackson if he understood that. Mr. Jackson stated in court that he was aware that if his PCR were to be granted his charges would be reinstated and that he wished to fight.

329.    Mr. Jackson was in a constant exited or depressed state and was seeing and hearing things that were not there and was mentally unstable and already experiencing all of the symptoms of SHU syndrome mentioned previously. Mr. Jackson still suffers from these conditions today even if to a lesser extent varying day to day.

## Post Conviction "Relief"...

330.    After suffering prolonged confinement conditions, Mr. Jacksons deteriorated mental state and other cognitive issues previously stated, Mr. Jackson would accept a plea agreement that he would be able to return home and too his wife and children as it was explained to him. Mr. Jackson was not at that time cognizant of all the ramifications or was able to competently understand the choices that were presented to him. Mr. Jackson just wanted the torture to stop.

331.    Mr. Jackson was told that his probation would be transferred to Porter County as he feared being placed under Lake County Probations supervision once again due to the constant abuse by its department and by Jacob Otto.

332.    Shortly after Mr. Jackson signed the plea agreement, Mr. Jackson would be transferred back to a regular holding block assigned to offenders. The same block that Mr. Jackson should have been transferred to instead of confinement. There he would remain for about another week until he would be released after his new sentence.

333.    Magistrate Sullivan failed in her duty based on the knowledge that had been provided to her already that a Competency Determination should have been ordered for Mr. Jackson. She was made aware from multiple sources previously of his deteriorated state. She was aware of the severity of those conditions and the rate at which he was deteriorating.

334. It would have allowed for Mr. Jackson to stabilize and for the court to order the Jail to provide him with phycological treatment, medications and care. Magistrate Sullivan had already displayed she had a biased view of Mr. Jackson and was not concerned about the validity of the acceptance of the plea agreement nor the fact that the last time she had talked to Mr. Jackson less then two months earlier he stated that he wanted to fight.

335. Magistrate Sullivan would use the previously used biased Threat Assessment Tool evaluation from the previous sentencing and without stating why would assign Mr. Jackson with every single special condition of adult probation available and without them being stipulated in the plea agreement or a determination as to why they should apply to him.

336. Magistrate Sullivan would state again that she does not believe in rewarding bad behavior and that no matter how small the violation would be, she would revoke Mr. Jacksons probation and send him to prison.

337. Magistrate Sullivan would reiterate on the record that Mr. Jackson had an immunity agreement as part of the plea and that his participation in the therapy and polygraph exams were mandatory and that information gathered would be for therapeutic purposes only. Then she would order Mr. Jackson to meet with Lake County Probation following the sentencing.

## Conspiracy, Violations and Pseudo "Science"

338. This surprised Mr. Jackson as he was told that his probation was to be transferred, which was done to keep him from having to worry about Jacob Otto. Mr. Otto would inform Jackson that he could not move back home and that he had to live with someone.

339. Otto also stated that he would be supervising Mr. Jackson probation through Porter County. Mr. Jackson stated that is not what was explained to him regarding the plea deal. Otto Stated he had no choice.

340. Mr. Jackson stayed with a friend temporarily while he looked for a place to move into. Mr. Jackson would be there only three days when the landlord would inform the tenant who was Mr. Jacksons friend that he could not stay there even though it did not violate the lease

agreement nor conditions of probation. The landlord was "tipped off" that Mr. Jackson was staying there.

341. Jacob Otto previously told him that he was not allowed to stay in hotels even if he registered there. This was false. Mr. Jackson would then talk to the direct Probation Officer over him, Jennifer York. She stated that he could stay in hotels and that as long as it did not fall into an area that violates conditions of probation that he could stay wherever he could find.

342. Mr. Jackson would also register as per the requirements of the Plea Agreement and the conviction. Again, the registration would be Lifetime instead of the 10 years that was promised.

343. According to the Plea Agreement, Porter County Probation had the discretion regarding whether Mr. Jackson could see, live with or contact his children. But it did not stipulate what would be the determining factors. Nor was Mr. Jackson told that Porter County Probation, who informed his attorney that he could live at home with this wife in kids would change their minds after speaking to Jacob Otto.

344. Mr. Jackson had to again also install Covenant Eyes on his phone and computer. This again violated the Terms of Service and Mr. Jackson would inform the company of this whom did nothing.

345. Mr. Jackson would enroll in therapy sessions and did not miss a single session, nor did he ever fail to participate in any sessions actively.

346. York would inform Mr. Jackson that due to her conversation with Otto she would not approve of Mr. Jackson returning home or to have visitation with his children. She stated that Mr. Jackson would first need to participate in an Instance Specific polygraph exam.

347. Mr. Jackson informed her of the Immunity Agreement. York would state that Mr. Jackson had nothing to worry about. Mr. Jackson stated that he does not believe in the exams and York would state that it is a held misconception that they are lie detectors. She stated that they are not but if he did "fail" it they would have to figure out why it came back that way and take it again until he passes before, she would consider allowing him to visit or communicate with his children.

348. On January 10, 2022, Alyssa Broshar would email Brian Armstrong, Jennifer York and David Jackson the following with a PDF attached:

*Hello,*

*My name is Alyssa Broshar and I am the therapist currently seeing David. I have attached a letter providing his diagnoses and a brief description of his symptoms for the purpose of a possible polygraph exemption.*

*Please email me at abroshar7@gmail.com or call me at (219) 742-4972 with any follow up you may have.*

*Thank you,*

*Alyssa Broshar, MAT, LMHCA*

*[ATTACHED PDF]*

*To Whom It May Concern,*

*My name is Alyssa Broshar, and I am the current therapist seeing David Jackson. I began seeing David for weekly individual counseling services on November 15, 2019. Since March 2021 David has been seen for twice weekly individual sessions due to heightened stress. Since I began seeing David, he has been consistent in maintaining his counseling sessions and has been actively working on meeting treatment objectives.*

*Based on my initial diagnostic interview and assessments, I have diagnosed David with Post-Traumatic Stress Disorder (PTSD). Common symptoms of PTSD are flashbacks of the traumatic event, increased arousal, avoidance, and frequent worry. David specifically has spoken about being fearful and having somatic symptoms such as muscle tension and cold sweats whenever he hears a door knock for example. He has described fearing leaving his home and has avoiding going out in public unless absolutely necessary. David has also mentioned sleep disturbances and panic attacks that were not present before his arrest. David previously disclosed past trauma*

141

*that began as a child but reported no PTSD symptoms occurring until his initial arrest.*

*On David's recent assessment (National Stressful Events Survey PTSD Short Scale) completed January 2022 his score indicated "severe" PTSD symptoms. On October 22, 2020 David was seen by a psychologist at Porter Starke to confirm his previous ADHD diagnosis so he could continue to receive medication to manage symptoms. The results of the full psychological assessment confirmed the previous ADHD diagnosis and this therapist's PTSD diagnosis; David was additionally diagnosed with Generalized Anxiety Disorder as well at the time of the psychological assessment. Please feel free to contact me by cell phone with any additional follow up questions or concerns. My phone number is (219) 742-4972.*

*Thank you,*

*Alyssa Broshar, MAT, LMHCA*

349.    Mr. and Mrs. Jackson for the last few years, prior to this point, had been in a custody battle with Mr. Jacksons ex-wife Jacqueline Renslow-Wiler over Mr. Jacksons eldest child. The court had appointed an Ad-Litem at the beginning of the custody battle under the name of Linda Lablanc.

350.    After completing several investigations and working with Lake and Porter County DCS, forensic psychologist Dr. Chris Zacney, PsyD and along with 4 separate counseling services, including reviewing all of Mr. Jacksons legal cases including all evidence concluded that Mr. Jackson would be best suited to be the Primary custodian for his eldest daughter.

351.    Zacney stated in his official report that Mr. Jackson was vital in the childs life and that the mother of the child displayed several unhealthy behaviors detrimental to the child. Zacney stated that the mother and child had developed an unhealthy enmeshed codependent relationship, and the child was also not receiving vital influences and her mental health was being neglected.

352.    Lake and Porter County DCS determined that Mr. Jackson was not a threat to his child.

353.    The 4 independent counseling services stated that the mother displayed unhealthy alienation habits regarding the father to the child and recommended removal from the mother's home and placed in a residential care facility.

354.    The separation between Mr. Jackson and his eldest child was initiated as an emergency action due to Mr. Jacksons arrest on the criminal matters addressed in this case.

355.    At the previous sentencing hearing for the second plea deal, the Ad-Litem sent a letter to the trial court asking that the court allow Mr. Jackson to be involved in his eldest daughter's life based on these assessments following the conclusion of the acceptance of the plea agreement. The trial court disregarded this request by never addressing it.

356.    Mr. Jackson, following his conviction and now in the custody of Porter County, shared the information about the current custody battle with York. York would then set up the time for the Polygraph test with Nosduh Forensic Bureau with Terry Hudson. This would be the first of two Polygraph sessions Mr. Jackson would have with Hudson.

357.    Nosduh Forensic Bureau Corporation has a registered NCAGE Code for doing business with international governments. NATO Commercial and Government Entity Code 8MQ50 was created on 2020-07-09 14:18:02.

358.    Mr. Jackson met with Hudson and provided his medication list and diagnosis to Hudson prior to the test. Hudson stated to Mr. Jackson that every person claims the same issues and that the diagnosis and medications would not affect the test. Several of the medications as well as Mr. Jacksons diagnosis have been proven to interfere with polygraph test results.

359.    Hudson would then start going over the control questions. The first four where things like identifying Mr. Jacksons information which were all affirmative. The 5th was identified as the deceptive question which consisted of simply informing Mr. Jackson that when asked during the test to answer "falsely" to the question regarding Hudson's shirt color. This is not a valid proper control question used to set a baseline. These would be the same baseline questions used in the following test provided by Hudson later.

360.    Polygraph evidence is generally treated with skepticism in both Indiana and the 7th Circuit, and its admissibility is often contested. The requirements, procedures, and regulations for a polygraph to be considered valid or invalid are influenced by both state and federal case law, as well as the standards set forth by the scientific community.

361.    **Admissibility:**

a.  **Frye Standard:** Historically, the admissibility of polygraph evidence was governed by the Frye standard, which requires that the scientific principle from which the evidence is derived must be sufficiently established to have gained general acceptance in the particular field to which it belongs.

b.  **Daubert Standard:** The Daubert standard, which is now the prevailing standard in federal courts, including the 7th Circuit, requires that the trial judge act as a gatekeeper to ensure that any and all scientific testimony or evidence admitted is not only relevant but reliable. The factors considered under Daubert include:

   i.   Whether the theory or technique can be tested.

   ii.  Whether it has been subjected to peer review and publication.

   iii. The known or potential error rate.

   iv.  The existence and maintenance of standards controlling the technique's operation.

   v.   Whether it has attracted widespread acceptance within a relevant scientific community.

362.    **Case Law:**

a.  **United States v. Scheffer, 523 U.S. 303 (1998):** The U.S. Supreme Court held that a per se rule excluding polygraph evidence in military courts did not violate the defendant's constitutional rights. This case underscores the general judicial skepticism towards polygraph evidence.

b.  **United States v. Lea, 249 F.3d 632 (7th Cir. 2001):** The 7th Circuit upheld the exclusion of polygraph evidence, emphasizing the lack of consensus in the scientific community regarding its reliability.

c. **United States v. Robbins, 197 F.3d 829 (7th Cir. 1999):** The court addressed the admissibility of polygraph evidence and highlighted the importance of the Daubert standard in evaluating scientific evidence. The case underscores the need for rigorous scientific validation of polygraph techniques, including control questions, to meet the Daubert criteria.

363.    Control questions in a polygraph test are designed to establish a baseline physiological response that can be compared to responses to relevant questions. For a control question to be valid. A valid control question in a polygraph test serves as a baseline for comparison. It is typically unrelated to the specific issue being investigated. Control questions are designed to evoke a physiological response (e.g., anxiety) in both truthful and deceptive individuals. Examples of valid control questions might include general inquiries about past behavior (e.g., "Have you ever lied to avoid getting into trouble?"). Invalid control questions would be those directly related to the specific incident under investigation. Or simply answering a question falsely as per instructed as that would not initiate a similar response as deception would as it would lack anxiety and other similar responses as a true lie in terms of emotional and psychological impact.

364.    When Mr. Jackson was done, Hudson would have Mr. Jackson fill out the paperwork regarding the release of the information. This would and should only go to the direct probation officer over the probationer and/or the therapist involved in the exam which in this instance was none. However, the paperwork for some reason listed both York and Otto. Mr. Jackson questioned this but was informed that this was what he (Hudson) was provided with. Ottos name however was not on the following polygraph paperwork later.

365.    York would inform Mr. Jackson that one of his questions came back as signs indicative of deception and would not allow him to see his children until he had passed the test, and the results would change. Mr. Jackson stated he does not believe in Polygraph tests as they are junk science and Jackson knew he was being honest.

## Criminal Fraud & Entrapment

366. Unbeknownst to Mr. Jackson, Otto would illegally disseminate the polygraph results without permission from Mr. Jackson or the courts to Wardrip. This was contemptuous behavior that would go unpunished.

367. This information being released violated Probation Standards. Ind. Probation Standards II-A-1.4 (regarding confidentiality of records); Ind. Probation Standards III-A-1.4 (regarding release of information); Ind. Probation Standards III-A-1.9 (regarding records management). Standard II-A-1.4 states "Information contained in probation files is confidential and may only be released in accordance with the Indiana Rules on Access to Court Records, state and federal statutes and rules, and policies adopted by the Judicial Conference of Indiana.". This is further supported in Ind. R. Acce. Ct. Rec. 5 under commentary. Ind. Probation Standards II-A-1.9; Ind. Probation Standards III-A-1.9. Standard 1.9 regarding accessing or dissemination of probation records, is governed by the Indiana Rules on Access to Court Records. Probation officers shall maintain the security of probation records. Following this we then go to Ind. R. Acce. Ct. Rec. 5 and Ind. R. Acce. Ct. Rec. 9. Rule 5 under Commentary states that per Probation Standards 1.4 that probation record information is confidential. And under Rule 9 it states that the information cannot be released unless; A) Jackson waved confidentiality, he did not B) A formal written request received, and Jackson being notified and able to respond, a hearing if needed and then an order from the court. No requests were made and no order from the court was given. C) There was an immunity agreement made in court prior to accepting his new plea agreement.

368. Jackson stressed concerns regarding information gathered during Court Ordered Indiana's Sex Offender Management and Monitoring (SOMM) Therapy and Polygraph examinations and received a promise of immunity which was an inducement made prior to the plea agreement. Any violation of this inducement is considered a violation of the plea agreement.

369. There was no cause for Otto to have viewed the information or disseminated it as Jackson's supervision was transferred, Otto was not the direct supervising officer over Jackson nor was cause provided by Porter County Probation. Ind. Probation Standards II-D-4.21 (regarding transfer of supervision). This was an illegal search violating Jacksons 4th Amendment right especially in the light of caselaw and the existence of an Immunity Letter, Ind. Probation Standards II-D-4.18 (regarding searches). See Vanderkolk v. State, 32 N.E.3d 775 (Ind. 2015). Otto's actions

when measured against his job's expectations as defined by Standards fell short and therefore lacked any authority. Ind. Probation Standards III-D-4.4 (regarding expectations defined).

370.    Wardrip, upon receiving this information, failed to report Otto's illegal act of misconduct in accordance with Ind. R. Acce. Ct. Rec. 11. And Nat'l Prosecution Standards 1-1.6. Indiana recognizes the National Prosecution Standards. The standard listed on the Indiana website is the 2009 3rd edition. Otto violated his code of conduct. Ind. Probation Standards II-F(2) (regarding code of conduct for Indiana probation officers). These standards were established under I.C. § 11-13-1-8 Rules and Regulations by Judicial Conference of Indiana. The violations include "a, b, c, d, e, g, i, n, p, t, u" under this standard. This act falls under the tort law of Intrusion upon seclusion and is held to be offensive against Jackson. Restatement (2nd) of Torts, §652(b) (Intrusion upon Seclusion) (U.S. Const. amend. I, §1.7.5.10 U.S. Const. First Amendment – Privacy Torts, Violation of Privacy Rights).

371.    When the Rules of Access are violated then Ind. R. Acce. Ct. Rec. 11 and Ind. R. Acce. Ct. Rec. 12 address sanctions / immunities. It states when a judicial officer is aware of a violation the officer is authorized / expected to enforce this rule. It states immunity only applies if the violation was unknowing or unintentional. That is not the case here.

372.    Wardrip intentionally and knowingly disseminated this information to her department and the independent Indiana Prosecutor's Attorney's Council, then conspiring with Otto, disseminated that information to third parties, violating of the immunity agreement, the plea agreement, court rules, circumventing the courts authority and denying Jackson's ability to address it. These acts violated ethics and conduct rules, state, federal and local laws including Jackson's 5th Amendment rights. Nat'l Prosecution Standards 1-2.1 (regarding standards of conduct); Nat'l Prosecution Standards 2-6.1 (regarding judicial respect); Nat'l Prosecution Standards 3-1.4 (regarding illegally obtained evidence); Nat'l Prosecution Standards 5-4.2 (regarding implication of authority); Nat'l Prosecution Standards 5-4.3 (regarding inability to fulfill agreement).

373.    As stated in United States. v. Antelope, 395 F.3d 1128 (9th Cir. 2005) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)), a plaintiff has suffered an injury-in-fact if he has experienced "an invasion of a legally protected interest which is(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Further, "a 'legally protected interest'

requires only a 'judicially cognizable interest.'" ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters, 645 F.3d 954, 959 (8th Cir. 2011).

374. Mr. Jackson would start his court ordered therapy through PACT under Brian Armstrong. Jackson would fully participate and never miss a session. Jackson however did complain to York that there was no actual therapy in those sessions but rather it was just an update about who needed to take a polygraph next, what the results were, if the person failed then why.

375. Outside of two handouts and Mr. Jackson participating in an extensive sexual history application prior to the sessions it was more akin to further supervision as provided by a Probation Officer.

376. Mr. Jackson would then be notified through his family attorney Joseph Miyake that Confidential immunized polygraph information was disseminated by Wardrip and Otto and under "False Light", see I.C. § 35-44.1-2-3(c) (regarding false reporting; false informing; I.C. § 5-26.5-1-4.8 (regarding invasion of privacy), who claimed Jackson was a threat based on the records regarding Jackson's children to third parties.

377. The polygraph was to be used solely as a tool for rehabilitation, contained no admittance of guilt or evidence of a criminal act and was protected by immunity and confidentiality protection granted to court record information. This information was disseminated under the color of law, using language implying guilt of crimes not charged or part of an active investigation. These claims were resolved years prior by multiple competent authorities with jurisdiction. Wardrip's claims were based solely on Jackson being an offender. This is stated by Wardrip in the family court and reflected in transcripts.

378. Due to this breach of the Plea Agreement, Immunity Offer, Court Rules, Laws both State and Federal, and the irreparable damage caused by this breach, Mr. Jackson would initiate another Post Conviction Relief session.

## Family Court Interference

379. Confidential information was given to the opposing side of a civil custody hearing. The information was given in a "False Light", see I.C. § 35-44.1-2-3(c) (regarding false reporting;

false informing; I.C. § 5-26.5-1-4.8 (regarding invasion of privacy), both to the parties involved and to the Civil Court during the custody hearing. It was given by both Nadia Wardrip and Otto, who stated that there was a clear threat and concern based on the information from Jackson's probation records. This was used to prejudice Jackson by false light implications of guilt of a crime against his child. They stated that he posed a threat to his children and was given under the color of law in their official position representing the State.

380.    As stated in the transcripts from before on October 8, 2021, the statements and information collected where to be used for therapeutic purposes only and the judge ordered that the Prosecutor could not use the information, and anything gained would be considered compulsory.

381.    The polygraph information was to be used solely as a tool for rehabilitation and had no admittance of guilt, nor is considered in any court to be admissible evidence of a criminal act. Wardrip admits on the stand to not knowing what questions were asked or which response was considered "deceptive". Wardrip's claims were based on no evidence and were based solely on his status of being an offender.

382.    Wardrip had previously shared this information with a senior deputy prosecutor and the unauthoritative agency Indiana Prosecuting Attorneys Council (IPAC). Otto and Wardrip then further disseminated this information unrequested to third parties under the color of law along with language that implied guilt of a crime not charged (nor a part of an active investigation) which that had been resolved years prior by multiple competent authorities having jurisdiction in the matter.

383.    Wardrip and Otto involved themselves in an unrelated civil matter involving Constitutional rights and familial dissolution and custody. It was presided over by a separate court who was aware of Jackson's history. Wardrip and Otto were considered "Key Witnesses" and stated they were there in their official capacity and further disseminated confidential court record and confidential probation record information on the stand in that case without reservation or caution. Otto even attempted to admit evidence to the court, including paperwork from the confidential probation record which was immediately halted by the judge over the proceedings.

384.    The Respondent's actions were not in the scope of their positions. The information was not evidence of a criminal act. The information was also protected by an immunity letter and the confidentiality protection granted to court record information,

385.    On April 7 and 8, 2022, Jackson and his ex-wife, Jaqueline Renslow-Wiler, appeared before Judge Alexis Vazquez Dedelow regarding the custody of their child together. The hearing began by discussing Tinder's "key witness," Wardrip, may not be able to participate due to concerns of conflicting interests caused by the PCR that Miyake filed the night before. Tinder stated that if Wardrip didn't testify it would prejudice her case. Anything Wardrip could legally share could be obtained without her. Tinder was relying on confidential information not of the public record. Tinder stated Wardrip's participation was essential to assist the Court in understanding Jacksons criminal case status including probation impacts on parenting time with his child.

386.    The first witness called was York who only answered questions that were public knowledge, refusing others.

387.    Tinder called Otto to the stand. Otto showed no restraint, offered information, provided legal opinions and conclusions. Otto acknowledges that the Plea Agreement states he lacked authority over Jackson's visitation and made allegations of criminal acts by Jackson against his children. Otto's opinions were offered in his official capacity violating the Probation Code of Conduct under the "color of law" and "false authority". I.C. § 34-15-1-1 (regarding allegation; burden of proof (defamation / libal / slander); U.S. Const. amend. XIV, § 1.5.4.9 (regarding burdens of proof and presumptions); I.C. § 34-47-3-4 (regarding false or inaccurate reporting of case or proceeding). Otto attempted to submit papers from the Confidential Probation Record however the Judge stopped him. Otto violated Jackson's privacy rights in violating code of conduct. Ind. Probation Standards II-F(2) (regarding code of conduct for Indiana probation officers). These standards were established under I.C. § 11-13-1-8 (regarding rules and regulations by Judicial Conference of Indiana). These violations would include "a, b, c, d, e, g, i, n, p, t, u" under this standard. This act alone falls under tort law of Intrusion upon seclusion and is held to be offensive against Jackson. Restatement (2nd) of Torts, §652(b) (regarding intrusion upon seclusion); U.S. Const. amend. I, §1.7.5.10 (regarding privacy torts and violation of privacy rights).

388.   Wardrip took the stand against the chief deputy's advice. Wardrip claimed that "the state, and when I say state, I mean myself in the capacity of a deputy prosecutor at the Lake County Prosecutor's Office, received information that caused myself as well as the chief deputy of our office concerned for the safety of the child and what might happen to the child if in fact the child was reunified with Mr. Jackson." This demonstrates the prosecution's deliberate violation of the plea agreement. Wardrip confessed to sharing the confidential information with others in her office.

389.   The disseminated information lacked any evidence or admission of guilt of any criminal act. It was misconstrued under "False Light" that it could be interpreted that Jackson had harmed and is a dangerous threat to his own children. See I.C. § 35-44.1-2-3(c) regarding false reporting; false informing; I.C. § 5-26.5-1-4.8 regarding invasion of privacy.

I.C. § 35-44.1-2-3(c) A person who reports that:(8) makes a false report that a person is dangerous (as defined in IC 35-47-14-1) knowing the report or information to be false; commits false informing causing harm (Class A misdemeanor)

I.C. § 35-47-14-1(a) For the purposes of this chapter, an individual is "dangerous" if:

(1) the individual presents an imminent risk of personal injury to the individual or

(2) It is probable that the individual will present a risk of personal injury to the individual or to another individual in the future and the individual:

(B) is the subject of documented evidence that would give rise to a reasonable belief that the individual has a propensity for violent or suicidal conduct.

Attorneys should not make extrajudicial statements about cases in which they are participating (or had participated) that will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.

390.    *Lawyer's Public Comments on Pending Matters*, Ind. Sup. Ct. Disciplinary Comm'n Op. No. 01-22, 2 (March 14, 2022), https://www.in.gov/courts/ojar/files/dc-opn-1-22.pdf,  (first citing Ind. Prof'l Conduct Rule 3.6(a); and then citing Ind. Prof'l Conduct Rule 3.8(f) (regarding special responsibilities of prosecutors)).

391.    Wardrip discussed Confidential Polygraph information with reckless abandon with individuals who have a personal interest in Jackson who could use this information to their advantage by releasing it.

> *Ethical Minefield #1 – Commenting on Inadmissible Evidence or Credibility*
>
> *Pursuant to Rule 3.6(d)(3), attorneys should not discuss the results of an individual's participation in a test or examination because such extrajudicial statements are presumed to create prejudice, and polygraph results are inadmissible at trial. Likewise, a lawyer should avoid making extrajudicial comments about a witness' credibility, as this too has substantial potential to contaminate the jury pool.*
>
> . . . .
>
> *Ethical Minefield #2 – Commenting on Prejudicial Matters Outside the Public Record*
>
> *... actions are inconsistent with Rule 3.6. Although Rule 3.6(b)(2) permits a lawyer to provide information contained in the public record (e.g. papers filed on a public docket), such information must be the type to "which an ordinary citizen would have lawful access." Information that is only accessible to insiders, such as agency internal investigative reports or background checks, does not fall into the safe harbor public records exception. Moreover, for a lawyer's statements to be protected under the public records exception, a lawyer may not provide information beyond quotations from or references to the contents of the public record.*

392.    Ind. Sup. Ct. Disciplinary Comm'n Op. No. 01-22, at 2-3, (first citing *In re Litz*, 721 N.E.2d 258, 259 (Ind. 1999); then citing Ind. Prof'l. Cond. R. 3.6(d)(1); then quoting *In re Brizzi*, 962 N.E.2d 1240 (Ind. 2012); and then citing *In re Brizzi*, 962 N.E.2d at 1247.

393.    Wardrip's and Otto's actions are inconsistent with Indiana Professional Conduct Rule 3.6. Otto's and Wardrip's statements in their official capacity stated their department's concerns regarding the results of the polygraph and that there was a danger in Jackson having

supervised therapy sessions with his children. Wardrip and Otto "Expressed Opinions on Guilt" to third parties violating Indiana Professional Conduct Rule 3.6 and 3.8(f) as they used inflammatory language when describing alleged crimes and the defendant while not using the precautionary presumption of innocence language. *See Litz*, 721 N.E.2d at 258; *Brizzi*, 962 N.E.2d at 1246. Prosecutors are limited to statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose. Ind. Prof'l. Cond. R. 3.8(f). Their statements have a substantial likelihood of heightening public condemnation of Jackson and thus would be prohibited.

> *Ethical Minefield #3 – Expressed Opinions on Guilt of Defendant or Suspect*
>
> *...statements are inconsistent with Rule 3.6 and 3.8(f) because Prosecutor S used inflammatory language when describing the crime and the defendant, did not specifically refer to the public record, and did not include the precautionary presumption of innocence language Prosecutors are limited to statements that are necessary to inform the public of the nature and extent of the prosecutor's action and that serve a legitimate law enforcement purpose. Therefore, the announcement that the death penalty would be sought is not problematic. However, the remaining statements have a substantial likelihood of heightening public condemnation of the accused and thus would be prohibited.*

394. Ind. Sup. Ct. Disciplinary Comm'n Op. No. 01-22, at 3-4, (first citing Ind. Prof'l. Cond. R. 3.6; then citing Ind. Prof'l. Cond. R. 3.8(f); then citing Litz, 721 N.E.2d at 258; then citing Brizzi, 962 N.E.2d at 1246; and then citing Ind. Prof'l. Cond. R. 3.8).

395. These actions impacted Jackson's family case and could be seen as affecting his civil suits as well. It potentially contaminated the jury if the cases were returned for trial.

> *Ethical Minefield #4 – Commenting on Matters Extending Beyond Exception (Adverse Publicity)*
>
> *Although Attorney Z was not involved in the investigation of Officer B's criminal matter, the Chief of Police's remarks could impact public perception of Attorney Z's pending civil suit against Officer B. Per*

*Rule 3.6(c), a responsive statement might be warranted. Nonetheless, Attorney Z's response was not directed at dispelling the assertion that Officer B had been cleared of all wrongdoing. Rather than de-escalating the impact of pretrial publicity, Attorney Z's remarks potentially further fanned the flames; therefore, the remarks are problematic under Rule 3.6.*

*Ind. Sup. Ct. Disciplinary Comm'n Op. No. 01-22, at 4, (citing Ind. Prof'l Cond. R. 3.6(c))*

396. Wardrip states why she disseminated the information. When asked about the confidentiality of the information Wardrip admits to not having access to that information. Wardrip admits disseminating the information was unprovoked but then states it was provoked by leniency letter sent by the Ad-Litum at Jackson's sentencing. Wardrip admitted to being in contact with Jackson's ex-wife's attorney prior to and following his conviction. Wardrip stated Jackson is a threat to his child solely based on his sex offender status and that she has no idea which question was "failed" in the polygraph. This shows Wardrip's motives were merely prejudicial, whose actions caused irreparably harm to Jackson and his family.

397. The Valparaiso Police Department, Porter County Department of Child Services and the Judge Dedlow over the Civil Trial case found no credible threat regarding Jackson and visitation with his children. The Porter County Probation Department, who by Plea Agreement, had the discretion over visitation stated that she would abide by any decision of the court and had already agreed to allow supervised reunification therapy regarding Jackson. Wardrip's comments invite the court to "reweigh the evidence or assess the credibility of the witnesses" regarding already evaluated complaints. *S.P.H. v. State*, 806 N.E.2d 874, 879 (Ind.Ct.App. 2004)

398. Otto's and Wardrip's actions constitute a Pattern of Racketeering Activity, I.C. § 35-45-6-1(d), including their supporting department heads, superiors and all others who have oversight and were aware of or involved in any way to the actions of the respondents are implicated in an act of conspiracy against rights as defined by I.C. § 35-32-2-4 and 18 U.S.C. § 241. Unlike most conspiracy statutes, §241 does not require, as an element, the commission of an overt act.

154

399.    Otto and Wardrip knowingly used the falsified Special Conditions of Adult Probation, provide false / inaccurate reporting of case or proceedings as defined I.C. § 34-47-3-4, including the confidential probation record information to harrass Jackson and his family outside of court. Because two departments were involved their actions qualify as a conspiracy. I.C. § 35-32-2-4. Otto and Wardrip intended to interfere with Jackson's parenting and marriage rights. U.S. Const.amend. XIV, § 1.6.3.4. (regarding family autonomy and substantive due process, family rights - interfering with marriage and parenting rights); U.S. Const. amend. XIV, § 1.5.4.9 (regarding burdens of proof and presumptions); I.C. § 35-44.1-2-2 (regarding obstruction of justice: coercion). Jackson would file grievances with both the Probation Department and the Disciplinary Commission.

## Emergency Motions and Notice to the Court

400.    On February 17, 2022, Magistrate Sullivan, through emergency motion for stay, was informed of the State's illegal dissemination to third parties. Magistrate Sullivan denied it ignoring the real threat of repeated unpunished acts as the next polygraph was scheduled for March 7, 2022. The State retaliated by filing a Petition to Revoke labeled as "2nd Petition" despite the original conviction and subsequent probation violations having been overturned. The trial court abandoned its judicial role and acted as an additional prosecutor on multiple occasions and at times the trial court allowed the prosecution to act in a judicial role.

401.    Mr. Jackson would inform York of the violation of his confidentiality, his rights, his plea agreement and immunity agreement. York would inform Jackson that she did not disseminate the information and that it was a violation as well.

402.    Mr. Jackson would request several times moving forward for York to report the violation to her supervisor and to Lake County. Mr. Jackson also asked to submit a complaint as well, but York stated that Jackson would have to do it in Lake County. Jackson would state that he had done so several times, but no luck ever came from it. Work would state that she would "Staff It" and get back to him.

155

403.    York would eventually tell Mr. Jackson that after speaking to her supervisors they decided not to file a complaint against Lake County Probations actions or the actions of Otto or Wardrip.

404.    York was aware of the custody case stating that she would follow whatever the court decided. After the results of the polygraph came back, York granted permission for Jackson to participate in reunification therapy with his youngest child. This was stated weeks prior to the Custody Hearing and in the Custody Hearing.

## Removed from Therapy

405.    Mr. Jackson would participate in the next INSOMM therapy as normal. During the session, Mr. Jackson would inform Armstrong that he would like to call him after the therapy session. Armstrong agreed.

406.    Following the session, Mr. Jackson would inform Armstrong of what had happened in Family Court and informed Armstrong that a second PCR had been filed. This conversation was recorded by Mr. Jacksons phone.

407.    Armstrong stated that he could not have Mr. Jackson in the sessions if he was challenging his conviction. Mr. Jackson voiced his concern that he would be punished again by Otto and Wardrip for not being compliant and that he wished to stay in the therapy session. Armstrong stated that he would call Jackson later and discuss it.

408.    Armstrong would call Mr. Jackson while he was in therapy with Mrs. Jackson and Broshar. Mr. Jackson would put his phone on speaker and Mrs. Jackson and Broshar were able to overhear the conversation.

409.    Armstrong stated that he was going to call York and discuss the situation with her. That if Mr. Jackson did not hear back from Armstrong or York before the next session that Mr. Jackson should assume to participate and that he had nothing to worry about. Mr. Jackson thanked Armstrong and continued his therapy. *See generally Jaffee v. Redmond*, 518 U.S. 1, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (recognizing the psychotherapist-patient privilege and noting that effective

psychotherapy depends upon confidentiality). The next therapy session was to be on April 21st, 2022.

410. A week later before the next session York would email Jackson informing him that she had removed him from Porter County Probation due to non-compliance and that he was being transferred back to Lake County.

411. Mr. Jackson would drive over to Porter County Probation and talk to York stating that it was a misunderstanding and that he would like to remain in therapy and in Porter County probation. York stated that she had already initiated the transfer and that there was nothing she could do.

412. This resulted in Mr. Jackson being removed from therapy due to having an active PCR. This triggered the Entrapment that Probation Officer Otto and Prosecutor Wardrip had caused.

413. Prior to this "Violation", Mr. Jackson had no violations or any disciplinary actions. This was even stated by his direct Probation Officer York during her testimony in the unrelated civil case a few weeks prior.

## Jailed Yet Again & Bond Denial

414. On April 21, 2022, Otto filed a Petition to Revoke Jackson's probation. Magistrate Sullivan issued an arrest warrant. Mr. Jackson was monitoring his case when he noticed a warrant had yet again been issued for his arrest. Like every other time prior, Mr. Jackson would turn himself in to the Lake County Jail.

415. Otto's Petition to Revoke stated that Jackson had been 'discharged unsatisfactorily from Project Pro.' A warrant was issued, denied bond, Jackson remained incarcerated until the conclusion of the Petition to Revoke. The evidentiary hearing wasn't scheduled until July 28, 2022 (91 days without bond violating I.C. § 35-38-2-3(d); I.C. § 35-38-2-3(f)). Jackson repeatedly requested the hearing.

157

416. While in Lake County Jail, Mr. Jackson requested a lower bunk due to his medications making him very dizzy at times and lightheaded. The bunks lack steps and ladders. This was ignored. Mr. Jackson is also just 5'5" and middle aged.

417. A few months later, Mr. Jackson, while trying to step down from his top bunk to pick up his lunch, had a dizzy spell and fell from the top of his bunk. Mr. Jacksons head arm shoulder and hip would impact the steel table and stool that was bolted to the concrete steel reinforced floor.

418. Mr. Jackson would then push the button in his cell which would be ignored for hours for help. Mr. Jackson would submit several sick call slips and then a period would go by before it would be responded too.

419. Mr. Jackson would be X-Rayed and given OTC Low Dose Pain Meds. The Doctor would tell Mr. Jackson that he needed a Cat Scan but that the Jail most likely would not approve of the diagnostic. Mr. Jackson still suffers from pain in his shoulder, muscle spasms and nerve pain as he was never treated. Future sick slips to address this issue would be ignored.

420. On June 22, 2022, an email was filed from therapist Jessica Roosevelt accepting Jackson into SOMMS Therapy. Jacob Otto would state later that he never received notice of the acceptance and then claim that he had the judicial authority to deny Mr. Jacksons acceptance into the state recognized therapy service. This is not true.

421. Mr. Jackson would speak to his PCR Attorney Brian Woodard about how the Plea Agreement was done while Mr. Jackson was in a mentally unstable state and that there where grounds to raise along with the validity of the charging documents. Mr. Jackson stressed that he wanted these arguments made. Woodward would fail to do so.

422. Mr. Jackson would do an intake over the phone in the Lake County Jail in the Pod next to all the other inmates. Mr. Jackson was worried about being too loud as he did not want the other inmates from overhearing his intake answers to Fresh Start Counseling. He would be accepted into the program and an official letter would be sent out to Mr. Jacksons family and layer.

423. Otto would be made aware of the results, who did not have authorization from Mr. Jackson to speak to the therapist yet, would contact the therapist and discuss his "views". This

would result in the denial of Mr. Jacksons acceptance into the program with the excuse that they believed Mr. Jackson was holding back or not being "completely" honest.

424.    This act by Otto would reflect his intervention with all other previous therapy services as well.

## Hearsay Reigns Supreme with Sullivan - PTR Granted

425.    On July 28, 2022, Evidentiary Hearing. PTR Granted. Otto stated during Jackson's probation to revoke hearings that Jackson was kicked out of therapy. Follow up questions showed this was not true. Otto and Prosecution would state Jackson was not permitted to return to Project Pro due to being told he was recording sessions. Otto stated that Jackson's Attorney Matthew Lawson told him that Jackson recorded the sessions. Lawson said that was not true, but Magistrate Sullivan ignored his objections.

426.    First, while a trial judge may not assume an adversarial role in any proceeding, the courts have held that the judge may intervene in the fact-finding process and question witnesses in order to promote clarity or dispel obscurity. *Fox v. State*, 497 N.E.2d 221 (1986). The purpose of allowing the judge to question witnesses is to permit the court to develop the truth or present facts which may have been overlooked by the parties. Id. As long as the questioning is conducted in an impartial manner and the defendant is not prejudiced, such questioning is within the discretion of the court. *Id.* In this case, Magistrate Sullivan directly prejudiced Jackson by preventing Lawson from disputing Otto's claiming Lawson was the source denying Jackson the right to confront and cross-examine adverse witnesses, and a neutral and detached hearing body. *See Gagnon*, 411 U.S. at 782; *Morrissey*, 408 U.S. at 489. See I.C. § 35-38-2-3(d).

427.    Though Magistrate Sullivan stated Jackson could find any therapist on the SOMM provider list, Otto stated that he had the right to deny Jackson's acceptance to the program. When questioned what granted him that authority, Otto misrepresented a line from the probation agreement that he had the authority to deny "Programs". The SOMM program is a state program. That line refers to non-standard Programs and not to Treatment Providers as that is beyond probation's authority. Magistrate Sullivan accepted Otto's claim of having this Judicial Authority.

159

428.    The right to select treatment provider is protected by constitutional rights and legal principles. Probationers have the right to choose their treatment providers and courts do not involve themselves in this selection unless there exists concerning factors such as the probationer's needs, the program's effectiveness, and public safety.

429.    The Indiana SOMM program was created / approved by the State. Liberty Behavioral Health Corporation handles treatment regulations and policies for Probationers, Parolees, and the Indiana Department of Corrections. Lawson submitted a phone recording between Jackson and the service provider to refute the claims by Otto, but Magistrate Sullivan treated it with indifference and did not admit or listen to it. The result was revocation of probation based on contested unverified hearsay evidence by Otto. The Call recording / transcripts contradicts Otto's claims.

430.    On August 10, 2022, Lake County Community Corrections evaluated Jackson for work release. They informed Jackson that he qualified. However later Otto would speak with them, and their decision changed.

431.    Otto, when speaking to LCCC, misconstrued Jackson's behavior while under his supervision caused by his mental illnesses under a "False Light", see I.C. § 35-44.1-2-3(c) (referring to false reporting; false informing) to keep him from being accepted into programs. I.C. § 5-26.5-1-4.8; 42 U.S.C. § 12101; Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 *et. seq.* (1990). *See* 45 CFR § 84; 45 CFR § 85; 29 U.S.C. § 794.

432.    Otto's and Wardrip's departments receive federal grants which have non-discrimination requirements, including for people with disabilities and criminal history. 29 U.S.C. § 794. Jackson was continuously discriminated against and denied entry into the programs including two offender therapy programs and Kimbrough (LCCC) though the actions done by Otto supported by the prosecutors office. The local agencies receive federal financial assistance, and thus are subject to Title VI. *See, Graves v. Methodist Youth Services, Inc.*, 624 F. Supp. 429 (N.D. Ill. 1985). Jackson's probation was revoked and initiated an appeal.

# Denial of 2nd PCR

433. During Jackson's 2nd Post Conviction Relief Petitions hearing, the prosecutor falsely informed the court that the violation of the plea agreement regarding the 10-year registration was due to the Porter County Sheriff's Department. The Prosecutor stated that they were informed that the Porter County Sheriff's Department Website and Registry Section was the official list. No other evidence was provided to support this claim.

434. However, as per the offender registration notice provided to the department of corrections, the information entered the sex offender registry was from the state registration department themselves. Jackson has also endured malicious prosecution, harassment and conspiracy by Lake County Probation, acting outside of their scope of duty by releasing unrequested confidential Probation Records violating the Indiana Rules of Court Rules on Access to Court Records and disseminating them to third parties in a malicious attempt to interfere with unrelated Civil Case involving Jackson. By releasing the Confidential Probation Records, Lake County Prosecution and Lake County Probation violated the Court-Offered Immunity Agreement.

435. October 4, 2022, Order in the PCR.

436. January 27 2023, PCR Atty Brian Woodword filed Proposed Findings of Facts and Conclusions.

437. February 27, 2023, Court Order – Findings of Facts and Conclusions Denying Mr. Jacksons PCR.

438. May 17, 2023, (22A-CR-2693) The Court of appeals "affirm(ed) the judgment of the trial court in part, reverse in part, and remand with instructions." Indicating that Magistrate Sullivan had erred and ordered the trial court "reverse its order that he serve the entirety of his suspended sentence, and remand for the trial court—exercising its discretion—to determine the appropriate sanction."

439. Jackson served his sentence at New Castle Correctional Facility. He had no disciplinary records from his time at New Castle (nor Lake County Jail or the RDC) and was released on June 22, 2023, on parole with an ankle monitor. Jackson has been 100% compliant on parole which concludes June 18, 2024.

440. On August 10, 2023, the court held a resentencing hearing for the PTR, Magistrate Sullivan affirmed her sentence and voiced disagreement with the Appeals Court ruling.

## PCR APPEAL

441.    Mr. Jacksons PCR Appeal would be denied stating simply that Mr. Jackson just had to be patient. They did not address any issues raised.

442.    Mr. Jackson also requested that due to manifest injustice that the PCR appeal and Appeal on the Indirect Criminal Contempt which highlighted some of the issues and new information since would support arguments. This was denied.

443.    Mr. Jackson requested that he be provided legal representation due to multiple situations including the nature of his disabilities, financial status as indigent, the complexity of the issues and matters, manifest injustice and more. Caselaw showing support was provided but never addressed. It was denied to him.

444.    Transfer to the Supreme Court was requested due to various conflicting rulings in the Appeal Decision as well as conflicts in the Indiana Supreme Court and the local Federal District Court. This was not addressed in the denial of the transfer.

## Prison

445.    Mr. Jackson was not required to participate in the INSOMM program due to his active PCR. This was confirmed by the staff and no action was taken against Mr. Jackson as such an assignment would have been automatic. When Mr. Jackson noticed that he was not signed up for the programs he reached out to make sure he was compliant, and they informed him that he had an automatic exemption to INSOMMS due to his active PCR. This conflicts with the Magistrates and States positions that sent him to Prison.

446.    While serving time New Castle, Mr. Jacksons good time credit would be delayed due to failings of the officer in charge of submitting timely evaluations. This was addressed multiple times by Mr. Jackson through grievances.

447.    Mr. Jackson also requested by statute that he became eligible for transfer to Work Release and filled out the requests and filed proper motions. It would not be responded too in time

by Magistrate Sullivan until after the window for opportunity had passed. Mr. Jackson feels this was deliberately done.

448. Normally prisoners would receive their tablets within the first week. Mr. Jackson received a broken one which was returned within minutes of receiving it as it did not turn on. New Castle would not provide Mr. Jackson with a tablet that all the other inmates had to communicate with family and access to legal resources to work on his active appeals and cases for months.

449. New Castle would not allow Mr. Jackson to have visitation with his children. This would include over the phone, video or in person. This is a violation to Mr. Jacksons constitutional rights and caused detrimental harm to him and his family. Mr. Jackson had even submitted requests for reconsideration in this matter and it would be denied. Mr. Jackson still has the paperwork.

450. New Castle would not provide Mr. Jackson with the requested medications, nor would they offer any psychological treatment. No therapists or mental health professionals were available to treat mental health issues.

451. Mr. Jackson's diet provided by the Prison would cause elevated dangerous levels of certain lab results. This includes Mr. Jacksons triglycerides. The Prison knowing about Mr. Jacksons medical needs was unable to accommodate these issues.

452. The Prison would go extended days without water for showers and would not provide adequate drinking water during those times. The Prison would also turn off the phones and video chat systems when issues like this would happen to prevent information from being let out,

453. Mr. Jackson would be informed of his Lifetime Registration requirement and would put in requests and grievances to correct the Lifetime Registration. These were never corrected.

454. Mr. Jackson was told that the Prison had him as not having an education and would not allow him to participate in jobs or programs. Mr. Jackson would wright to classifications and educational services who would not correct the issue.

455. Due to the distance of travel that Mr. Jacksons family had to do to visit, Mr. Jackson qualified for extended visitation hours. Mr. Jackson would put in requests as he qualified for such services, all of which would be denied.

456.    Mr. Jackson would be given a GPS monitor prior to being released without any determination as to the necessity of such a device. Mr. Jacksons history shows he was not a flight risk and had no priors.

457.    Mr. Jackson would successfully complete his Prison sentence with no violations or any disciplinary actions.

# Parole

458.    While out on Parole Mr. Jackson was told by his Parole Officer that Probation had incorrectly applied Mr. Jacksons threat level and had adjusted it to the minimal level. This further proves that Lake County Officers were wrong.

459.    Mr. Jackson would also be told by Parol that he could not participate in the Offender Therapy as he had active PCR, and this was confirmed by the same therapist Kevin Malloy whose report stated as such. This again confirmed Mr. Jacksons previous held statements and shows that the Probation Office lied to the court.

460.    Mr. Jackson's Parole Restrictions however did violate Mr. Jacksons constitutional rights including not allowing him to see or talk to his children. Mr. Jackson was told that he was able to have sexual relations with his wife, however.

461.    A condition of Parole did include the further illegal use of the Covenant Eyes software. Covenant Eyes was made aware of this and was told that Parol was not authorized to use the software for monitoring.

462.    Parole did however during Halloween night order ALL supervised registered offenders to appear for a 4-6 hour meeting at DOC Prison facility for a meeting. This was false. This meeting was not a meeting at all. It was an illegal detention in violation of Mr. Jacksons rights and contradicts the idea of Good Time Credits that were earned. Mr. Jackson, along with the others, would be locked in the basement of a DOC prison during this time. Told to sit in chairs and simply to wait until the end of the hours for trick or treating. Participation was mandatory. If anyone failed to show up, they would be in violation of parole and would be arrested.

463.    Mr. Jackson has several medical conditions which the side effects of the condition of the medications would result in Mr. Jacksons limbs from swelling up. Mr. Jackson would complain about the GPS monitor both regarding the necessity of it but also that at times would restrict his body fluids and blood flow. Mr. Jackson would take pictures showing his leg swollen and the band restricting his circulation. Mr. Jacksons Parol Officer would put in paperwork asking for it to be removed but would be denied.

464.    Mr. Jackson would successfully complete his Parole with no violations or any disciplinary actions.

## Filed Notices and PCR 3

465.    October 17, 2023, Mr. Jackson filed an Affidavit under Cause 45G02-2204-PC-000010.

466.    On December 28, 2023, Mr. Jackson filed a Petition for Successive Post-Conviction Relief to address issues with council, states actions and inactions and issues with the PTR. This would be denied as premature on February 1, 2024.

467.    December 28, 2023, Mr. Jackson filed a Breach of Contract Notice Letter in Cause 45G02-2204-PC-000010 and a grievance and Breach of Contract Notice, which Magistrate Sullivan refused for filing January 2, 2024.

468.    January 3, 2024, Mr. and Mrs. Jackson filed Grievance under 45G02-2204-PC-000010.

469.    January 5, 2024, David and Nickole Jackson filed a related complaint under cause: 2:24-cv-00009. The complaints are part of the same continuing conspiracy and Monell should be merged and treated as an updated complaint.

## Indirect Criminal Contempt - Round 1

470.    On January 5th, 2024, Jackson filed Motion to Show Cause - Indirect Contempt of Court which would allow his claims to be heard by the State itself and by a Special disinterested judge under cause 45G02-1803-F4-000011, 45G02-1803-F4-000009, 45G02-1803-F3-000011. Magistrate Sullivan's actions prevented this.

165

471.    As in *Antelope,* 395 F.3d, Jackson's case history reads like a never-ending loop tape: he asserts his constitutional rights, the court advises him that surely his statements will be confidential but that he must comply with what he views as a violation of his constitutional rights, in the initial conviction he asserts his rights, his release is revoked, and Jackson ends up incarcerated. All grievances are ignored, and the motion for Indirect Criminal Contempt is denied though uncontestable facts and evidence were provided.

472.    As stated in *Antelope,* 395 F.3d at 1133, "[i]Indeed, it is difficult to imagine a more paradigmatic "injury in fact" than actual incarceration." It is easy to conclude that Jackson's Fifth Amendment claim is ripe for review. As in *Antelope,* Jackson contends that the Fifth Amendment restrains the government from forcing him to admit prior wrongdoing unless his statements are protected by use and derivative use immunity in accordance with *Kastigar v. United States,* 406 U.S. 441 (1972). Whether there is merit to Jackson's argument is a legal matter, which the higher courts decide without deference to the judgment of the lower courts. *See United States v. Rubio-Topete,* 999 F.2d 1334, 1338 (9th Cir. 1993).

473.    The analysis in well-settled principles, starting with the Constitution: The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This right remains available to Antelope despite his conviction. *See Minnesota v. Murphy,* 465 U.S. 420, 426 (1984) ("A defendant does not lose this protection by reason of his conviction of a crime. . . ."); cf. *McKune v. Lile,* 536 U.S. 24, 48-54, (2002) (O'Connor, J., concurring in 4-1-4 decision) (applying the full-blown Fifth Amendment analysis to a prisoner's claim that the prison's requirement that he participate in a sex offender treatment program violated his constitutional right).

474.    This exact scenery was addressed by the 7th circuit court which foresaw the very actions done here by Indiana Prosecutors.

> As INSOMM stresses to its participants throughout the program, they enjoy neither immunity nor confidentiality for any of the disclosures they make at any stage. Moreover, participation is an all-or-nothing affair: inmates may not opt out of any part of the program, and they are required to respond fully to all questions asked. A counselor who suspects that a participant has been either deceptive or less than forthcoming has the discretion to order polygraph testing. Such an order triggers a requirement for the

participant to fill out a detailed Polygraph Sex History Questionnaire. A participant is excused from admitting responsibility for an offense only if the polygraph examination indicates no deception and the counselors agree that the participant is being truthful.

. . . .

But the Fifth Amendment draws one sharp line in the sand: no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V (emphasis added).

. . . .

In an action brought by a class led by Donald Lacy, an inmate subject to INSOMM, the district court ruled that Indiana's system as currently operated impermissibly compels self-incrimination and must be revised. We affirm.

. . . .

Truthful and complete answers to questions such as these—and there are many, many more—are highly pertinent to crimes beyond those of conviction. The odds that some participants would be investigated and successfully prosecuted for past uncharged crimes are high. The required disclosures could provide enough detail to kickstart a brand-new investigation. (By the time the state knows the victim's first name, age, and relationship to the offender, as well as when and where the abuse took place, it often will require little outside investigation to complete the story.) INSOMM disclosures might advance or substantiate an ongoing investigation or one that was halted for lack of evidence. In current or potential prosecutions, disclosures from INSOMM could confirm identity or modus operandi. FED. R. EVID. 404(b)(2). And when the questions require an admission of responsibility for the crime of conviction rather than for an uncharged crime, a participant who pleaded not guilty and testified in his own defense could be exposed to perjury charges. In short, when Indiana requires inmates to describe all of their past sexual offenses in minute detail, the risks of self-incrimination are far from "remote" or "speculative." They are self-evident.

Indiana's arguments to the contrary are unpersuasive. It places great weight on the fact that "[p]articipants are not required to identify their victims or specific dates of the sexual activity" and that they "are specifically advised not to provide identifying information." But that general statement collides with the specific command to provide highly detailed questions about each incident of past sexual abuse, omitting only the date and the victim's last name (or even full name). The required details easily raise a significant risk of incrimination. The state has not explained how it is possible to answer these more specific questions—such as the age

of the victim and the victim's relationship to the participant—while taking advantage of the general admonishment to avoid "identifying information." Ignoring the actual questions, the state insists that the disclosures are at such a high level of generality that they "could not support a link in the chain sufficient to support an investigation or even admission at trial."

Saying so does not make it so. This ipse dixit does not explain why granular descriptions of the circumstances surrounding specific sex crimes and patterns of criminal sexual behavior would prove useless to investigators or prosecutors. The Fifth Amendment "protects against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." The questions posed to an INSOMM participant would yield answers that any competent sex-crimes investigator or prosecutor would love to have.

Indiana also stresses that "no prosecutions have been initiated as a result of the INSOMM program." But this fact—assuming it is true—is not determinative. It is not the case that "a witness' constitutional privilege against self-incrimination depends upon a judge's prediction of the likelihood of prosecution. Rather, it is only where there is but a fanciful possibility of prosecution that a claim of fifth amendment privilege is not well taken."

Indeed, in its reply brief the state all but concedes that the necessary level of risk is present. It admits there that the possibility of prosecution is anything but "fanciful." It does so in the course of explaining why INSOMM does not provide immunity for its participants. Offenders, the state insists, must feel the risk of prosecution for the program to achieve its therapeutic goals. "Immunity is not an option. If prisoners know they will never be prosecuted for past offenses, they may be led to believe that society does not consider their crimes to be serious." No one says that the state is obliged to grant immunity, of course; Lile holds otherwise. But the state's recognition that the disclosures run enough risk of self-incrimination that a prisoner might want immunity is telling. It seems to us that the state is trying to have it both ways: on the one hand, it wants us to believe that the rehabilitative purpose of INSOMM depends on the disclosures' carrying a meaningful risk of prosecution; but on the other hand, it maintains that this risk is too remote to implicate the Fifth Amendment. Our own independent assessment of the program convinces us that the disclosures do give rise to a real and appreciable risk of prosecution."

475.    *Lacy v. Butts*, 922 F.3d 371, 371-377 (7th Cir. 2019) (first citing *Zicarelli v. N.J. State Comm'n of Investigation*, 406 U.S. 472, 478 (1972); then quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972) (emphasis added); then quoting *In re Folding Carton Antitrust Litigation*, 609 F.2d 867, 871 (7th Cir. 1979) (emphasis added); and then citing *McKune v. Lile*, 536 U.S. 24, 27 (2002)).

476.    Jackson cannot be mandated to obey these special conditions given,

> [i]t is true that Ind. Code§ 35-38-2-1(a) requires that when a court places a person on probation, the court "shall . . . specify in the record the conditions of probation." The intent of this statutory requirement is "to provide a defendant with prospective notice of the standard of conduct required of him or her while on probation and to prohibit the imposition of additional conditions after sentencing."

477.    *Bowles v. State*, Court of Appeals Case No. 06A05-1702-CR-411 (Ind. App. Oct. 4, 2017) (first citing *Ratliff v. State*, 546 N.E.2d 309, 311 (Ind. Ct. App. 1989) (noting that I.C. § 35-38-2-1(a) "imposes upon the sentencing court a duty to specify the conditions of probation in the record at the time it places a defendant on probation")); and then quoting *Atkins v. State*, 546 N.E.2d 863, 865 (Ind. Ct. App. 1989).

478.    The court records, including those in Probation, show that Jackson's sentencing was 3 days prior to him meeting Otto. Even with Otto backdating the special conditions of probation form, no prospective notice was given to Jackson regarding these conditions at the time of his sentencing. Therefore, the additional conditions Otto imposed onto Jackson after his sentencing cannot be valid conditions of probation. This is further support by *Freije v. State*, 709 N.E.2d 323, 325 (Ind. 1999), noting "the 'special' or 'additional' conditions must be checked off by the judge." Otto's signature on the probation conditions form does not fulfill the requirement of the sentencing judge acknowledging and checking each additional condition.

479.    On January 10th, 2024, Sullivan issued an order, ordering the Respondents to reply to Mr. Jacksons Motion. It did not establish a date for an evidentiary On January 24, 2024, The State replied to the Motion of Contempt / Rule to Show Cause.

480.    On January 24, 2024, Jackson replied to the Stated Response.

481.    On January 25, 2024, Magistrate Sullivan denied Mr. Jacksons Rule to Show Cause motion through summary judgement. No evidentiary hearing was held denying Mr. Jacksons his constitutional right for due process, redress, to be represented by the state in a fair unbiased court.

482.    On January 25, 2024, Jackson filed a motion for Reconsider.

483.    On January 26, 2024, Magistrate Sullivan denied the Motion. Jackson filed Affidavit of Judicial Bias, Notice of Appeal, Motion to Proceed on Appeal In Forma Pauperis.

484.    On February 1, 2024, the Court of Appeals issued an order denying successive post-conviction appeal as untimely under Cause 23A-SP-03128.

485.    On February 27, 2024, Order Denying Petition for Post Conviction Relief.

486.    On February 29, 2024, the Court of Appeals returned their memorandum on the appeal of Jackson's Post Conviction Relief Petition (23A-PC-00583).

487.    On January 30, 2024, Jacksons Notice of Appeal was received and filed, the Trial Court issued an order allowing petitioner to proceed forma pauperis and ordered transcripts.

488.    On February 26, 2024, Notice of Completion of Clerk's Record was filed.

489.    On February 27, 2024, Notice of Completion of Clerk's Record AMENDED was filed.

490.    Magistrate Sullivan violated proper procedures and performed an unlawful summary judgement. When addressed by Jackson, Magistrate Sullivan confirmed her original order. Both orders lacked findings of facts or conclusions of law, lacked an evidentiary hearing, lacked prosecution by the State, and lacked the appointment of a special disinterested judge.

491.    The policies and procedure for indirect criminal contempt per Indiana court operations and closures, *see* Indiana Office of Court Services, *Indiana Contempt Procedure*, Indiana State Gov., https://www.in.gov/courts/iocs/files/pubs-contempt-procedure-benchcard.pdf (Jan. 1, 2024), is as follows:

> *The characteristics of criminal contempt are deemed (1) willfulness,*
> *(2) deliberate intention to either, see Hancz v. City of South Bend,*
> *691 N.E.2d 1322 (Ind. Ct. App. 1998), (2a) disobey or interfere with*
> *the process of lawful order, (2b) influencing, intimidation or injuring*
> *a witness, or 2c. providing a false or inaccurate report of a case, e.g.,*
> *McCormack v. Lemond, 274 Ind. 505, 413 N.E.2d 228 (1980); In re*
> *Contempt of McLaren, 850 N.E.2d 400 (Ind. 2006); In re Contempt*
> *of Fox, 796 N.E.2d 1186 (Ind. 2003), and (3) conduct occurs outside*

the judge's presence, or the judge's knowledge of the incident is not first-hand or immediate, *In re Nasser*, 644 N.E.2d 93 (Ind. 1994). The associated procedures include: (1) a new, separate cause of miscellaneous criminal action. (2) the action is prosecuted in name of the state, *Allison v. State*, 187 N.E.2d 565, 570 (Ind. 1963); *In re Crumpacker*, 431 N.E.2d 91 (Ind. 1982). (3) rule to show cause is required. (4) The appointment of a special judge is required. see I.C. § 34-47-3-7; *Davidson v. State*, 836 N.E.2d 1018 (Ind. Ct. App. 2005). (5) The following elements of due process are required: (5a) service of rule to show cause and order to appear, *Peterson v. State*, 468 N.E.2d 556, 558 n.1 (Ind. Ct. App. 1984); see I.C. § 34-47-3-5; (5b) representation by counsel, *Cooke v. United States*, 267 U.S. 517 (1925); (5c) rights advisement; (5d) when indigent, court-appointed counsel; (5e) A sentence exceeding six months invokes the right to trial by jury, *Holly v. State*, 681 N.E.2d 1176 (Ind. Ct. App. 1997) (citing *Codispoti v. Pennsylvania*, 418 U.S. 506, 511, 94 S. Ct. 2687, 2691, 41 L.Ed.2d 912 (1974) and *Cheff v. Schnackenberg*, 384 U.S. 373, 380, 86 S. Ct. 1523, 1526, 16 L.Ed.2d 629 (1966). (6) The standard of proof is that evidence must show that contemnor acted with willful and intentional disobedience. *Jones v. State*, 847 N.E.2d 190, 199 (Ind. Ct. App. 2006). (7) Per I.C. § 34-47-3-6, the defendant is: (7a) required to answer rule to show cause, and (7b) if the defendant fails to appear or refuses to answer, trial court may proceed to attach and punish the defendant for contempt. (8) Defenses include: (8a) inadequate notice as to facts constituting contempt, *Showalter v. Brubaker*, 650 N.E.2d 693, 701 (Ind. Ct. App. 1995); (8b) inability to obey (burden of proof is on the defendant), *State ex rel. Thrasher v. Hayes*, 177 Ind. App. 196, 204, 378 N.E.2d 924, 929 (1978); *Thomas v. Woollen*, 255 Ind. 612, 614, 266 N.E.2d

*20, 22 (1971); and (8c) inability to pay (burden of proof is on the defendant), Smith v. Indiana State Bd. of Health, 158 Ind. App. 445, 303 N.E.2d 50 (1973). (9) Sanctions associated with indirect criminal contempt are (9a) a fine; (9b) imprisonment, State v. Hetzel, 552 N.E. 2d 31, 34 (Ind. 1990); see also Warr v. State, 877 N.E. 2d 817 (Ind. Ct. App. 2007); Rice v. State, 874 N.E. 2d 988 (Inc. Ct. App. 2007); (9c) a fine and imprisonment; and 9d. reasonable sanctions at the judge's discretion.*

492. David Jackson provided credible evidence showing that the respondents, Jacob Otto, and Nadia Wardrip and their departments committed illegal acts against him and the court. This included copies of three email chains that involved third parties and Wardrip from her official email address.

493. No hearing was set. I.C. § 34-47-3-5. Magistrate Sullivan's dismissal of Jackson's Motion to Show Cause and Motion for Indirect Criminal Contempt without a hearing violated Jackson's due process rights and constituted an abuse of discretion and provided no findings of the court against Ind. R. Trial. P.52 (findings by the court).

494. A party who has been injured or damaged by the failure of another to conform to a court order may seek a finding of contempt. Cowart v. White, 711 N.E.2d 523, 530 (Ind. 1999).

495. The Motion for Indirect Criminal Contempt of Court - Rule to Show Cause, the Lake County Prosecutor's Office had a duty to identify and address the clear conflict of interest in this matter. Ind. Prof'l. Cond. R. 1.7. They failed to do so, which allowed a clear appearance of impropriety. Magistrate Sullivan and the departments receiving Jackson's various complaints / grievances failed to inform him of his victim rights. I.C. § 35-40-5-9.

496. The action was not prosecuted in the name of the State by a Special Prosecutor as required by statute due to conflicts of interest. The requirement of a special prosecutor and special judge exists to ensure that neither party would be prejudiced by possible bias or conflicts of interest.

497. In the Respondent's reply to the Rule to Show Cause, the Respondents admitted the dissemination but claim since it was not a physical file the respondents did not violate any rules or

laws. Respondents only addressed the Prosecutor acts and not Probation's. It failed to address all other claims and stated several "False Light" statements as fact. *See* I.C. § 35-44.1-2-3(c) (regarding false reporting; false informing; I.C. § 5-26.5-1-4.8 (regarding invasion of privacy)

498.    Some limited aspects of what must be proven for a "false light" under I.C. § 5-26.5-1-4.8. The plaintiff must prove that you have said something false. *Near East Side Cmty. Org. v. Hair*, 555 N.E.2d 1324, 1335 (Ind. Ct. App. 1990). It is also clear that the false statement must identify the plaintiff. *E.g., Furno v. Citizens Ins. Co. of Am.*, 590 N.E.2d 1137 (Ind. Ct. App. 1992); *Mavity v. Tyndall*, 66 N.E.2d 755 (Ind. 1946).

499.    Respondent's reply was evasive, provided no evidence refuting claims, stated Prosecutors lack influence or authority to correct / adhere to the plea agreement and claimed Jackson was responsible to correct any errors made enforcing the plea agreement. Jackson filed a Motion to Reconsider, stating the Magistrate offered no findings of facts or conclusions of law. Magistrate Sullivan replied to Jackson's motion again without offering any findings of facts or conclusions of law other than to state that she reviewed the motions in the matter and dismissed the action.

500.    The proceedings failed to follow State guidelines, denied Jackson's rights of redress, denied representation by the State, denied his right to due process. Magistrate Sullivan's actions can be seen as an Obstruction to Justice and biased. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U. S133, 137 (1955).

501.    Judges and Magistrates as administrators over court records and the officers under their supervision failed in their duty to investigate, failed to report, failed to intervene, failed due process requirements, and failed the sanctity of the Legal System as a whole. See I.C. § 11-13-1-8. Under I.C. § 11-13-1-8 (3) referred to protection of probation records and disclosure of information contained in those records. Under I.C. § 11-13-1-8 (h)(2) refers to record keeping practices.

502.    The denial of Jackson's Sixth Amendment right to have the Assistance of Counsel for his defense means he has been left to fend for himself. In *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963), the Supreme Court held "lawyers in criminal courts are necessities, not luxuries," and yet in this process he has been denied this necessity. The state on numerous occasions has openly mocked his attempts as nonsensical and incoherent

173

503. Angela J. Brown has provided the court through testimonial evidence three different conflicting statements that further support Mr. Jacksons claims that of the States deliberate failure to correct the registry per the plea agreement but has repeatedly committed perjury to the court which the court has let go perceivably unnoticed and unchallenged by the court.

## The FBI, DOJ, Police, State Police, Disciplinary Boards, Etc.

504. On April 5, 2024, Mr. Jackson received a callback regarding a complaint he placed with the Indiana State Police. Mr. Jackson informed the Indiana State Police about the actions of Otto and Wardrip. The Officer, Mike Bailey, would state that Mr. Jackson should contact the Crown Point Police. Mr. Jackson would inform Bailey that he had contacted the Crown Point Police Department twice to place reports and was told that someone would call him back so that he could place a report and they failed to do so.

505. Bailey would point out that he was familiar with Wardrip and the work that she does and inquired if Mr. Jackson was an offender. Jackson stated he is contesting his convictions but that he was currently on the offender list.

506. Bailey would state that he would have to talk to his superiors, but he doubted that they could do anything due to it being the Prosecutors office. Jackson stated that these acts were done outside of the court and after a conviction and that they did not legally have authority to access disseminate the records.

507. Bailey would tell Mr. Jackson to write him an email detailing the complaint. Mr. Jackson did so immediately at the conclusion of the call.

508. On April 10, 2024, having not heard back from Bailey, Mr. Jackson would then send a follow up email with law enforcement policies addressing his complaint showing that they are enforceable.

509. Bailey would reply stating that a lot of the conduct violates Federal regulations and laws and that they should be addressed by a Federal Agency. And by the disciplinary commissions.

510.    Mr. Jackson would reply stating that the boards had already denied Mr. Jacksons claims and pointed out that Wardrip's supervisor sits on the board as well. Jackson also points out that Police can enforce both state and federal laws and not all of the claims were federal.

511.    Bailey would reply stating that outside of permission from a disciplinary board or a state prosecutor of jurisdiction that the Indiana State Police can take no action. Jackson would reply asking why which would be ignored.

512.    On April 18, 2024, Mr. Jackson would call the FBI at (317) 595 4000. He spent 40 minutes and 21 seconds on that call that day. Most of which he was on hold. Mr. Jackson would call the Department of Justice Main Switchboard Number: (202) 514-2000 four separate times this day as well. Every time Mr. Jackson would tell the Operator that he wished to file a complaint and seek investigation into illegal criminal activities done by state officials. He would get most of the way through the complaint until the Operator discovered Mr. Jackson was a registered offender. This would result in an immediate hang-up nearly every call. The one time that did not result in a hang-up, Mr. Jackson was told that if the FBI decided to move forward that they would contact him. This never happened.

513.    On April 18, 2024, Mr. Jackson felt that he was being blocked from making his report, so he tried to find a direct email to Herb Stapleton or Christopher Wray without success. So, Mr. Jackson found Stapleton on LinkedIn and contacted him through there.  Mr. Jackson uploaded the evidence and his complaint in detail, this also included Mr. Jackson's troubles when making the report over the phone. This communication was received and even confirmed as "Viewed" according to LinkedIn Messenger. But Mr. Jackson would not receive a reply or any correspondence.

514.    Mr. Jackson also sent a copy of the complaint to Stapletons personal email address at stapleton191@hotmail.com.  This was also ignored by Stapleton.

515.    Mr. Jackson received a copy of the States Notice filed under cause: 45G02-2204-PC-000010 via USPS mail a few days ago along with a copy of the court's order of July 1, 2024, issued by Magistrate Sullivan. If the court would notice that a lot of the correspondence from that

cause is being sent to the New Castle Prison and being returned as undelivered. A change of address has already been submitted to correct the record even though Mr. Jackson had been filing all motions with the correct address and has informed the Clerk in person and over the phone as to the current address in which he resides to have the issue corrected unsuccessfully.

516. The three conflicting positions are:

a. During the Post Conviction Relief Hearing the Prosecutor stated that the Prosecutors Office spoke with DOC who stated that the problem was not with them. Then stated that the problem was due to the Porter County Sheriffs office and that their registration list was not the official list.

b. Lake County Prosecutor, through a filed statement on January 23, 2024, stated on the record:

*12. Finally, the defendant states in his motion that he is still required "to Register for Lifetime instead of the 10 years as promised by the 1st and 2nd plea deal." In its Findings of Fact and Conclusions of Law, "the Court ordered the Lake County Clerk to send a copy of the November 2021 plea and agreement with Stipulated Factual Basis to Larry Sheets, Porter County Registration Coordinator, to correct the Porter County Sexual Offender website to reflect that Jackson was required to register for ten (10) years." It should be noted that the Prosecutor's Office has no control, authority, or influence over the DOC Registration Coordinator. As an alternative, and as stated on the record at the hearing of the Petition for Post-Conviction Relief in October 2022, the defendant should follow the complaint/appeal process that the DOC Sex Offender Registration Division has laid out on its website.*

c. However, following Mr. Jacksons completion of his State Level Appeal and the resuming of the stayed federal Habeas Corpus, Magistrate Sullivan ordered that same Deputy Prosecutor to contact the Sherriff's department to correct the error 2 years following the original order. This led to the same Deputy Prosecutor to not only

176

contacting the Sherriff but also on her own to reach out to the Department of Corrections who then immediately corrected the issue. Mr. Jackson states that this verifies that not only did the Deputy Prosecutor knowingly lie to the court both Mr. Jackson's Post Conviction Relief evidentiary hearing when she stated that:

i. The Sherriff had the authority to correct the issue which was false.

ii. The Sherriff Registry Website was not the official website which was false.

iii. The Department of Corrections stated that the problem was not on their end, which was false.

iv. That they had spoken to the Department of Corrections which was false.

517. The latest filing clearly states that the Prosecutor did not talk to the Department of Corrections as they were not aware of any change. If the Prosecutor had taken a little time and effort to abide by the agreement, then all of this could have been prevented years ago. But it shows that the Prosecutor committed multiple instances of perjury, always had the ability to correct the problem if they so choose too and their inaction had been completely deliberate.

518. The response to the Magistrates order to have it corrected following the state appellate process regarding the Department of Corrections response contradicts the Deputy Prosecutors multiple previous testimonial statements both in court and through motions. Not only was this a prejudicial delay but a deliberate showing that the State knowingly and intentionally failed to correct the issue, but they had knowingly perjured themselves to the court repeatedly. The response also tries to establish through inference that Mr. Jackson did not himself reach out to the Department of Corrections while in the custody of New Castle Correctional Facility through the Appeals process that was ignored.

519. On July 22, 2024, Mr. Jackson then received a letter which states that the Department of Corrections is correcting the listing but then the Porter County Sherriff's department via Captain Larry W. Sheets states that Mr. Jackson had not, according to their records updated his registered address since June 23, 2024. This is false and a misrepresentation of facts. That would have meant that Mr. Jackson failed to abide by law and fulfill his yearly registration requirement as well as updated the registration with his new address when he moved back in with his wife following the completion of his parole in which case a warrant would have been issued for his

177

arrest. Mr. Jackson not only has a copy of the registration receipt but also shortly following that registration a Porter County Sherriff's officer showed up to Mr. Jackson residence at which he currently resides to confirm that he did in fact update the registry. Captain Sheets states that the DOC corrected the error only in part as in the correspondence it states that Mr. Jackson is still listed as a Serious Sex Offender instead of Sex Offender.

520.    There is a vast difference in the distinctions. Namely that Mr. Jackson is unable to attend, participate or set foot on any school property. In the letter from the Prosecutor, it states that Mr. Jackson would have to sign the correction to make it go into effect. Mr. Jackson states that the registration is not correct and worries that by signing a false \ incomplete correction would take another 3 years to correct the rest of it or to be considered waiving his rights.

521.    This distinction prevents Mr. Jackson from being able attend or take an active role not only as a parent for both of his children but as the primary caretaker of his youngest child. Mr. Jackson has been verbally adamant on the record that he would not have agreed to such a distinction. It also clearly is in contradiction to the plea agreement which states register as a "Sex Offender for 10 years" not a "Serious Sex Offender" which are not the same. Mr. Jackson holds that this is an established behavior done by the State in their attempts to deprive unlawfully Mr. Jackson of his constitutional right without due process of law of his parenting rights. Such a deprovision of right must be done on an individual basis and use of evidence-based tools and decisions to be mandatory.

522.    This same belief is what allowed the Lake County Prosecutor and Lake County Probation Office to illegally disseminate confidential probation record information in a federal level crime of conspiracy to deprivation of constitutional rights.

523.    On May 6, 2024, regarding Court Reporter Jan Shrader, Mr. Jackson requested that transcripts be provided to him to be used for his appeals and habeas corpus petition. The motion was granted, and a due date was set for June 20, 2024.

524.    Mr. Jackson reached out to Jan Shrader as he is representing himself Pro Se and asked about other dates and the format in which he will receive the copies in. Mr. Jackson requested that they be in searchable PDF format, if possible, to allow easy storage and searchability to aid in his preparation process. Mrs. Shrader replied to Mr. Jacksons email stating

that the judge would have to approve it, refused to answer any other questions other then that she can ask the court if the PDF format would be acceptable and then concluded with her wish that Mr. Jackson not contact her directly and to address all questions to the court. Mr. Jackson replied to her stating that he is Pro Se and according to multiple court officials and several state website references there is no reason why Mr. Jackson should not be able to contact the Court Reporter when he is Pro Se as any other person has the right to do through their personal lawyers. Mrs. Shrader never replied.

525.    Mrs. Shrader did not notify the court when the due date came up as to needing any extension or any notification whatsoever including failing to file the transcripts with the court.

## The Reporters Spouse

526.    On May 16, 2024, at 5:35-5:38PM, a Safelite AutoGlass van drove by the front of Mr. and Mrs. Jacksons house in which they were renting at the time. The address was 507 Oak St. FRNT, Valparaiso IN 46383. While Mr. Jackson was in the yard with two guests and Mr. and Mrs. Jacksons 7-year-old daughter, the driver yells out of the window "A Pedophile Lives There!" before driving off.

527.    A call was then made by Evalyn Miller to the Safelite Customer Care Team at 888-238-4527 which resulted in a recorded message. Then Evalyn Miller went to the Safelite website and opened up a chat to report harassments made by the Safelite driver. Evalyn was then referred to a different phone number 800-638-8958 and spoke with someone for 2 minutes and 20 seconds.

528.    During the call, Safelite stated that they have GPS tracking in their vehicles and would be able to discover who it was. After Evalyn Miller made the complaint to Safelite, the company never reached out or responded to the complaint or the parties involved.

## Sentence Served – Home Sweet Home?

529.    On June 18, 2024, Mr. Jackson's sentence was served in full, and Parole was completed without incident. Mr. Jacksons Parole Officer Agent Willians would call Mr. Jackson and congratulate him for finishing Parol and wished him luck on his life moving forward.

530.    Mr. Jackson would move back in with Mrs. Jackson and their 7-year-old daughter.

531.    Anna Hearn, the Jacksons Landlord, would be informed again that Mr. Jackson was moving back in, and he updated his registry. Hearn would change her mind about Mr. Jackson staying at the apartment and informed Mr. and Mrs. Jackson via Text Message that it violated the terms of the Lease.

532.    Mr. and Mrs. Jackson stated that Hearn had changed her mind and that she was looking at leasing one of the three apartments in the building in which the Jacksons stayed and said that the possible new tenant has kids and Hearn can't have Mr. Jackson living there.

533.    Mr. And Mrs. Jackson would start securing a new place to live.

534.    Mr. and Mrs. Jackson originally applied for this apartment back on July 9, 2020. At that time Mr. Jackson had only been arrested and out on bond with no criminal convictions. The Jacksons would be approved for the rental and put down the first and last months payment and security deposit.

535.    Mr. and Mrs. Jackson had a hard time finding a place to live due to property owners doing background checks and seeing that Mr. Jackson had been arrested and is currently facing charges. This is against the law.

536.    According to HUD, denying housing based on arrest records without convictions violates the Fair Housing Act (FHA). The FHA prohibits discrimination in housing based on protected characteristics, including race, religion, sex, and national origin. Denying housing based on arrest records can have an unjustified discriminatory effect, violating the FHA. HUD has issued guidance stating that housing providers should avoid using criminal history to screen tenants. But that has not stopped them from doing so.

537.    The guidance stresses that arrests are not the same as convictions. A housing provider that denies housing to persons on the basis of arrests not resulting in conviction cannot prove that the exclusion actually assists in protecting resident safety and/or property, said HUD.

538.    When there are applicants with convictions, landlords must still prove that a policy to exclude them is necessary and nondiscriminatory. "A housing provider that imposes a blanket prohibition on any person with any conviction record—no matter when the conviction occurred, what the underlying conduct entailed, or what the convicted person has done since then—will be unable to meet this burden."

539.    Upon doing a background check Hearn would call Mr. and Mrs. Jackson and send text messages stating that they could not be rented to based on his arrest at that time and that they needed to come back and pick up their deposit. Mr. and Mrs. Jackson, not knowing that this was illegal, showed back up and cried and tried to explain the situation.

540.    Mr. and Mrs. Jackson contacted their lawyer at the time, Cantrell who would speak to Hearn which resulted in her changing the lease to include a provision that if the tenant is placed on the registry and/or has a felony conviction that their lease would be terminated and have 30 days to move out.

541.    When Mrs. Jackson talked to Hearn both times Mr. Jackson took a plea, Hearn told Mrs. Jackson that it would be ok, and they could stay. However, due to Probation and Parole conditions, Mr. Jackson would end up not being able to stay there anyway.

542.    When Mr. Jacksons parole ended, he moved back in and updated his registration. Mr. Jackson informed Hearn of it and Hearn then a few days later would send a message to the Jacksons and their family that she is looking for a new tenant for a newly vacant spot and since they might have children that she could not have Mr. Jackson living there. This act is illegal.

543.    Mr. and Mrs. Jackson are now trying to find a new place to live.

## Notices

544.    On July 5, 2024, Mr. Jackson filed a Motion to notify the court informing the court that the order was not complied with. Instead of the court requesting reason as to why the order was not complied with the court treated the notice as a second request and granted the order a second time with a new due date of Jully 22, 2024. Again, no filing was made, and no notice, motion or request was made by Mrs. Shrader.

545.    Mr. Jackson now believes that this may be a deliberate act to further delay his appeals, civil cases and the Habeas Petition to protect the officers of the court and the illegal actions that have happened.

546.    Mr. Jackson is surprised by the lack of not only oversite by nearly every court officer but also repeated lack of discipline practiced both by administrators and officers and lack of standards not to mention the lack of accountability for every single action that has happened and stated in previous motions.

547.    On July 22, 2024, Mr. and Mrs. Jackson along with their 7-year-old daughter were returning home when they saw the same van parked at 404 Valparaiso St. Valparaiso Indiana 46383. Mr. Jackson recognized the driver who was outside of the van as the same driver who drove by and harassed Mr. Jackson, his daughter and two guests. The Safelite AutoGlass vehicle was # 19140 and the license plate number is 211 848C.  Mrs. Jackson grabbed Mr. Jacksons phone and took a picture of the vehicle.

548.    The driver was later found to be Daniel Reese. His wife, Sara Alice Reese, did a story on Mr. Jackson and the business which Mr. and Mrs. Jackson owned when the related criminal actions against Mr. Jackson initiated and most of the related follow-up stories as well.

549.    This act was done while in the employment of Safelite, during Mr. Reese's commute, in a company vehicle, during business hours and in the scope of his employment as the commute was business related. Safelite took no actions to rectify the situation with any of the individuals involved in the harassment.

## Court Reporter Failing to Report & Court Interference

550.    On July 23, 2024, due to the Pending Civil Case which names Magistrate Sullivan and Judge Bokota as defending witnesses, Mr. Jackson requested a Special Judge and Special Prosecutor to handle these motions as required in Indirect Criminal Contempt Motions and for them to be brought forth under new cause numbers as also required by state law.

551.    This motion was due to Personal Bias and Prejudice Claims made by Mr. Jackson.

552.    On July 23, 2024, Mr. Jackson requested:

a. The re-requested dates of testimony are September 16, 2021, and October 8, 2021, which have already been requested twice before but have failed to be delivered.

b. Requested Hearing Transcripts for May 5, 2018, June 25, 2018, October 6, 2018, October 13, 2018, September 28, 2018, November 2, 2018, January 10, 2019, March 19, 2019, April 23, 2019, May 31, 2019, July 12, 2019, September 20, 2019, October 18, 2019, October 25, 2019, December 13, 2019, January 31, 2020, February 18, 2021, February 24, 2021.

c. Request for Deposition Transcripts done by Attorney Adam Tavitas and Atty John Cantrel in the related cases including:

  i. Detective Robert Brazil - 2nd Deposition - August 30th, 2019

d. Request for Court Records:

  i. Order / Transcript if done in open court by Judge Clarence Murray Discovery Deadline Order

  ii. State's Answer to Discovery Order from April 19, 2018

## Indirect Criminal Contempt - Round 2

553. On July 23, 2024, Mr. Jackson filed a motion of Indirect Criminal Contempt against the Deputy Prosecutor for perjury based on three conflicting statements mentioned elsewhere in this filing. This motion also included Indirect Criminal Contempt against the Court Reporter Jan Shrader for failure twice to fulfill the court's order to deliver two transcripts to Mr. Jackson needed for his appeals and habeas petition.

554. This Motion was denied by Magistrate Sullivan the same day.

555. On July 23, 2024, Mr. Jackson filed a Notice regarding Registration Record Errors and a Motion for Emergency Stay of Registration Pending Habeas. This was due to an official letter stating that Mr. Jackson had not performed his yearly registration requirements for over a year, which on its own could be used by the state to initiate an arrest warrant and is a Level 6 Felony. It also included a copy of the letter stating as such as well as Mr. Jacksons copy of his completed yearly renewal and receipt of the transaction showing this to be error.

556. It also stated that the updated registration was still in error and in violation of the plea agreement regarding that the registry states Mr. Jackson is a "Serious Sex Offender" instead of a "Sex Offender". This distinction goes against the wording of the plea agreement.

557. Mr. Jackson holds that this is an established behavior done by the State in their attempts to deprive unlawfully Mr. Jackson of his constitutional right without due process of law of his parenting rights. Such a deprovision of right must be done on an individual basis and use of evidence-based tools and decisions to be mandatory.

558. Because of these continual errors and threats to Mr. Jacksons freedom, Mr. Jackson is requesting an Emergency Motion to Stay Registration Enforcement while he challenges his conviction on Habeas Corpus as the constant failures of the various State departments threaten his right to freedom and are now considered harassment.

559. The Magistrate replied that same day against all 5 of Mr. Jacksons motions.

560. On July 23, 2024, Magistrate Sullivan responded in an order the same day addressing all the motions stating:

> The defendant files pro se Change of Judge and Request
> Appointment of Special Judge, Motion of Indirect Criminal Contempt
> for Deliberate Failure to Abide by Court Order Rule to Show Cause,
> Notice to the Court of Registration Records Errors Motion for
> Emergency Stay of Registration Pending Habeas, Motion for
> Transcripts and Court Records, and Notice of Correct Address and
> Mycase Access.
> The pro se Change of Judge and Request Appointment of Special
> Judge, Motion of Indirect Criminal Contempt for Deliberate Failure to
> Abide by Court Order Rule to Show Cause, and Motion for
> Transcripts and Court Records, are examined, considered and
> denied.
> The State is directed to file response as to the pro se Notice to the
> Court of Registration Records Errors Motion for Emergency Stay of
> Registration Pending Habeas with the magistrate on or before
> August 6, 2024.

*The Clerk is directed to correct the defendant's address as reflected in the Notice of Correct Address and Mycase Access.*

*The Clerk is further directed to notify the defendant and Deputy Prosecuting Attorney Angela Brown.*

*so ORDERED:KW ,4. Salaam, Magistrate. (id/23)*

561.    On July 23, 2024, Mr. Jackson would file a new Personal Affidavit of Judicial Bias along with a motion in response to the order a Motion for Change of Venue and Judge to the attention of Judge Natalie Bokota.

562.    On July 25, 2024, Mr. Jackson would file an appeal in the Court of Appeals regarding the court's order on July 23, 2024, addressing all motions. Mr. Jackson would file a motion to stay pending appeal as well.

563.    On July 25, 2024, Shrader would on her own file the original requested transcripts without reason given as to why they were late for both orders. However, the records indicate that they were submitted by Mr. Jackson, which is false.

564.    On July 30, 2024, the Court would reply stating that they have not been served in the Civil Complaint yet, Mr. Jackson had filed regarding adding them in his latest incomplete draft to the Federal Court. Mr. Jackson plans on providing this latest copy as well to the Trial Court for its records when it is completed. However, Mr. Jackson did provide the Court with the receipt of the appeal and there is an active Habeas Corpus which is claiming Judicial Bias as well. There have also been filed altogether two affidavits of Judicial Bias along with evidence and statements which meet the needs of recusal. They also state that motions and orders to not always need to have explanations but orders regarding Indirect Criminal Contempt do require them and it was to be overseen by a Special Judge to protect against biased by the judge or magistrate overseeing the case. This is required by State Law and has been argued previously.

# VERIFICATION

"I verify under penalties of perjury that all information within this Exhibit is factual and accurate as to the best of my / our abilities."

/S/ _____ Date: 8/5/24      /S/ _____ Date: 8/5/24
Signature: David Edward Jackson III        Signature: Nickole Anna Jackson

/S/ _____ Date: 8/5/24      /S/ _____ Date: 8/5/24
Parent Signature for minor child:          Parent Signature for minor child:
Stoic Azalia Jackson                       Promise Joy Jackson

Plaintiffs, pro-se
507 Oak St. FRNT
Valparaiso IN, 46383
(219) 781-2799
Dated: August 5, 2024

186